UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DOCTORS HOSPITAL OF LAREDO AND LAREDO PHYSICIANS GROUP, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Civil Action No.  5:21-cv-01068 |
| DR. RICARDO CIGARROA, CIGARROA HEART AND VASCULAR INSTITUTE, LAREDO TEXAS HOSPITAL COMPANY, LP D/B/A LAREDO MEDICAL CENTER, AND LAREDO PHYSICIAN ASSOCIATES, | ) ) ) ) ) ) ) | |
| Defendants. | | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

Plaintiffs Doctors Hospital of Laredo ("Doctors Hospital") and Laredo Physicians Group ("Physicians Group"), by and through their attorneys, file this Original Complaint against Defendants Dr. Ricardo Cigarroa, Cigarroa Heart and Vascular Institute ("Cigarroa Institute"), Laredo Texas Hospital Company, LP d/b/a Laredo Medical Center ("LMC"), and Laredo Physician Associates ("LPA"), and respectfully allege the following:

## I.    INTRODUCTION AND SUMMARY OF COMPLAINT

1.    Laredo is a vibrant and growing city with more than 260,000 residents. According to a recent analysis, a population of that size should have at least 20 cardiologists. But Laredo currently has eight, and only six of them are interventional cardiologists, the type needed to support acute-care hospitals and patients with acute cardiology needs.

2.    If a patient with interventional cardiology needs is not treated in Laredo, the patient must travel to different markets, like San Antonio or Houston. But such out-of-market trips carry

significant patient risk. "Time is muscle," and the sooner a patient with acute cardiological needs receives medical care, the better.

3.      To address the lack of interventional cardiologists and ensure that Laredo patients can receive prompt and high quality cardiological care in Laredo, Plaintiffs started actively recruiting new interventional cardiologists to Laredo in August 2020.

4.      When Defendant Dr. Cigarroa, a prominent interventional cardiologist in Laredo, heard of Plaintiffs' plans, he perceived a threat to his dominant market position. Fancying himself the "Kingmaker" of cardiology in Laredo, he has personally boasted to others that he controls 90% of the market. Confronted with increased competition in the interventional cardiology market in the Laredo, Texas Metropolitan Statistical Area, Dr. Cigarroa entered into a conspiracy with the Cigarroa Institute (a cardiology outpatient clinic) and LMC (the largest acute-care hospital in Laredo) to engage in anticompetitive and tortious behavior. Their conspiracy had a simple but pernicious goal: deprive Doctors Hospital and Physicians Group of the doctors and employees needed to compete and provide interventional cardiology services to the Laredo market.

5.      Defendants' conspiracy unfolded in multiple steps. First, Dr. Cigarroa issued threats to Doctors Hospital, Physicians Group, and prospective interventional cardiologists that Plaintiffs were recruiting to not move to Laredo and compete with Dr. Cigarroa. Defendants' coercion and threats worked: multiple qualified interventional cardiologists who were interested in joining Physicians Group, and to whom Physicians Group extended employment offers, decided not to join because of Defendants' acts.

6.      Next, Dr. Cigarroa, his son, and his nephew – representing more than half of the interventional cardiologists in Laredo – gave notice that they would no longer respond to emergency calls at Doctors Hospital, and the son and nephew downgraded their medical staff

privileges to "Courtesy." Instead, Dr. Cigarroa's group would be responding to emergency calls from and referring their patients to Doctors Hospital's only competitor in Laredo: LMC.

7.    Then, emboldened by their success in scaring off competitors, and further cementing their dominant market power and position, Defendants aimed their anticompetitive and tortious behavior at Laredo's only cardiovascular surgeon, Dr. Arthur Santos, who was employed by Physicians Group. Defendants successfully induced Dr. Santos to agree to join Defendant LPA, breaching his enforceable non-compete contractual provision.

8.    Finally, not content with depriving Doctors Hospital of interventional cardiologists, Defendants targeted Doctors Hospital's cardiothoracic surgery technicians to induce them to join LMC and work with Dr. Cigarroa and Dr. Santos.

9.    The conspiracy to monopolize Laredo's interventional cardiology market is a win-win-win for Defendants. Dr. Cigarroa and the clinic avoid competition for interventional cardiological services, while LMC is left as the only provider of acute cardiology services in Laredo, gaining additional patients and corresponding increased revenue. Meanwhile, Doctors Hospital's acute-care cardiology program will be threatened with extinction and, critically, Laredo patients are left with higher health care costs and greater health risks and without competitive market alternatives.

10.    Defendants' anticompetitive and tortious behavior violates federal and state law. Unless restrained, their behavior has damaged and will continue to damage Plaintiffs and the Laredo public. Plaintiffs accordingly seek injunctive relief and damages.

## II.    PARTIES

11.    Plaintiff Doctors Hospital of Laredo is a Texas entity with its principal place of business in Laredo, Texas.

12.     Plaintiff Laredo Physicians Group is a Texas non-profit physicians group, certified by the Texas Medical Board. Its sole member is Independence Laredo LLC, which is registered in Texas with its principal place of business in Laredo, Texas.

13.     Defendant Dr. Ricardo Cigarroa is a resident of Texas. He can be served at 203 Sunset Drive, Laredo, TX 78401.

14.     Defendant Cigarroa Heart and Vascular Institute is a Texas entity with its principal place of business in Laredo, Texas. It can be served through its registered agent: Ricardo G. Cigarroa, 1710 E. Saunders Street, Tower B, 5th Floor, Suite 500, Laredo, TX 78041.

15.     Defendant Laredo Texas Hospital Company, LP d/b/a Laredo Medical Center is a Texas entity with its principal place of business in Laredo, Texas. It can be served through its registered agent: Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620, Austin, TX 78701.

16.     Defendant Laredo Physician Associates is a Texas physicians group with its principal place of business in Laredo, Texas. It is affiliated with LMC and can be served through its President or Chief Executive at its principal place of business: 1700 E. Saunders Street, Laredo, TX 78041.

### III.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 26 because Plaintiffs allege violations of Sections 1 and 2 of the Sherman Antitrust Act and Section 4 of the Clayton Act.

18.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) because they are "are so related to" the antitrust claims that they "form part of the same case or controversy under Article III of the United States Constitution."

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred here. Venue is also proper in this District pursuant to 15 U.S.C. § 22 because on information and belief Defendant LMC transacts business here.

## IV.     FACTS GIVING RISE TO THIS ACTION

### A.     Laredo's two hospitals and associated physician groups.

20.     The Laredo, Texas Metropolitan Statistical Area ("Laredo") has approximately 260,000 residents spread across approximately 108 square miles.

21.     To serve its population, Laredo has two hospitals that qualify as adult acute-care facilities, meaning that they provide inpatient, outpatient, and emergency care for a variety of ailments, ranging from general surgery to cardiology.

22.     Laredo's largest hospital is Defendant LMC. According to its website, LMC is "a 326-bed licensed acute care facility offering a range of inpatient and outpatient services."

23.     Laredo's second largest hospital, located six miles from LMC, is Plaintiff Doctors Hospital. It is a 183-bed acute care facility that offers Laredo residents a variety of medical services and where physicians practice a variety of specialties. Doctors Hospital also houses the Heart and Vascular Center, which includes a recently renovated cardiac surgery suite.

24.     LMC and Doctors Hospital are the only two hospitals in Laredo that offer inpatient interventional cardiovascular services. If a patient with interventional cardiovascular needs does not want to go to LMC or Doctors Hospital, or either hospital is not able to receive that patient, they would have to travel to a different market, the closest being San Antonio.

25.     Dr. Cigarroa, an independent interventional cardiologist, is an undisputed public figure in the Laredo community. His family, medical practice, and penchant for media attention have made him close to a household name, or at least as much of a household name as a cardiologist

can be. Every practicing physician and hospital administrator in Laredo, as well as most of southwest Texas, has heard of Dr. Cigarroa.

26.     Historically, Dr. Cigarroa retained privileges at both LMC and Doctors Hospital and contracted to provide on-call emergency coverage at both hospitals for a certain number of days each month.

27.     Plaintiff Physicians Group is affiliated with Doctors Hospital. Physicians Group has been operating in the Laredo community since 2012. Although it employs physicians who practice a variety of specialties, until October 2021 it did not employ interventional cardiologists. Instead, Doctors Hospital utilized the services of independent cardiologists like Dr. Cigarroa.

28.     Defendant Laredo Physician Associates ("LPA") is affiliated with Defendant LMC, analogous to the relationship between Physicians Group and Doctors Hospital.

29.     As entities and individual physicians engaged in the provision of medical services, Plaintiffs and Defendants are engaged in interstate commerce by soliciting employees and patients inside and outside of Texas and using equipment and materials purchased inside and outside of Texas. Plaintiffs and Defendants also receive federal funding.

**B.     Laredo requires additional interventional cardiologists.**

30.     Cardiology involves the diagnosis and treatment of diseases and conditions of the heart and circulatory system. General cardiologists specialize in the diagnosis and treatment of patients with conditions such as hypertension, high cholesterol, and other conditions that put a patient at a higher risk of stroke or heart attack.

31.     Interventional cardiology is a sub-specialty of cardiology. Interventional cardiologists perform procedures that treat acute heart issues like blockages. Interventional cardiologists use imaging technologies to route a catheter through a patient's arteries to the site of a blockage or other cardiovascular issue where the interventional cardiologist can treat the

blockage or other issue with a variety of technologies. In short, interventional cardiology provides less invasive treatment options for cardiovascular issues than surgery. Where more invasive treatment, such as traditional open-heart surgery, is required, a cardiologist or interventional cardiologist will refer the patient to a cardiovascular surgeon.

32.     These sub-specialties are distinct and not fungible. For example, interventional cardiologists cannot perform open-heart surgery like a cardiovascular surgeon can. Similarly, a cardiovascular surgeon typically will not treat cardiovascular blockages. And general cardiologists may not be able to perform the procedures that either an interventional cardiologist or a cardiovascular surgeon performs.

33.     Interventional cardiologists must be licensed in Texas to practice that specialty. Because medical specialties are not fungible, there is no available substitute for patients. A patient with interventional cardiological medical needs requires an interventional cardiologist.

34.     On August 10, 2020, Emma Montes-Ewing started as Doctors Hospital's new Chief Executive Officer. Upon arrival, she quickly realized that a population the size of Laredo required additional interventional cardiologists to meet the cardiology needs of its residents.

35.     Doctors Hospital also required additional interventional cardiologists. In order to offer acute inpatient cardiological care like Doctors Hospital does, it requires an interventional cardiologist to be available and on call 24 hours a day, 7 days a week, and 52 weeks a year to respond to emergency patient needs. These needs typically include a patient with a cardiac event that may require a surgical intervention to treat or remove a blockage.

36.     Without an interventional cardiologist on call, Doctors Hospital would need to turn away patients with acute cardiological needs because there would be no doctor able to provide the necessary care.

37.     To analyze Laredo's and Doctors Hospital's shortage of interventional cardiologists, Montes-Ewing reviewed a White Paper from Merritt Hawkins titled "Demonstrating Community Need for Physicians." That Paper included a methodology that could be used to assess how many physicians of each specialty were required for populations of various sizes. The methodology was based on research from the University of Pennsylvania's Wharton School.

38.     Montes-Ewing applied that methodology to Laredo based on a conservative assessment of 260,000 residents. The results, titled "Demonstrating Community Need for Physicians in Laredo," revealed that a city the size of Laredo should have at least 20 cardiologists. Ideally most, if not all, of these 20 cardiologists would be interventional cardiologists so that they could provide the full suite of medical procedures to patients, short of invasive heart surgeries.

39.     Laredo, however, had only seven cardiologists and of those, only five were interventional cardiologists.

40.     Dr. Cigarroa and his family accounted for four of the five interventional cardiologists: (1) Dr. Cigarroa; (2) his son, Dr. Ricardo Cigarroa II, who started practicing in Laredo in March 2020; (3) his nephew, Dr. Joaquin Cigarroa; and (4) his brother, Dr. Carlos Cigarroa, who maintains a separate office practice from the other family members practicing cardiology.

41.     Dr. Cigarroa, his son, and his nephew are independent physicians, and as of May 2021 had active privileges at both Doctors Hospital and LMC. They also saw patients at the Cigarroa Institute, an outpatient clinic.

42.     The only additional interventional cardiologist at the time of the study in Laredo was Dr. Pedro Diaz, also an independent physician. The final two cardiologists of the seven identified in Montes-Ewing's analysis were non-interventional "general" cardiologists – they did

not perform the invasive, catheter procedures required by Doctors Hospital and the Laredo community. Both non-interventional cardiologists also indicated their intent to retire in the near future.

43.     Plaintiff Doctors Hospital and Laredo's patient population were experiencing the negative effects of too few cardiologists. For example, with a shortage of cardiologists, there was the potential for longer response times for cariological inpatient consults and procedures at the hospital, as well as longer wait times for patients at outpatient cardiovascular clinics. Moreover, patient wait times at outpatient clinics were also lengthening as the interventional cardiologists in Laredo were being pulled in multiple directions by LMC, Doctors Hospital, and their respective private practice clinics.  Notwithstanding the community need, Cigarroa benefitted from the lack of cardiologists by further enhancing his market power to be used in pernicious ways to the detriment of Plaintiffs and the community.

**C.     Plaintiffs start recruiting new cardiologists, and Defendants immediately engage in anticompetitive behavior to interfere.**

44.     Confronted with a lack of interventional cardiologists in Laredo, and with no interventional cardiologists employed by the Physicians Group, Montes-Ewing focused on recruiting new interventional cardiologists to Laredo. Although they would be employed by the Physicians Group, because the new cardiologists would be affiliated with and have medical staff privileges at Doctors Hospital, Montes-Ewing believed it was important to help with the search and explain her vision for the cardiology program at Doctors Hospital to prospective recruits.

45.     Plaintiffs' success in recruiting new cardiologists to Laredo would result in multiple positive effects. As for the Laredo public, it would provide them with additional cardiologists to help address the gap that Plaintiffs' study had identified. As for Plaintiffs, it would allow them to provide quality medical services to additional patients, fill an unmet critical healthcare need in the

community, and realize additional revenue. It would also provide Plaintiffs with the necessary stability that is required for successfully maintaining and expanding a top-class cardiology program at Doctors Hospital. To start her recruitment efforts, Montes-Ewing first spoke with Dr. Michael Blanc, a qualified interventional cardiologist whom she had known from her prior jobs in hospital administration and management. She invited him and his family to Laredo to visit the city and the facilities offered by Doctors Hospital.

46.     Defendants, however, did not view additional cardiologists in Laredo as a public good. In fact, they viewed Physicians Group's recruitment of new cardiologists as a threat to their heretofore unchallenged market power.

47.     This is because any new interventional cardiologists hired by Physicians Group who would have medical staff privileges at Doctors Hospital would compete with Dr. Cigarroa for intervention cardiological medical care. As well, those patients would be treated at Doctors Hospital, not LMC.

48.     On September 10, 2020, Dr. Cigarroa and Montes-Ewing exchanged text messages. Upon learning that Doctors Hospital and Physicians Group were inviting Dr. Blanc to visit, Dr. Cigarroa unequivocally stated that he was "against" it for two primary reasons. *See* Ex. 1 at 4.

49.     First, Dr. Cigarroa stated that his cardiologist son, Dr. Cigarroa II, was "just beginning" and should be "given . . . a chance to set his feet" and establish his own cardiology practice without worrying about competition from additional cardiologists. *See* Ex. 1 at 4. Second, Dr. Cigarroa stated that he "would have preferred" that Montes-Ewing recruit new cardiologists "through our practice," meaning Dr. Cigarroa's practice. *Id.*

50.     Dr. Cigarroa went on to write that it was "ridiculous" for Plaintiffs to look for new cardiologists without first receiving Dr. Cigarroa's (and his son's) "serious input," *id.* at 7, and

that Montes-Ewing's recruitment efforts outside of Dr. Cigarroa's practice was "a stinging rebuke," *id.* at 11.

51.     To underscore his frustration with Plaintiffs' intent to challenge Dr. Cigarroa's dominant market power, Dr. Cigarroa referred to Montes-Ewing as a "witch CEO" who was falling into "the usual ceo [sic] pitfall" of not sufficiently consulting with him. Ex. 1 at 12, 10. Dr. Cigarroa made his opposition to any new cardiologists, including Dr. Blanc, clear to all the cardiologists in Laredo.

52.     Although Dr. Blanc had enjoyed his visit and was interested in the opportunity, he declined Physicians Group's offer of employment upon learning of Dr. Cigarroa's vehement and organized opposition. Dr. Blanc explained his reasoning to Montes-Ewing on multiple occasions in October and December 2020: Dr. Cigarroa had a monopoly for cardiology in Laredo; Dr. Blanc knew that Dr. Cigarroa did not want him to move to Laredo; and at this stage of his career, Dr. Blanc could not "start a war" with the Cigarroa family.

53.     Plaintiffs next invited cardiologist Dr. Michael Bennett to Laredo to visit Plaintiffs' facilities as part of their recruitment efforts. He enjoyed the visit and expressed his interest and excitement at the possibility of moving to Laredo and joining Physicians Group's practice.

54.     But, again, Defendants repeated their pattern and practice of anticompetitive behavior. As with Dr. Blanc, Defendants made it clear to anyone who would listen, including Doctors Hospital, Physicians Group, and Dr. Bennett, that they opposed bringing new cardiologists to Laredo, including Dr. Bennett.

55.     And, again, Defendants' anticompetitive actions worked. Dr. Bennett declined Physicians Group's employment offer on or about April 5, 2021. He learned that Dr. Cigarroa did

not want him moving to Laredo, and as with Dr. Blanc, was not interested in opposing Dr. Cigarroa and Defendants' dominant control of the interventional cardiology market in Laredo.

**D.    Defendants continue their anticompetitive and tortious behavior by making additional threats.**

56.    With Defendants having successfully flexed their market power and restrained trade to prevent Physicians Group from hiring Dr. Blanc and Dr. Bennett, Plaintiffs tried to recruit two new cardiologists.

57.    The first recruit was Dr. Mehmet Çilingiroğlu, a cardiologist practicing in San Diego. Physicians Group and Dr. Çilingiroğlu executed a Letter of Intent ("LOI") on or about July 15, 2021.

58.    Physicians Group's second recruit was Dr. Marc Feldman, a cardiologist and Professor of Medicine with an active research laboratory at and corresponding funding from the University of Texas Health Science Center at San Antonio ("UTSA"). Physicians Group and Dr. Feldman executed an LOI on or about July 15, 2021. Dr. Feldman has been a resident of San Antonio at all times relevant to the allegations in this Complaint. Dr. Feldman was also a clinical instructor to Dr. Çilingiroğlu at UTSA.

59.    Dr. Feldman's intent was to practice in Laredo part time, likely seven (7) days each month. This would allow him to continue to live in San Antonio, so that Dr. Feldman could retain his research laboratory at UTSA, as well as the corresponding university funding. Plaintiffs knew of and agreed with Dr. Feldman's intent to remain based in San Antonio.

60.    When Dr. Cigarroa learned of Plaintiffs' recruitment of Dr. Çilingiroğlu and Dr. Feldman, he and Defendants continued their anticompetitive and tortious behavior to restrain the interventional cardiology market in Laredo.

61.     On or about July 14, 2021, Dr. Cigarroa attended a Doctors Hospital General Medical Staff meeting. Although Dr. Cigarroa had the right to attend because of his privileges at Doctors Hospital, it was unusual: Dr. Cigarroa had not attended a General Medical Staff meeting in over a year.

62.     The reason for Dr. Cigarroa's attendance soon became clear. On the topic of recruiting Dr. Çilingiroğlu and Dr. Feldman, Dr. Cigarroa stated that "we can't stand for this" because these new cardiologists would be competing for patients in Laredo. And Defendants did not want any new competition.

63.     Dr. Cigarroa doubled down one week later, on or about July 21, 2021, when he attended a Doctors Hospital Department of Medicine Committee meeting. He stated that Laredo had enough cardiologists and accordingly urged the Committee to reject Plaintiffs' recruitment of Dr. Çilingiroğlu and Dr. Feldman. The Committee declined to do so.

64.     While flexing his market power by directly demanding that Plaintiffs cease their recruitment efforts, Dr. Cigarroa was also working behind the scenes to sabotage the recruitment of Dr. Feldman.

65.     On or about August 5, 2021, Dr. Feldman texted Doctors Hospital's CEO, Montes-Ewing, asking to speak with her. During a subsequent phone call, Dr. Feldman informed Montes-Ewing that Dr. Cigarroa had threatened UTSA's Dr. Allen Anderson. Dr. Anderson was the Chair of UTSA's Cardiology Department.

66.     Dr. Cigarroa had boasted to Dr. Anderson (who was working in San Antonio at the time of the call) that he controlled 90% of the Laredo cardiology market, and that he did not want Dr. Feldman to come to Laredo. To ensure that Dr. Feldman did not come to Laredo, Dr. Cigarroa threatened Dr. Allen and UTSA, saying that he would stop referring his patients to UTSA for

cardiac surgeries and would begin referring those patients to UTSA's competition if Dr. Feldman joined Physicians Group.

67.     Dr. Cigarroa's acts were directed at entities and individuals in San Antonio and were in furtherance of Defendants' anticompetitive and tortious behavior.

68.     Dr. Cigarroa's threat was significant to UTSA. Until September 2021, Defendant Physicians Group's Dr. Santos was the only cardiovascular surgeon in Laredo. If a patient had open heart or valve replacement surgery in Laredo, Dr. Santos performed the procedure. And if he chose not to, was unable to, or if the treating cardiologist referred elsewhere, Laredo residents were referred to hospitals and cardiovascular surgeons in other locations, chiefly San Antonio.

69.     UTSA was one such hospital for referrals. On information and belief, Dr. Cigarroa referred his patients who required surgery that Dr. Santos could or would not perform to UTSA, which was a significant source of revenue for UTSA.

70.     Confronted with Dr. Cigarroa's threat and the potential for a significant loss of revenue, Dr. Anderson asked to meet with Dr. Feldman in person at UTSA. During that meeting, Dr. Anderson instructed Dr. Feldman "not to come to Laredo as that was Dr. Cigarroa's territory." To effectuate that demand, Dr. Anderson informed Dr. Feldman that if he accepted Physicians Group's offer (having already signed an LOI at this point), UTSA "will take your lab away from you," including the corresponding funding.

71.     Dr. Anderson's threat to Dr. Feldman was a direct result of and caused by Dr. Cigarroa's threat to cease referring patients to UTSA if Dr. Feldman started practicing with Physicians Group in Laredo. Dr. Anderson's threat was an additional act in San Antonio in furtherance of Defendants' anticompetitive and tortious behavior.

72.     Later that day (still August 5), Montes-Ewing attended a dinner meeting with Laredo's cardiologists to discuss Doctors Hospital's plans for its cardiology program. Defendant Dr. Cigarroa and his son were in attendance.

73.     After Montes-Ewing's short presentation, Dr. Cigarroa II demanded that Montes-Ewing and Physicians Group terminate any contracts with Dr. Çilingiroğlu and Dr. Feldman and refuse to hire them. His reasoning echoed his father's: Dr. Cigarroa II needed time to develop his practice in Laredo and wanted to do so without any competition from new and well-qualified cardiologists.

74.     Dr. Cigarroa agreed, stating that "we don't like it and we will not stand for it," with "it" being Physicians Group's hiring of Dr. Çilingiroğlu and Dr. Feldman. He followed up by explicitly threatening Montes-Ewing with the statement that she "will learn what it is like to go against this group."

75.     On or about August 9, 2021, Dr. Cigarroa and Dr. Cigarroa II sent a letter to Doctors Hospital informing it that they would stop providing emergency coverage for the hospital after the required 90-days' notice. Moreover, Dr. Cigarroa II would be dropping his privilege status at Doctors Hospital from "Active" to "Courtesy."

76.     On or about August 12, 2021, Montes-Ewing spoke with both Dr. Çilingiroğlu and Dr. Feldman. During that call, Dr. Feldman informed Montes-Ewing that Dr. Cigarroa's anticompetitive and tortious act had worked: UTSA pulled its funding from Dr. Feldman's research laboratory. Because Dr. Feldman's plan had been to work part-time in Laredo so that he could retain his laboratory and funding at UTSA, Dr. Feldman was upset, anxious, and concerned. As with Dr. Blanc and Dr. Bennett, Defendants' anticompetitive behavior and threats were scaring off qualified cardiologists from practicing in Laredo.

77.     On August 24, 2021, Dr. Çilingiroğlu emailed Montes-Ewing to express his concern with Dr. Cigarroa's threat to stop referring patients to UTSA if Dr. Feldman came to Laredo, and Dr. Allen's threat in response to withhold funding for Dr. Feldman's UTSA laboratory. Dr. Çilingiroğlu made it clear that he was concerned about joining Physicians Group's practice in Laredo. Hesitantly, Dr. Çilingiroğlu began practicing with Physicians Group on October 4, 2021.

78.     Soon thereafter, Dr. Feldman informed Physicians Group that he would not be joining their practice in Laredo.

79.     Notably, when Dr. Feldman informed UTSA that he would not be joining Physicians Group's practice in Laredo, UTSA's funding of his research laboratory was restored.

80.     Defendants' threats and barriers to entry were successful. UTSA acceded to Dr. Cigarroa's demands and coerced Dr. Feldman to not accept Physicians Group's employment offer, eliminating and reducing competition in Laredo's interventional cardiology market.

81.     Defendants' anticompetitive and tortious interference with the prospective employment contract between Physicians Group and Dr. Feldman caused Plaintiffs to suffer monetary damages.

82.     Plaintiffs' damages include, but are not limited to, their likely need to hire locum tenens ("Locum") cardiologists to serve the patient population if Defendants' anticompetitive and tortious behavior continues. These Locum physicians are temporary fixes and do not allow a hospital to maintain and grow a stable and top-quality cardiology program, nor does this practice offer the Laredo patient community continuity of care with respect to their caregivers. Moreover, Locum cardiologists are much more expensive than hiring full or part-time cardiologists,

sometimes as much as two to three times the cost. If Defendants' anticompetitive and tortious behavior forces Plaintiffs to use Locum cardiologists, the higher costs will be unsustainable.

83.     Indeed, these costs will raise the costs of care, and will be indirectly passed to consumers, because higher coverage costs compel the hospital to seek higher reimbursement rates from commercial payers, like insurers, as an offset. This, in turn, results in higher premiums, co-pays and deductibles paid by consumers.

84.      Ultimately, Doctors Hospital's ability to provide care to patients in cardiology and other specialties will suffer, and its cardiology program may be shuttered, leaving LMC as the only acute-care hospital offering cardiology care in Laredo. Indeed, that is the object of Defendants' anticompetitive plan.

85.     Defendants' anticompetitive and tortious behavior has also had, and will continue to have, a significant negative impact on Laredo residents needing cardiological medical care. By conspiring to limit the number of cardiologists in Laredo, Defendants are restricting the public's choice in selecting their physician and preventing the population from being served by the appropriate number of cardiologists, resulting in potentially dangerous wait times for emergency care and/or the need to travel outside of the Laredo market to seek the care required.

**E.     Dr. Cigarroa, the Cigarroa Institute and LMC.**

86.     Defendants Dr. Cigarroa, LMC, and the Cigarroa Institute are working together towards their common goal to target and keep Plaintiffs from hiring competing interventional cardiologists for the Laredo market, so that Laredo patients needing interventional cardiology care will only be seen at LMC and the Cigarroa Institute.

87.     Dr. Cigarroa has repeatedly stated to physicians and hospital staff in Laredo that he is in league with LMC. Indeed, Dr. Cigarroa has asserted that the current CEO of LMC, Jorge Leal, is "in [his] pocket" and under his control.

- 17 -

88.     Moreover, Dr. Cigarroa is well aware of the necessity of interventional cardiologists to sustaining a cardiology program at an acute care hospital. At least one interventional cardiologist must be on call 24/7 to respond to emergency calls. Because constant coverage is needed and doctors take vacation or become ill, multiple interventional cardiologists are needed.

89.     After Defendants' successfully conspiring and interfering with Plaintiffs' efforts to hire Dr. Blanc, Dr. Bennett, and Dr. Feldman, Dr. Cigarroa followed through on a threat he had made to Montes-Ewing if she persisted in trying to recruit new cardiologists. On August 6, 2021, Dr. Cigarroa informed Doctors Hospital that he, his son, and his nephew were providing notice that they would cease responding to emergency calls at Doctors Hospital and that his son was lowering his privilege status.

90.     This left Doctors Hospital with two interventional cardiologists to provide 24-hour, seven-day-a-week emergency coverage. Splitting 24/7 coverage between two cardiologists day after day and month after month is untenable.

91.     LMC, Dr. Cigarroa, and the Cigarroa Institute all benefit from their conspiracy. LMC benefits through increased patient counts, patient referrals, and revenue. It also benefits from the weakening of its only competitor in Laredo: Doctors Hospital.

92.     Dr. Cigarroa benefits as well. He has furthered his dominant market position, and, in conjunction with LMC, has ensured they will not hire or associate with new interventional cardiologists to avoid competition.

93.     The tightknit relationship between Dr. Cigarroa, the Cigarroa Institute, and LMC is furthered evidenced by LMC's intent, on information and belief, to purchase part of the Cigarroa

Institute. This transaction will enrich Dr. Cigarroa and ensure his patients at the Cigarroa Institute would now only go to LMC for cardiological procedures.

94.     As well, to further help LMC grow its cardiology program while harming Doctors Hospital, Dr. Cigarroa, LMC, and LPA conspired with each other to hire Doctors Hospital's skilled cardiology staff. These cardiology staff employees support the interventional cardiologists at Doctors Hospital, and without them Doctors Hospital would not be able to provide acute inpatient cardiological services.

95.     Dr. Cigarroa's recruitment efforts have included in-person solicitations and directly calling the employees' personal cell phones. Dr. Cigarroa has informed the technicians that he controls LMC, and can get LMC to agree to whatever compensation the surgery technicians want in order to leave Doctors Hospital.

**F.      Defendants unlawfully conspire to induce Dr. Santos to violate his non-compete with Physicians Group.**

96.     After preventing Plaintiffs from bringing new cardiologists into Laredo, Defendants further cemented their market share and market power by inducing Dr. Santos to breach his covenant not to compete with Physicians Group.[1]

97.     Up until September 2021, Dr. Santos was the only cardiovascular surgeon in Laredo available to perform cardiovascular procedures such as open heart and valve replacement surgeries.

98.     Dr. Santos and Dr. Cigarroa have a professional and close relationship.

---

[1]     Pursuant to the terms of the Agreement between Dr. Santos and Physicians Group, Physicians Group is filing a contemporaneous arbitration demand on Dr. Santos to enforce the Agreement.

99.     On May 13, 2020, Physicians Group and Dr. Santos executed a Physician Employment Agreement ("Agreement") that included the following provision:

> Section 5.3(b): For one (1) year following the termination of this Agreement, Physician shall not, directly or indirectly, provide Specialty services within a fifteen (15) mile radius from the Offices where Physician spends twenty-five percent (25%) or more of his/her time providing services under this Agreement (the "Practice Territory").

In addition to being reasonable in terms of duration and scope, Dr. Santos's Agreement included a "buy-out" provision as required by Texas law.

100.    Physicians Group and Dr. Santos executed the Agreement concurrently with a separate Confidential Release and Settlement Agreement ("Release") that resolved a dispute regarding a prior employment agreement between Physicians Group and Dr. Santos. As consideration for resolving the dispute and agreeing to the new Agreement, including the covenant not to compete, Physicians Group provided Dr. Santos with monetary compensation.

101.    If Dr. Santos terminated the Agreement without cause prior to May 1, 2023, the Release obligated him to pay back 1/36th of the consideration that Physicians Group paid for each month that remained in the Initial Term as set forth in the Agreement.

102.    Prior to September 17, 2021, on information and belief, Defendants Dr. Cigarroa, LMC, and LPA contacted Dr. Santos to recruit him to leave Physicians Group and join LPA as their cardiovascular surgeon, who would only perform surgeries at LMC.

103.    On information and belief, Dr. Santos informed Dr. Cigarroa, LMC and LPA that he had a non-compete provision as part of his Agreement with Physicians Group. LPA typically includes non-compete provisions in its contracts with physicians and would have inquired as to whether Dr. Santos had such an agreement with Physicians Group. Defendants nonetheless encouraged Dr. Santos to resign from Physicians Group.

104.    On September 20, 2021, Dr. Santos informed Physicians Group that he was resigning effective December 16, 2021. On information and belief, Dr. Santos will be moving his cardiovascular surgery practice to LPA to perform surgeries at LMC and continue to receive cardiological surgery referrals from Dr. Cigarroa, Dr. Cigarroa II, and Dr. Joaquin Cigarroa.

105.    This tortious interference benefits all Defendants: Dr. Cigarroa continues to weaken Plaintiffs' ability to provide cardiological services; LPA and LMC receive all of Dr. Santos's patients and corresponding revenue; and the Cigarroa Institute will receive new patient referrals from Dr. Santos.

106.    While employed by Physicians Group, Dr. Santos spent at least 25% of his time at Physicians Group, which is located at 6801 McPherson Road, Suite 331, Laredo, Texas 78041.

107.    LMC and LPA, where Dr. Santos intends to move his practice, is located at 1700 E Saunders Street, Laredo, Texas, 78041.

108.    LMC and LPA are 2.9 miles from Physicians Group, which is encompassed by the reasonable geographic scope of Dr. Santos's covenant not to compete.

**G.    Relevant Product Market and Geographic Market.**

109.    As alleged above, interventional cardiology is a subspecialty of cardiology that constitutes a distinct product market because there are no substitutes. Patients with acute cardiac conditions who require certain procedures, including the treatment and removal of stents, require interventional cardiologists.

110.    In addition, acute-care hospitals that offer cardiological services require an interventional cardiologist to be on call at all times.

111.    Plaintiffs have attempted to recruit new interventional cardiologists to move to Laredo, which Defendants have been unlawfully conspiring to prevent.

112.    Laredo is the relevant geographic market. It has approximately 260,000 residents and only two acute-care hospitals that offer inpatient interventional cardiological care: Plaintiff Doctors Hospital and Defendant LMC.

113.    Based on patient migration data, the lack of sufficient interventional cardiologists in Laredo causes Laredo patients with cardiological needs to travel to a hospital in San Antonio, a different geographic market, which is at least 150 miles away, or over two hours by car. There are no closer reasonable substitutes that offer the same high level of care as does Doctors Hospital.

114.    Traveling to San Antonio for interventional cardiological services carries significant risk. Patients with acute cardiological needs must receive treatment as soon as possible. "Time is muscle," because each additional minute in the delay of sufficient blood flow to the heart causes tissue damage, which impacts a patient's recovery and may result in death.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**RESTRAINT OF TRADE IN VIOLATION OF SECTION 1 OF THE SHERMAN ACT
(AGAINST DEFENDANTS DR. CIGARROA, CIGARROA INSTITUTE, AND LMC)**

115.    Plaintiffs incorporate the material fact allegations in the preceding paragraphs.

116.    Defendants possess dominant market power in the distinct product market of interventional cardiologists and interventional cardiological services and the geographic market of Laredo. Defendant Dr. Cigarroa has market power because he controls the actions of himself, his son, and his nephew, who represent more than half of the interventional cardiologists in Laredo. The Cigarroa Institute has market power because it receives referrals from a majority of the interventional cardiologists in Laredo. Defendant LMC has market power because it is the largest acute-care hospital in Laredo and only one of two such hospitals.

117.     Defendants have conspired to restrain the product market for interventional cardiologists and interventional cardiological services in Laredo by acting to prevent Plaintiffs from recruiting new interventional cardiologists to practice in Laredo.

118.     Defendants successfully conspired to prevent Plaintiffs from hiring interventional cardiologists Dr. Blanc and Dr. Bennett.

119.     Defendants also successfully conspired to coerce UTSA to threaten Dr. Feldman with losing his research laboratory and funding at UTSA if he joined Physicians Group's practice, part time, in Laredo. When UTSA removed Dr. Feldman's funding, he likewise was precluded from joining Physicians Group's practice.

120.     Defendants' acts, practices, and conduct violate Section 1 of the Sherman Act and have injured Plaintiffs' business by unlawfully restraining Plaintiffs' ability to recruit new interventional cardiologists to Laredo. *See* 15 U.S.C. § 1.

121.     Dr. Cigarroa and Cigarroa Institute benefit from the antitrust conspiracy through ensuring there is less competition for interventional cardiological services in Laredo, allowing them to charge supercompetitive rates. LMC benefits from the antitrust conspiracy by receiving additional cardiology patients and corresponding revenue through Dr. Cigarroa, his son, and his nephew moving their practice to LMC. Likewise, LMC gets additional patients (and the right to collect revenues from those patients and their insurers) by precluding Doctors Hospital and Physicians Group from staffing its cardiology clinic and practice.

122.     Defendants' acts, practices, and conduct are per se unlawful; they are manifestly anticompetitive, reduce consumer choice, and reduce the supply of interventional cardiologists in the Laredo market.

123.   Defendants' anticompetitive conduct and conspiracy are also unreasonable and unlawful because they have significant anticompetitive effects and no pro-competitive benefits or justification.

124.   Plaintiffs have been injured because they are unable to successfully hire new interventional cardiologists who are necessary to treat the Laredo community and sustain and grow their cardiology program. Without new interventional cardiologists, Plaintiffs' ability to continue providing cardiological services, including acute care, and Laredo patients' ability to receive timely, high quality emergent interventional cardiology care are in jeopardy.

125.   Plaintiffs' injuries were and are a direct and proximate result of Defendants' anticompetitive conduct.

126.   The injuries to Plaintiffs and the Laredo public are injuries to the competitive process and are of the type that the Sherman Act is intended to prohibit. Defendants' anticompetitive conduct has reduced the availability of interventional cardiologists and interventional cardiological services in Laredo. Given the existing shortage of interventional cardiologists, precluding the hiring of even one additional interventional cardiologist has a marked effect on competition and patient choice.

127.   Plaintiffs have suffered and will continue to suffer monetary damages unless the Court enjoins Defendants' continuing violations and orders them to compensate Plaintiffs.

### SECOND CAUSE OF ACTION
### MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT
### (AGAINST DEFENDANTS DR. CIGARROA, CIGARROA INSTITUTE, AND LMC)

128.   Plaintiffs incorporate the material fact allegations in the preceding paragraphs.

129.   Defendants possess dominant market power in the distinct product market of interventional cardiologists and interventional cardiological services and the geographic market of Laredo. Defendant Dr. Cigarroa has market power because he controls the actions of himself, his

son, and his nephew, who represent more than half of the interventional cardiologists in Laredo. The Cigarroa Institute has market power because it receives referrals from a majority of the interventional cardiologists in Laredo. Defendant LMC has market power because it is the largest acute-care hospital in Laredo and only one of two such hospitals.

130.    Defendants have used their dominant market power and monopolization of the product market for interventional cardiologists and interventional cardiological services in Laredo to coerce, threaten, and prevent Plaintiffs from recruiting new interventional cardiologists to Laredo.

131.    Defendants successfully used their dominant market power and monopolization to prevent Physicians Group from hiring interventional cardiologists Dr. Blanc and Dr. Bennett.

132.    Defendants also successfully used their dominant market power and monopolization to threaten Dr. Feldman with losing his research laboratory and funding at UTSA if he joined Physicians Group's practice, part time, in Laredo. When UTSA removed Dr. Feldman's funding, he was precluded from joining Physicians Group's practice.

133.    Defendants' acts, practices, and conduct violate Section 2 of the Sherman Act and have injured Plaintiffs' business by unlawfully restraining Plaintiffs' ability to recruit new interventional cardiologists to Laredo. *See* 15 U.S.C. § 2.

134.    The purpose of Defendants' anticompetitive conduct is to willfully maintain or expand their dominant market power and monopolization of the product market for interventional cardiologists and interventional cardiological services in Laredo.

135.    Dr. Cigarroa and Cigarroa Institute benefit from the monopoly through ensuring there is less competition for interventional cardiological services in Laredo, allowing them to charge supercompetitive rates. LMC benefits from the monopoly by receiving additional

cardiology patients and corresponding revenue through Dr. Cigarroa, his son, and his nephew moving their practice to LMC. Likewise, LMC gets additional patients (and the right to collect revenues from those patients and their insurers) by precluding Doctors Hospital and Physicians Group from staffing its cardiology clinic and practice.

136.    Defendants' acts, practices, and conduct are per se unlawful; they are manifestly anticompetitive, reduce consumer choice, and reduce the supply of interventional cardiologists in the Laredo market.

137.    Defendants' anticompetitive conduct and conspiracy are also unreasonable and unlawful because they have significant anticompetitive effects and no pro-competitive benefits or justification.

138.    Plaintiffs have been injured because they are unable to successfully hire new interventional cardiologists necessary to treat the Laredo community and sustain and grow their cardiology program. Without new interventional cardiologists, Plaintiffs' ability to continue providing cardiological services, including acute care, and Laredo patients' ability to receive timely, high quality emergent interventional cardiology care are in jeopardy.

139.    Plaintiffs' injuries were and are a direct and proximate result of Defendants' anticompetitive conduct.

140.    The injuries to Plaintiffs and the Laredo public are injuries to the competitive process and are of the type that the Sherman Act is intended to prohibit. Defendants' anticompetitive conduct has reduced the availability of interventional cardiologists and interventional cardiological services in Laredo. Given the existing shortage of interventional cardiologists, precluding the hiring of even one additional interventional cardiologist has a marked effect on competition and patient choice.

141.    Plaintiffs have suffered and will continue to suffer monetary damages unless the Court enjoins Defendants' continuing violations and orders them to compensate Plaintiffs.

### THIRD CAUSE OF ACTION
**ATTEMPTED MONOPOLIZATION IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT
(AGAINST DEFENDANTS DR. CIGARROA, CIGARROA INSTITUTE, AND LMC)**

142.    Plaintiffs incorporate the material fact allegations in the preceding paragraphs.

143.    Through their pattern and practice of anticompetitive acts and behavior, Defendants' intend to secure dominant market power and monopolization in the distinct product market of interventional cardiologists and interventional cardiological services in Laredo to prevent having to compete with new cardiologists for patients and revenue.

144.    Defendants' acts, threats, and tactics have had a direct adverse effect on competition in Laredo, as evidenced by their success in preventing Physicians Group from hiring interventional cardiologists Dr. Blanc, Dr. Bennett, and Dr. Feldman.

145.    Defendants' conduct constitutes attempted monopolization that violates Section 2 of the Sherman Act. *See* 15 U.S.C. § 2.

146.    The purpose of Defendants' anticompetitive conduct is to willfully obtain, maintain, or expand their dominant market power and monopolization of the product market for interventional cardiologists and interventional cardiological services in Laredo.

147.    Dr. Cigarroa and Cigarroa Institute benefit from the attempted monopolization through ensuring there is less competition for interventional cardiological services in Laredo, allowing them to charge supercompetitive rates. LMC benefits from the attempted monopolization by receiving additional cardiology patients and corresponding revenue through Dr. Cigarroa, his son, and his nephew moving their practice to LMC. Likewise, LMC gets additional patients (and

the right to collect revenues from those patients and their insurers) by precluding Doctors Hospital and Physicians Group from staffing its cardiology clinic and practice.

148.    Defendants' acts, practices, and conduct are per se unlawful; they are manifestly anticompetitive, reduce consumer choice, and reduce the supply of interventional cardiologists in the Laredo market.

149.    Defendants' anticompetitive conduct and conspiracy are also unreasonable and unlawful because they have significant anticompetitive effects and no pro-competitive benefits or justification.

150.    Plaintiffs have been injured because they are unable to successfully hire new interventional cardiologists necessary to treat the Laredo community and sustain and grow their cardiology program. Without new interventional cardiologists, Plaintiffs' ability to continue providing cardiological services, including acute care, and Laredo patients' ability to receive timely, high quality emergent interventional cardiology care are in jeopardy.

151.    Plaintiffs' injuries were and are a direct and proximate result of Defendants' anticompetitive conduct.

152.    The injuries to Plaintiffs and the Laredo public are injuries to the competitive process and are of the type that the Sherman Act is intended to prohibit. Defendants' anticompetitive conduct has reduced the availability of interventional cardiologists and interventional cardiological services in Laredo. Given the existing shortage of interventional cardiologists, precluding the hiring of even one additional interventional cardiologist has a marked effect on competition and patient choice.

153.    Plaintiffs have suffered and will continue to suffer monetary damages unless the Court enjoins Defendants' continuing violations and orders them to compensate Plaintiffs.

**FOURTH CAUSE OF ACTION**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE RELATIONS**
**(AGAINST DEFENDANTS DR. CIGARROA, CIGARROA INSTITUTE, AND LMC)**

154.    Plaintiffs incorporate the material fact allegations in the preceding paragraphs.

155.    Defendants have wrongfully and intentionally interfered with Physicians Group's prospective contract and business relationship with Dr. Marc Feldman.

156.    Physicians Group and Dr. Feldman executed a Letter of Intent on or about July 15, 2021, in which Dr. Feldman agreed to join Physicians Group's cardiology practice in Laredo, part-time, while continuing to work at his research laboratory at UTSA.

157.    Before Dr. Feldman signed an employment contract with Physicians Group, Defendants intentionally interfered. Upon learning that Dr. Feldman had signed an LOI with Physicians Group, Dr. Cigarroa threatened UTSA's Dr. Allen Anderson, the Chair of UTSA's Cardiology Department. Dr. Cigarroa stated that he would cease referring patients to UTSA if Dr. Feldman joined Physicians Group's practice in Laredo.

158.    Dr. Cigarroa intended this threat to interfere with and prevent Dr. Feldman from signing an employment contract with Plaintiffs.

159.    Dr. Cigarroa had a meeting of the minds with LMC prior to interfering with Dr. Feldman's prospective employment contract with Physicians Group as part of the broader antitrust conspiracy to restrict competition for interventional cardiology in Laredo and ensure LMC had a dominant market share for interventional cardiology in Laredo.

160.    Defendants Dr. Cigarroa, Cigarroa Institute, and LMC benefitted from this interference by restricting competition for interventional cardiological services in Laredo.

161.    Defendants' intentional interference was independently tortious or unlawful because it violated the United States Anti-Kickback Law, 42 U.S.C. § 1320a-7b and the Texas

Patient Solicitation Act, Tex. Occ. Code § 102.001 *et seq.*, by conditioning future patient referrals to UTSA on their pressuring of Dr. Feldman to not accept Plaintiffs' employment offer.

162.    Defendants' intentional interference was also independently unlawful by being part of and in furtherance of Defendants' antitrust violation.

163.    Defendants' intentional interference proximately caused Plaintiffs to suffer actual damage or loss by preventing Dr. Feldman from joining Plaintiffs' practice.

**FIFTH CAUSE OF ACTION**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(AGAINST DEFENDANTS DR. CIGARROA, CIGARROA INSTITUTE, LMC, AND LPA)**

164.    Plaintiffs incorporate the material fact allegations in the preceding paragraphs.

165.    Dr. Santos signed a valid and enforceable Physician Employment Agreement ("Agreement") with Plaintiff Physicians Group that included a covenant not to compete that restricted his ability to practice cardiology within a 15-mile radius of where Physicians Group was located for a period of one year.

166.    Defendants Dr. Cigarroa, Cigarroa Institute, LMC, and LPA were aware of Dr. Santos's Agreement with Plaintiff Physicians Group, including the covenant not to compete.

167.    Defendants willfully and intentionally interfered with Dr. Santos's Agreement with Physicians Group by inducing him to breach his Agreement and agree to join Defendants' cardiology practice.

168.    Defendants Dr. Cigarroa, Cigarroa Institute, LPA and LMC benefitted from this tortious interference by increasing their revenue through increased surgical procedures performed at their facilities and additional patients referred to and by Dr. Santos and by further weakening Doctors Hospital's and Physicians Group's ability to offer interventional cardiological services.

169.   Defendants' interference proximately damaged Plaintiff Physicians Group, and Physicians Group suffered actual damage or loss.

## VI.   ATTORNEY'S FEES

170.   Defendants' actions have forced Plaintiffs to retain the undersigned attorneys to protect their rights and to prosecute these claims. Plaintiffs are entitled to an award of reasonable attorney's fees and expenses.

## VII.   CONCLUSION AND REQUEST FOR RELIEF

171.   Defendants have conspired and exhibited a pattern and practice of anticompetitive and tortious behavior by attempting to use, and on multiple occasions successfully using, their market and monopoly power to restrain competition to prevent Plaintiffs from hiring additional interventional cardiologists in the Laredo market. Accordingly, Plaintiffs request the following relief:

   a.   A judgment that Defendants have violated Sections 1 and 2 of the Sherman Antitrust Act, corresponding treble damages, and permanent injunctive relief prohibiting Defendants from engaging in anticompetitive conduct;

   b.   A judgment that Defendants tortiously interfered with Physicians Group's prospective employment contract with Dr. Feldman, and corresponding damages;

   c.   A judgment that Defendants tortiously interfered with the Employment Agreement between Dr. Santos and Plaintiff Physicians Group, and corresponding damages;

   d.   Pre- and post-judgment interest as allowed by law;

   e.   Reasonable and necessary attorney's fees in expenses; and

   f.   All other equitable or legal relief as is proper.

Dated:  October 29, 2021                    Respectfully submitted,

 

*/s/ Bryce L. Callahan*
Bryce L. Callahan
State Bar No. 24055248
James E. Zucker
State Bar No. 24060876
Justin S. Rowinsky
State Bar No. 24110303
Myra Siddiqui
State Bar No. 24106434
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
Telephone: (713) 632-8000
Facsimile: (713) 632-8002
bcallahan@yettercoleman.com
jzucker@yettercoleman.com
jrowinsky@yettercoleman.com
msiddiqui@yettercoleman.com

**ATTORNEYS FOR PLAINTIFFS DOCTORS HOSPITAL OF LAREDO AND LAREDO PHYSICIANS GROUP**