**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| DOCTORS HOSPITAL OF LAREDO, | § | |
| LAREDO PHYSICIANS GROUP, | § | |
| *Plaintiffs,* | § | SA-21-CV-01068-XR |
| | § | |
| v. | § | |
| | § | |
| DR. RICARDO CIGARROA, | § | |
| CIGARROA HEART AND VASCULAR | § | |
| INSTITUTE, LAREDO TEXAS | § | |
| HOSPITAL COMPANY, LP, D/B/A | § | |
| LAREDO MEDICAL CENTER, AND | § | |
| LAREDO PHYSICIAN ASSOCIATES, | § | |
| *Defendants.* | § | |

## ORDER

On this date, the Court considered a motion to dismiss filed by Defendants Dr. Ricardo

Cigarroa and the Cigarroa Heart and Vascular Institute (ECF No. 34) and a motion to dismiss filed

by Defendants Laredo Medical Center and Laredo Physician Associates (ECF No. 35). After

careful consideration, the Court issues the following order.

## BACKGROUND[1]

This antitrust case concerns the provision of interventional cardiology services in Laredo,

Texas. Interventional cardiology is a subspecialty of cardiology. ECF No. 22 ¶ 41. While general

cardiologists specialize in the diagnosis and treatment of heart conditions that may lead to a stroke

or heart attack, interventional cardiologists perform specific procedures to treat acute heart

complications. *Id.* ¶¶ 40–41. For example, general cardiologists diagnose and treat hypertension

and high cholesterol. *Id.* ¶ 40. Interventional cardiologists, on the other hand, "perform procedures

---

[1] The Court recites the facts as alleged in Plaintiffs' amended complaint.

1

that treat acute heart issues like blockages and use imaging technologies to route a catheter through a patient's arteries to the site of a blockage[.]" *Id.* ¶ 41. Interventional cardiologists also treat patients who require "Primary Percutaneous Coronary Intervention ('PCI') to treat a ST-segment-elevation myocardial infarction ('STEMI')," commonly known as a heart attack. *Id.* ¶ 143. Interventional cardiologists offer less invasive treatment options for acute cardiac conditions. *Id.* ¶ 41. But if a patient requires open-heart surgery or a similar, more invasive treatment, a general or interventional cardiologist will refer the patient to a cardiovascular surgeon. *Id.* ¶ 42.

In Texas, an interventional cardiologist must be licensed to practice that subspecialty. *Id.* ¶ 44. "Indeed, the American Board of Internal Medicine also requires 12 months of fellowship training in addition to the required three years of cardiovascular disease training to receive a board certification in the subspecialty of interventional cardiology." *Id.* As a result, "a cardiovascular surgeon typically will not treat cardiovascular blockages using PCI techniques." *Id.* ¶ 43. Similarly, interventional cardiologists "cannot perform open-heart surgery like a cardiovascular surgeon can." *Id.* General cardiologists also "may not be able to perform the procedures that either an interventional cardiologist or a cardiovascular surgeon performs." *Id.* In short, "[a] patient with interventional cardiological medical needs requires an interventional cardiologist." *Id.* ¶ 44.

"Time is of the essence when it comes to treating a patient with acute interventional cardiology needs, including STEMIs." *Id.* ¶ 45. In fact, "national guidelines and data from peer-reviewed scientific articles state that a patient with [a STEMI] should arrive at a hospital for treatment within 90 minutes after the onset of symptoms to avoid an increased risk of mortality." *Id.* ¶ 2. "These timing guidelines are considered a maximum, with multiple studies showing improved outcomes with patients who quickly arrive to a hospital, and are then quickly seen by an

interventional cardiologist." *Id.* ¶ 45. Any delays, including those caused by the delayed transportation of a patient to a hospital, decrease the patient's survival rate. *Id.* ¶ 46.

The city of Laredo, Texas is home to nearly 260,000 residents in an area comprising about one hundred eight square miles. *Id.* ¶ 30. There are "only two hospitals in Laredo that offer inpatient interventional cardiological services." *Id.* ¶ 34. Defendant Laredo Medical Center ("LMC") is the larger of these two hospitals. *Id.* ¶ 32. LMC is a 326-bed acute care facility, providing a similar range of services as the second hospital, Plaintiff Doctors Hospital of Laredo ("DHL"). *Id.* ¶¶ 32–33. As of 2020, LMC provided 59% of the acute-interventional cardiology procedures in Laredo. *Id.* ¶ 32. DHL is a 183-bed acute care facility, and as of 2020, provided about 41% of Laredo's acute interventional cardiology procedures. *Id.* ¶ 33.

DHL and LMC are located about six miles away from each other. *Id.* "If a patient with interventional cardiological needs does not want to go to LMC or [DHL], or either hospital is not able to receive that patient due to inadequate staffing or insufficient space, the patient would have to leave and travel to a hospital in a different geographic market." *Id.* ¶ 34. Indeed, "[t]he next closest comparable hospital to treat a STEMI is more than two hours away, too far away to safely care for Laredo cardiology patients." *Id.* ¶ 3.

Plaintiff Laredo Physicians Group ("LPG") is a physicians group affiliated with DHL. *Id.* ¶ 37. LPG employs physicians who practice various specialties and have staff privileges at DHL. *Id.* Until October 2021, LPG did not employ any interventional cardiologists. *Id.* Instead, DHL retained independent interventional cardiologists to provide their patients with interventional cardiology services. *Id.* Defendant Laredo Physician Associates ("LPA") is a physicians group affiliated with LMC just as LPG is affiliated with DHL. *Id.* ¶ 38.

3

DHL "requires an interventional cardiologist to be available and on call 24 hours a day, 7 days a week, and 52 weeks a year to respond to emergency patient needs." *Id.* ¶ 48. Without an interventional cardiologist on call at all times, DHL would be unable to immediately treat patients suffering from acute cardiological issues, such as a myocardial infarction or STEMI, because no interventional cardiologist would be available to provide the necessary interventional cardiology services. *Id.* ¶ 49. Indeed, the only other option for patients in Laredo would be to seek care at LMC. *Id.* If there are no available interventional cardiologists at either hospital, patients with a myocardial infarction, a STEMI, or any other acute cardiological issue would need to travel more than two hours away by car to a hospital in San Antonio. *Id.* ¶ 151. But as previously noted, relevant guidelines recommend that a patient with a STEMI receive treatment as soon as possible and no later than ninety minutes after the onset of symptoms. *Id.* ¶ 48.

In August 2020, Emma Montes-Ewing became DHL's Chief Executive Officer. *Id.* ¶ 47. Montes-Ewing "quickly realized that a population the size of Laredo required additional interventional cardiologists to meet the cardiology needs of its residents." *Id.* She came to this conclusion after reviewing "a White Paper from Merritt Hawkins titled 'Demonstrating Community Need for Physicians.'" *Id.* ¶ 49. Based on research from the Wharton School of the University of Pennsylvania, "[t]he paper included various methodologies that could be used to assess how many physicians of each specialty were required for populations of various sizes." *Id.* Montes-Ewing applied a particular methodology discussed in the paper and concluded "that a city the size of Laredo should have at least 20 cardiologists." *Id.* ¶ 50. Ideally, most of these cardiologists would specialize in interventional cardiology, "so that they could provide the full suite of less invasive cardiology medical procedures to patients, including PCI." *Id.*

At the time, however, Laredo had only five interventional cardiologists. *Id.* ¶ 51. Defendant Dr. Ricardo Cigarroa ("Dr. Cigarroa"), his son Dr. Ricardo Cigarroa II ("Dr. Cigarroa II"), his nephew Dr. Joaquin Cigarroa, and his brother Dr. Carlos Cigarroa accounted for four of the five interventional cardiologists. *Id.* ¶ 52. Dr. Cigarroa, his son, and his nephew are independent interventional cardiologists and treat patients at the Cigarroa Heart and Vascular Institute ("Cigarroa Institute"). *Id.* ¶ 53. Historically, Dr. Cigarroa, his son, and his nephew provided interventional cardiology services at both DHL and LMC.[2] *Id.* ¶¶ 36, 53.

Dr. Cigarroa "is an undisputed public figure in the Laredo community." *Id.* ¶ 35. "His family, medical practice, and penchant for media attention have made him close to a household name[.]" *Id.* "Every practicing physician and hospital administrator in Laredo, as well as most of southwest Texas, has heard of Dr. Cigarroa." *Id.* He has "boasted to others that he controls 90% of the [interventional cardiology] market." *Id.* ¶ 5. Dr. Cigarroa "views himself as different from, and above, his fellow doctors and demands special treatment from hospital staff and patients." *Id.*

"Confronted with a lack of interventional cardiologists in Laredo, and with no interventional cardiologists employed by [LPG], Montes-Ewing focused on recruiting new interventional cardiologists to Laredo." *Id.* ¶ 57. Since any new interventional cardiologist employed by LPG would be affiliated with DHL, "Montes-Ewing believed it was important to help with the search and explain her vision for the cardiology program at [DHL] to prospective recruits." *Id.* To start her recruitment efforts, Montes-Ewing spoke with Dr. Michael Blanc, a qualified interventional cardiologist she had known from prior work in hospital administration and management. *Id.* ¶ 60. Montes-Ewing invited Dr. Blanc to Laredo to visit the city and DHL. *Id.*

---

[2] Dr. Pedro Diaz is the fifth interventional cardiologist. ECF No. 22 ¶ 54. He is also an independent interventional cardiologist. *Id.*

On September 10, 2020, Montes-Ewing and Dr. Cigarroa exchanged text messages. *Id.* ¶ 62. Upon learning that DHL and LPG had invited Dr. Blanc to visit Laredo, Dr. Cigarroa expressed strong disapproval. *Id.* In his text messages to Montes-Ewing, Dr. Cigarroa "stated that his interventional cardiologist son, Dr. Cigarroa II, was 'just beginning' and should be 'given . . . a chance to set his feet' and establish his own cardiology practice without worrying about competition from additional interventional cardiologists." *Id.* ¶ 63 (quoting ECF No. 22-1 at 4). Dr. Cigarroa also "stated that he 'would have preferred' that Montes-Ewing recruit new interventional cardiologists 'through his practice[.]'" *Id.* (quoting ECF No. 22-1 at 4). According to Dr. Cigarroa, "it was 'ridiculous'" for DHL and LPG to recruit new cardiologists without first receiving his and his son's "'serious input,' and that Montes-Ewing's recruitment efforts outside of Dr. Cigarroa's practice was 'a stinging rebuke[.]'" *Id.* ¶ 64 (quoting ECF No. 22-1 at 7, 11). Dr. Cigarroa went on and "referred to Montes-Ewing as a 'witch CEO' who was falling into 'the usual [CEO] pitfall' of not sufficiently consulting with him." *Id.* ¶ 65 (quoting ECF No. 22-1 at 9, 12).

Despite enjoying his visit to Laredo and his interest in working at LPG and with DHL, Dr. Blanc declined LPG's offer of employment "upon learning of Dr. Cigarroa's vehement and organized opposition." *Id.* ¶ 70. In October and December 2020, Dr. Blanc, more than once, explained his reasons for declining the opportunity to Montes-Ewing:

> Dr. Cigarroa had a monopoly for interventional cardiology services in Laredo; Dr. Blanc knew that Dr. Cigarroa did not want him to move to Laredo; Dr. Cigarroa would blacklist Dr. Blanc and prevent him from ever receiving referrals; and at this stage of his career, Dr. Blanc could not "start a war" with the Cigarroa family. He did not want to risk moving to Laredo and being unable to build a practice because of Dr. Cigarroa's powerful opposition.

*Id.*

In May 2021, Dr. Cigarroa met with Jorge Leal, LMC's Chief Executive Officer, "with the goal of stealing [DHL and LPG's] patients for their own gain and ultimately forcing [DHL and LPG] to close their cardiology program." *Id.* ¶¶ 71, 72. "Dr. Cigarroa's pitch to Leal and LMC was straightforward: by allowing Dr. Cigarroa, his son (Dr. Cigarroa II), and his nephew (Dr. Joaquin Cigarroa) to transfer their practice from [DHL] to LMC while impeding [DHL and LPG's] recruitment of additional cardiologists, LMC would gain patients and revenue while simultaneously weakening its only competitor." *Id.* ¶ 74. LMC allegedly agreed to conspire with Dr. Cigarroa and the Cigarroa Institute: "While Dr. Cigarroa continued to threaten interventional cardiologists that [DHL and LPG] were recruiting, LMC would facilitate Dr. Cigarroa, Dr. Cigarroa II, and Dr. Joaquin Cigarroa moving their patients to LMC." *Id.* ¶ 75. Dr. Cigarroa has "stated to physicians and hospital staff in Laredo that he is in league with LMC" and that Leal is "effectively under his control." *Id.* ¶ 77.

On July 15, 2021, interventional cardiologists Dr. Mehmet Çilingiroğlu and Dr. Marc Feldman signed letters of intent with LPG. *Id.* ¶¶ 79–80. Dr. Çilingiroğlu practiced in San Diego, and Dr. Feldman was a "Professor of Medicine with an active research laboratory at and corresponding funding from the University of Texas Health Science Center at San Antonio ('UTSA')." *Id.* Dr. Feldman was Dr. Çilingiroğlu's clinical instructor at UTSA. *Id.* ¶ 80. LPG agreed that Dr. Feldman would work part-time, so that he "could retain his research laboratory at UTSA, as well as the corresponding university funding." *Id.* ¶ 81. Although LPG and DHL "needed full-time cardiologists, they were sufficiently impressed with Dr. Feldman's resume and research efforts and were willing to agree to a part-time arrangement with him while continuing to recruit additional interventional cardiologists to meet the needs of Laredo patients." *Id.* ¶ 82.

The day before Dr. Çilingiroğlu and Dr. Feldman signed their letters of intent with LPG, Dr. Cigarroa had attended a staff meeting at DHL. *Id.* ¶ 84. Dr. Cigarroa had not attended a staff meeting in over a year. *Id.* At the meeting, "[o]n the topic of recruiting Dr. Çilingiroğlu and Dr. Feldman, Dr. Cigarroa stated that 'we can't stand for this' because these new cardiologists would be competing for patients in Laredo." *Id.* ¶ 85.

One week later, Dr. Cigarroa attended a committee meeting for the Department of Medicine at DHL. *Id.* ¶ 86. There, Dr. Cigarroa again "stated that Laredo had enough cardiologists" and urged the committee to reject the recruitment of Dr. Çilingiroğlu and Dr. Feldman. *Id.* The committee disagreed and declined to follow Dr. Cigarroa's recommendation. *Id.*

On August 5, 2021, Dr. Feldman sent a text message to Montes-Ewing asking to speak with her. *Id.* ¶ 88. "During a subsequent phone call, Dr. Feldman informed Montes-Ewing that Dr. Cigarroa had directly threatened UTSA through Dr. Allen Anderson, Chair of UTSA's Cardiology Department." *Id.* Specifically, Dr. Cigarroa told Dr. Anderson "that he controlled 90% of the Laredo cardiology market, and that he did not want Dr. Feldman to come to Laredo." *Id.* ¶ 89. Dr. Cigarroa also told Dr. Anderson "that he would stop referring his patients to UTSA for cardiovascular surgeries and would begin referring those patients to UTSA's competition if Dr. Feldman joined [LPG]." *Id.* Dr. Anderson then met with Dr. Feldman at UTSA. *Id.* ¶ 95. Dr. Anderson instructed Dr. Feldman "not to come to Laredo as that was Dr. Cigarroa's territory." *Id.* He also told "Dr. Feldman that if he accepted [LPG's] offer . . . UTSA 'will take [his] lab away from [him],' including the corresponding funding." *Id.*

On the same day that Dr. Feldman asked to speak with her, Montes-Ewing "attended a dinner meeting with Laredo's cardiologists to discuss [DHL's] plans for its cardiology program." *Id.* ¶ 97. Dr. Cigarroa and his son Dr. Cigarroa II attended the dinner meeting. *Id.* "After Montes-

Ewing's short presentation, Dr. Cigarroa II demanded that Montes-Ewing and [LPG] terminate any contracts with Dr. Çilingiroğlu and Dr. Feldman and refuse to hire them" because he needed time to develop his interventional cardiology practice in Laredo "and wanted to do so without any competition from new and well-qualified cardiologists." *Id.* ¶ 98. Dr. Cigarroa stated that he and his son "'don't like it and . . . will not stand for it,' with 'it' being [LPG's] hiring of Dr. Çilingiroğlu and Dr. Feldman." *Id.* ¶ 99. Dr. Cigarroa also told Montes-Ewing "that she will 'learn what it is like to go against this group.'" *Id.*

Four days later, Dr. Cigarroa informed DHL "that he, his son, and his nephew were providing notice that they were terminating their contract to provide emergency services at [DHL.]" *Id.* ¶ 112. In other words, Dr. Cigarroa, his son, and his nephew "would cease responding to emergency calls at [DHL] and performing PCI procedures on patients with STEMIs." *Id.* Dr. Cigarroa II and Dr. Joaquin Cigarroa also informed DHL that they "would be dropping their privilege status . . . and would see far fewer patients at [DHL], if any." *Id.* ¶ 100.

"Dr. Cigarroa, the Cigarroa Institute, and LMC orally agreed to accept the patients of Dr. Cigarroa, Dr. Cigarroa II, and Dr. Joaquin Cigarroa[.]" *Id.* ¶ 115. In doing so, they "put the viability of [DHL's] acute cardiology program in jeopardy by removing more than half of the interventional cardiologists who had been responding to emergency calls at [DHL]." *Id.* ¶ 114. Indeed, "[t]his change and movement . . . left [DHL] with too few interventional cardiologists to provide 24-hour, seven-day-a-week emergency coverage." *Id.* ¶ 116. In DHL and LPG's words, "[s]plitting 24/7 coverage between two cardiologists day after day and month after month is untenable." *Id.*

On August 12, 2021, Montes-Ewing spoke with Dr. Çilingiroğlu and Dr. Feldman. *Id.* ¶ 101. During their call, Dr. Feldman informed Montes-Ewing that UTSA had pulled its funding from his research laboratory. *Id.* "Dr. Feldman was upset, anxious, and concerned." *Id.*

On August 24, 2021, Dr. Çilingiroğlu emailed Montes-Ewing and expressed his concern "with Dr. Cigarroa's threat to stop referring patients to UTSA if Dr. Feldman came to Laredo, and Dr. Allen's threat in response to withhold funding for Dr. Feldman's UTSA laboratory." *Id.* ¶ 102. Dr. Çilingiroğlu "was concerned about joining [LPG's] practice in Laredo." *Id.* Even so, he began practicing with LPG on October 4, 2021. *Id.*

On September 1, 2021, Dr. Feldman forwarded to Montes-Ewing an email "that he had sent to UTSA voicing his dismay with UTSA's decision to pull funding for his laboratory in response to Dr. Cigarroa's threat of halting future referrals." *Id.* ¶ 103. Dr. Feldman recounted "that after he 'signed a letter of intent to work as an interventional cardiologist,' Dr. Cigarroa called Dr. Allen to say he 'does not want [Dr. Feldman] working at DHL.'" *Id.* Dr. Feldman further explained "that he 'was told by [Dr.] Allen that if [he] start[s] in Laredo as a physician . . . [his] research lab will be taken away from [him]." *Id.* Consequently, Dr. Feldman informed LPG that he would not be joining their practice. *Id.* ¶ 104. When Dr. Feldman informed UTSA that he would not be joining LPG, his funding was restored. *Id.* ¶ 105.

To serve the Laredo community, DHL and LPG began to "hire locum tenens ('Locum') interventional cardiologists[.]" *Id.* ¶ 108. "Locum physicians are temporary fixes [that] do not allow a hospital to maintain and grow a stable and top-quality cardiology program[.]" *Id.* "[A] Locum cardiologist would be at least two to three times the cost" of hiring a full or part-time resident cardiologist. *Id.* The use of Locum cardiologists makes it harder for DHL and LPG to maintain the "consistency of physicians assigned to individual patients." *Id.*

During this time, LPG employed Dr. Arthur Santos, the only cardiovascular surgeon in Laredo. *Id.* ¶¶ 126–27. Dr. Santos performed his surgeries at DHL exclusively. *Id.* ¶ 127. If a patient at LMC required emergency open-heart surgery, the patient would be transferred to DHL

for the procedure. *Id.* ¶ 128. Although cardiovascular surgeons like Dr. Santos do not treat STEMIs, their availability is essential "for emergency open-heart surgery if needed during or after the PCI procedure is performed." *Id.* ¶ 127.

Years before these events on May 13, 2020, LPG and Dr. Santos had executed a Physician Employment Agreement ("Agreement"). *Id.* ¶ 130. The Agreement stated, in relevant part:

> Section 5.3(b): For one (1) year following the termination of this Agreement, Physician shall not, directly or indirectly, provide Specialty services within a fifteen (15) mile radius from the Offices where Physician spends twenty-five percent (25%) or more of his/her time providing services under this Agreement (the "Practice Territory").

*Id.* The Agreement included a buy-out provision, as required by Texas law. *Id.* The Agreement also included a provision that barred Dr. Santos for two years following the date of when the Agreement was terminated from "urg[ing], induc[ing], entic[ing] or in any other manner solicit[ing] Group employees to leave Group's employ." *Id.* ¶ 131.

"Dr. Santos and Dr. Cigarroa have a professional and close relationship." *Id.* ¶ 129. "Dr. Cigarroa, LMC, and LPA each contacted Dr. Santos to recruit him to leave [LPG] and join LPA as their cardiovascular surgeon, who would only perform surgeries at LMC." *Id.* ¶ 132. Dr. Cigarroa, LMC, and LPA knew that Dr. Santos was subject to a noncompete and non-solicitation agreement with LPG. *Id.* ¶ 134. LPA, after all, "typically includes non-compete and non-solicitation provisions in its contracts with physicians and would have inquired as to whether Dr. Santos had such an agreement with [LPG]." *Id.* Still, Dr. Cigarroa, LMC, and LPA "encouraged Dr. Santos to breach his contract with [LPG]." *Id.*

On September 20, 2021, Dr. Santos submitted his resignation to LPG, effective on December 16, 2021. *Id.* ¶ 135. Dr. Santos did not exercise the buy-out provision in the Agreement. *Id.* "Dr. Santos planned to move his cardiovascular surgery practice to LPA to perform surgeries

at LMC and continue to receive cardiological surgery referral from Dr. Cigarroa, Dr. Cigarroa II, and Dr. Joaquin Cigarroa." *Id.* Together, Dr. Cigarroa, the Cigarroa Institute, LMC, and LPA successfully convinced Dr. Santos to induce "four employees to quit [LPG] with the explicit stated intention of following Dr. Santos to . . . LMC." *Id.* ¶ 137. Indeed, the final date of employment for all four LPG employees was December 16, 2021—the same day that Dr. Santos's resignation would take effect. *Id.*

DHL and LPG have now had "to retain a new cardiovascular surgeon and associated staff of nurses and technicians on a mid-term contract at a higher cost." *Id.* ¶ 139. "These higher costs also place [their] ability to continue offering interventional cardiology services in jeopardy." *Id.* Additional costs associated with Locum interventional cardiologists, as well as a cardiovascular surgeon and their staff on a mid-term contract, "will raise the costs of care, and will be indirectly passed to consumers, because higher coverage costs compel [DHL] to seek higher reimbursement rates from commercial payers, like insurers, as an offset." *Id.* ¶ 109. "This, in turn, results in higher premiums, co-pays and deductibles paid by consumers." *Id.*

On October 29, 2021, DHL and LPG (together, "Plaintiffs") filed suit against Dr. Cigarroa, the Cigarroa Institute, LMC, and LPA (together, "Defendants"), asserting claims under §§ 1 and 2 of the Sherman Act and state law. ECF No. 1. Plaintiffs filed an amended complaint on January 18, 2022. ECF No. 22. On February 9, 2022, Defendants filed two motions to dismiss. ECF Nos. 34, 35. Plaintiffs filed responses, ECF Nos. 37, 38, and Defendants filed replies, ECF Nos. 40, 42.

## DISCUSSION

### I.   Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of claims for failure to state a claim upon which relief may be granted. To survive a motion to dismiss under

Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint must be taken as true and must be construed in the light most favorable to the nonmoving party. *Fernandez-Montes v. Allied Pilots Ass'n*, 987 F.2d 278, 284 (5th Cir. 1993). The complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Twombly*, 550 U.S. at 555.

## II.   Analysis

Defendants move to dismiss Plaintiffs' claims on three main grounds. First, LMC and LPA argue that Plaintiffs have failed to establish antitrust standing. Second, Dr. Cigarroa, the Cigarroa Institute, LMC, and LPA contend that Plaintiffs have failed to state claims upon which relief may be granted. Finally, based on their assertion that Plaintiffs have failed to state a federal claim, Dr. Cigarroa, the Cigarroa Institute, LMC, and LPA ask the Court not to exercise supplemental jurisdiction over Plaintiffs' state-law claims.

### A.   Plaintiffs plausibly allege that they have antitrust standing.

Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States." 15 U.S.C. § 15(a). "The Supreme Court has read this language to impose on antitrust plaintiffs threshold requirements that go beyond Article III standing." *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022) (citing *Atl. Richfield Co. v. USA*

*Petroleum Co.* (*ARCO*), 495 U.S. 328, 334 (1990)). The Fifth Circuit has "distill[ed] those requirements to three elements: '1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit.'" *Id.* (quoting *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997)).

LMC and LPA argue that Plaintiffs lack antitrust standing to bring this suit. *See* ECF No. 35 at 5–7; *see also* ECF No. 42 at 13–16. They contend that Plaintiffs have not suffered a plausible antitrust injury and that Plaintiffs are not the proper parties to bring this antitrust suit. *See* ECF No. 35 at 5; *see also* ECF No. 42 at 13–15. LMC and LPA do not contend that Plaintiffs have failed to establish injury in fact.[3]

### 1. Plaintiffs' allegations sufficiently show that they have suffered an antitrust injury.

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* In other words, the injury should be "the type of loss that the claimed violations . . . would be likely to cause." *Zenith Radio Corp. v. Hazeltine Rsch.*, 395 U.S. 100, 125 (1969). "Antitrust injury fleshes out the basic idea that the antitrust laws were enacted for the protection of *competition*, not *competitors*." *Pulse*, 30 F.4th at 488 (internal quotation marks and citation omitted).

Plaintiffs allege that in May 2021, Dr. Cigarroa, the Cigarroa Institute, and LMC formed an agreement, "with the goal of stealing Plaintiffs' patients for their own gain and ultimately

---

[3] Plaintiffs have shown injury in fact. They allege that Defendants' conduct has "forc[ed] them to seek medical services from temporary and ad hoc doctors at a substantially higher cost than full-time resident doctors." ECF No. 22 ¶ 165. "These allegations of economic injury establish injury in fact." *Pulse*, 30 F.4th at 488 (citing *Energy Mgmt. Corp. v. City of Shreveport*, 397 F.3d 297, 302 (5th Cir. 2005)).

forcing Plaintiffs to close their cardiology program." ECF No. 22 ¶¶ 71, 72. "Dr. Cigarroa's pitch to . . . LMC was straightforward: by allowing Dr. Cigarroa, his son (Dr. Cigarroa II), and his nephew (Dr. Joaquin Cigarroa) to transfer their practice from [DHL] to LMC while impeding Plaintiffs' recruitment of additional cardiologists, LMC would gain patients and revenue while simultaneously weakening its only competitor." *Id.* ¶ 74. Dr. Cigarroa would prevent Plaintiffs from recruiting new interventional cardiologists. *Id.* ¶ 75. LMC, meanwhile, would facilitate the transfer of Dr. Cigarroa's, Dr. Cigarroa II's, and Dr. Joaquin Cigarroa's patients to its hospital. *Id.*

Plaintiffs assert that Dr. Cigarroa prevented them from recruiting Dr. Feldman and expanding their interventional cardiology practice in Laredo. *Id.* ¶ 104. When Dr. Cigarroa, his son, and his nephew gave notice that they would no longer treat patients with acute heart issues at DHL, they also "put the viability of [DHL's] acute cardiology program in jeopardy by removing more than half of the interventional cardiologists who had been responding to emergency calls at [DHL]." *Id.* ¶¶ 112, 114. Their departure from DHL left Plaintiffs "with too few interventional cardiologists to provide 24-hour, seven-day-a-week emergency coverage" and placed them at a competitive disadvantage because "[s]plitting 24/7 coverage between two cardiologists day after day and month after month is untenable." *Id.* ¶ 116.

Plaintiffs submit that Dr. Cigarroa, the Cigarroa Institute, and LMC's anticompetitive conspiracy also increased their operating costs. The successful obstruction of Dr. Feldman's hiring has further required Plaintiffs to spend additional funds on recruiting interventional cardiologists. *Id.* ¶ 165. Plaintiffs' inability to recruit Dr. Feldman, combined with Dr. Cigarroa, his son, and his nephew's departure from DHL, has also decreased Plaintiffs' revenue by limiting their capacity to treat patients with acute heart issues at DHL. *Id.* ¶¶ 107, 166. Plaintiffs, in turn, were forced to hire temporary physicians at a cost of at least two to three times greater than the cost of hiring a

permanent full or part-time resident cardiologist. *Id.* ¶ 108. Dr. Santos's departure from LPG compounded Plaintiffs' costs, forcing them to retain a cardiovascular surgery team on a temporary basis and at a greater cost. *Id.* ¶¶ 108, 139.

Plaintiffs' alleged economic losses and competitive disadvantage "fall easily within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case." *Doctor's Hosp.*, 123 F.3d at 305. The Court, for purposes of this analysis, assumes that Dr. Cigarroa, the Cigarroa Institute, and LMC's anticompetitive conspiracy violates the antitrust laws. *See Sanger Ins. Agency v. HUB Intern., Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015) ("In analyzing this [antitrust] standing issue, we assume that [plaintiffs'] allegations of exclusive dealing amount to an antitrust violation." (citing *Doctor's Hosp.*, 123 F.3d at 306)). Assuming so, Plaintiffs' economic losses and competitive disadvantage flow from Dr. Cigarroa, the Cigarroa Institute's, and LMC's alleged anticompetitive conspiracy to exclude Plaintiffs from Laredo's market for interventional cardiology services. *See Pulse*, 30 F.4th at 491 (finding that plaintiff's incremental exclusion from the relevant market because of defendant's anticompetitive conduct "is textbook antitrust injury"); *see also Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 816–17 (D.C. Cir. 2001) ("Irrespective of consumer injury, an excluded competitor . . . suffers a distinct injury if it is prevented from selling its product.").

Defendants LMC and LPA argue that the antitrust laws protect competition not competitors, and that despite the alleged anticompetitive conspiracy, Plaintiffs successfully hired Dr. Çilingiroğlu as an interventional cardiologist. ECF No. 42 at 14–15 (citing *Felder's Collision Parts, Inc. v. All Start Advert. Agency, Inc.*, 777 F.3d 756, 757 (5th Cir. 2015)). But even so, the fact that Plaintiffs managed to recruit Dr. Çilingiroğlu does not automatically establish that the alleged conspiracy did not harm competition. Plaintiffs allege that they suffered economic losses

and are at a competitive disadvantage because of Dr. Cigarroa, the Cigarroa Institute, and LMC's alleged anticompetitive conspiracy. Plaintiffs also assert that Dr. Cigarroa's and Dr. Santos's departure from DHL and LPG respectively furthered the alleged conspiracy. Where, as here, the market for the provision of a particular service consists of only two competitors, one competitor's anticompetitive conduct injures the second competitor *and* the competition. *See Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 99 (5th Cir. 1988) ("[A] competitor of two merging entities has standing to challenge the merger if an allegation and proof of predatory pricing is made."). If Plaintiffs recover in this action, it will be because their "loss stems from a competition-*reducing* aspect or effect of" the anticompetitive conspiracy. *ARCO*, 495 U.S. at 344.

Plaintiffs also allege that Dr. Cigarroa, the Cigarroa Institute, and LMC's alleged anticompetitive conspiracy has decreased consumer choice for interventional cardiologists in Laredo, "resulting in potentially dangerous wait times for emergency care." ECF No. 22 ¶ 111. They assert that the alleged conspiracy has increased the cost of care and that this increase "will be indirectly passed to consumers, because higher coverage costs compel [DHL] to seek higher reimbursement rates from commercial payers, like insurers, as an offset." *Id.* ¶ 109. Consumers will therefore have to pay higher premiums, co-pays, and deductibles. These allegations plausibly establish that Dr. Cigarroa, the Cigarroa Institute, and LMC's alleged conspiracy has harmed consumer welfare. *See Doctor's Hosp.*, 123 F.3d at 306 ("Another way to explain the standing inquiry is that it ensures that the plaintiff's demand for relief ultimately serves the purposes of antitrust law to increase consumer choice, lower prices and assist competition, not competitors.").

Defendant LMC and LPA's contend that antitrust injury cannot arise from Dr. Cigarroa's decision to treat patients with acute heart issues at LMC because his decision to do so does not breach any contract. They also argue that Dr. Santos's termination of his contract with LPG cannot

establish antitrust injury because he is not an interventional cardiologist and did not in fact breach the Agreement. But "antitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace," *Doctor's Hosp.*, 123 F.3d at 305, and the allegations in the amended complaint viewed from the perspective of Plaintiffs' position in Laredo's two-hospital market for interventional cardiology services plausibly establish an antitrust injury.

### 2. Plaintiffs' allegations sufficiently show that they are proper parties.

"Antitrust standing requires 'proper plaintiff status, which assures that other parties are not better situated to bring suit.'" *Pulse*, 30 F.4th at 493 (quoting *Doctor's Hosp.*, 123 F.3d at 305). "This inquiry focuses on proximate causation." *Id.* In the Fifth Circuit, courts consider "factors such as (1) 'whether the plaintiff's injuries or their causal link to the defendant are speculative'; (2) 'whether other parties have been more directly harmed'; and (3) 'whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment.'" *Id.* (quoting *McCormack v. Nat'l Collegiate Athletic Ass'n*, 845 F.2d 1338, 1341 (5th Cir. 1988)).

LMC and LPA argue that Laredo's acute cardiology patients and the parties paying for those services are the proper parties to bring this antitrust suit. *See* ECF No. 35 at 7; *see also* ECF No. 42 at 15–16. To support their assertion, they rely on two non-binding cases from outside this district: *Baglio v. Baska*, 940 F. Supp. 819 (W.D. Pa. 1996), and *Ginzburg v. Memorial Healthcare Systems, Inc.*, 993 F. Supp. 998 (S.D. Tex. 1997). Both cases, however, are inapt.

In *Baglio*, a doctor who was terminated from his position as director of a pathology laboratory at an acute care hospital sued the hospital and several corporate and individual entities for antitrust violations. 940 F. Supp. at 824. Before he was terminated, the hospital "underwent a number of structural changes . . . as the hospital administration and a number of physicians explored joint venture possibilities that would affect various hospital services and departments."

18

*Id.* at 825. In particular, certain defendants discussed with each other the possibility of a joint venture to upgrade the hospital's pathology laboratory. *Id.* at 825. The doctor believed that the changes at the hospital "were part of a conspiracy to remove him from his position because he was perceived as an impediment to a laboratory joint venture." *Id.* The doctor contended that the defendants' actions constituted anticompetitive conduct that violated the antitrust laws and that either resulted in or required his termination as director of the pathology laboratory. *Id.* at 826.

On summary judgment, the district court ruled for the defendants concluding that the doctor had failed to establish antitrust standing. *Id.* at 828–30. The district court found, among other things, that the doctor was not a proper antitrust plaintiff. *Id.* at 830. It observed that the doctor had "allege[d] that the defendants caused harm not only to himself, but to participants in the marketplace who paid for kickbacks, in addition to paying for services." *Id.* (internal quotation marks and citation omitted). The district court "read this allegation to mean that patients needing pathology services would bear increased costs because of the actions of the defendants." *Id.* It then reasoned that based on these circumstances, the doctor was "not the appropriate plaintiff to represent the interests of those who might use the pathology lab." *Id.* Instead, the district court explained, "it is the[] patients and the larger payor community who would be directly injured by the alleged antitrust violations, and therefore they must bring an action on their own behalf." *Id.*

Similarly, in *Ginzburg*, a neonatologist who was denied reappointment to a hospital's medical staff filed suit against the hospital, its officials, and its staff members, alleging antitrust violations. 993 F. Supp. at 1007–08. The neonatologist had staff privileges at the hospital. *Id.* at 1005. But she also had an extensive history of disciplinary infractions for disruptive conduct and harassment. *Id.* at 1004–07. When the time came for her to file a request for reappointment to the medical staff in accordance with the hospital's bylaws, the Credential Committee denied her

request. *Id.* at 1007. The neonatologist appealed the committee's decision, but she did not succeed. *Id.* At all times, the neonatologist "denied all charges brought against her, maintaining throughout this almost four year process that she ha[d] neither engaged in disruptive conduct nor harassed any Hospital employees." *Id.* She instead contended "that all allegations asserted against her were invented for the purpose of eliminating her as a competitor and medical care provider." *Id.*

As in *Baglio*, the district court granted the defendants' request for summary judgment, holding that the neonatologist did not have antitrust standing. *Id.* at 1014–21. In determining whether the neonatologist was a proper plaintiff, the district court assumed "that the injury the antitrust laws address—the decrease in quality of care provided to [the hospital's] patients and the reduction in patient choice options—ha[d] in fact occurred[.]" *Id.* at 1020. In doing so, the district court reasoned that the hospital's patients and third party payors, not the neonatologist, were actually injured by the defendants' allegedly unlawful conduct. *Id.* The district court also found it significant that the neonatologist had "a business interest at stake" and that the neonatologist had alleged no connection between her personal injury and a lessening of competition. *Id.*

But in this case, Plaintiffs allege that Dr. Cigarroa, the Cigarroa Institute, and LMC's anticompetitive conspiracy has lessened competition in Laredo's market for interventional cardiology services. The anticompetitive conspiracy allegedly resulted in distinct injuries to Plaintiffs, including increased costs, lost revenues, and competitive disadvantages. Although the anticompetitive conspiracy may have also harmed insurers and consumers, the conspiracy has allegedly increased costs, decreased revenues, and threatened to drive Plaintiffs out of Laredo's market for cardiology services. In other words, Plaintiffs assert a harm to themselves that is distinct from any increased costs that insurers or consumers may have suffered because of Dr. Cigarroa, the Cigarroa Institute, and LMC's anticompetitive conspiracy. *See Pulse*, 30 F.4th at 494 ("Pulse's

claimed harm—being driven from the market by FANF's abusive structure—is distinct from any increased costs FANF may visit on merchants or issuers."); *cf. Norris v. Hearst Tr.*, 500 F.3d 454, 467 (5th Cir. 2007) (finding that plaintiffs who were neither customers nor competitors lacked antitrust standing). Moreover, no insurer or customer could recover for Plaintiffs' lost profits and market share, "so there is no chance of duplicative recoveries." *Pulse*, 30 F.4th at 494. *Baglio* and *Ginzburg*, therefore, do not control the outcome in this case. Plaintiffs are proper parties to bring this antitrust suit against Dr. Cigarroa, the Cigarroa Institute, and LMC.

## B. Plaintiffs have stated claims upon which relief may be granted.

Plaintiffs allege that Dr. Cigarroa, the Cigarroa Institute, and LMC restrained trade in violation of § 1 of the Sherman Act. ECF No. 22 ¶¶ 154–69. Plaintiffs also contend that Dr. Cigarroa, the Cigarroa Institute, and LMC engaged in monopolization and attempted monopolization in violation of § 2 of the Sherman Act. *Id.* ¶¶ 170–201. Plaintiffs submit that Dr. Cigarroa is also liable for tortious interference with prospective business relations. *Id.* ¶¶ 202–11. They also allege that the Cigarroa Institute and LMC are liable for conspiracy to tortiously interfere with prospective business relations. *Id.* ¶¶ 212–18. Finally, Plaintiffs assert that all defendants are liable for tortious interference with an existing contract. *Id.* ¶¶ 219–25. Defendants argue that all claims are subject to dismissal for failure to state a claim upon which relief may be granted.

### 1. Plaintiffs plausibly allege that Dr. Cigarroa, the Cigarroa Institute, and LMC restrained trade in violation of § 1 of the Sherman Act.

Section 1 of the Sherman Act "prohibits all agreements that restrain trade." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014). To establish a violation of § 1 of the Sherman Act, plaintiffs "must demonstrate that: '(1) [the defendants] engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market.'" *Id.* (quoting *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 627

(5th Cir. 2002)). The conspiracy element of a Sherman Act claim is satisfied if plaintiffs show "that the defendants engaged in concerted action, defined as having 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

"Once a plaintiff establishes that a conspiracy occurred, whether it violates § 1 is determined by the application of either the *per se* rule or the rule of reason." *Id.* (citation omitted). "[T]he *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue and only if courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.* (*Leegin I*), 551 U.S. 877, 886–87 (2007) (citations omitted). "Moreover, the per se rule should only be applied when 'conduct [is] so pernicious and devoid of redeeming virtue that it is condemned without inquiry into the effect on the market in the particular case at hand.'" *Marucci*, 751 F.3d at 374 (alteration in original) (quoting *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 223 (5th Cir. 2001) (citation omitted)).

"Under a rule of reason analysis, the factfinder considers all of the circumstances to determine whether a restrictive practice imposes an unreasonable restraint on competition." *Id.* (citing *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 343 (1982)). "The court's considerations should include the restrictive practice's 'history, nature, and effect' and '[w]hether the businesses involved have market power.'" *Id.* (alteration in original) (quoting *Leegin I*, 551 U.S. at 885–86 (internal quotation marks and citation omitted)). "Market power has been defined as 'the ability to raise prices above those that would be charged in a competitive market.'" *Id.* (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n.38

(1984) (citations omitted)). "The rule of reason analysis also requires that the plaintiff show that the defendants' activities injured competition." *Id.* (citing *PSKS, Inc. v. Leegin Creative Leather Prods.* (*Leegin II*), 615 F.3d 412, 417 (5th Cir. 2010)). "The rule of reason is designed to help courts differentiate between 'restraints with anticompetitive effect that are harmful to the consumer and restraints simulating competition that are in the consumer's best interest.'" *Id.* (quoting *Leegin I*, 551 U.S. at 886). "Regardless of which rule applies, the court's inquiry should ultimately focus upon 'form[ing] a judgment about the competitive significance of the restraint.'" *Id.* (alteration in original) (quoting *Bd. of Regents*, 468 U.S. at 103 (internal quotation marks and citation omitted)).

According to the amended complaint, DHL and LMC are the only two hospitals in Laredo that offer interventional cardiology services. ECF No. 22 ¶ 34. In August 2020, Montes-Ewing started as DHL's new CEO and determined "that a population the size of Laredo required additional interventional cardiologists to meet the cardiology needs of its residents." *Id.* ¶ 47. To determine how many interventional cardiologists Laredo's residents needed, Montes-Ewing consulted a White Paper from Merritt Hawkins titled "Demonstrating Community Needs for Physicians." *Id.* ¶ 49. The paper was based on research from the Wharton School of the University of Pennsylvania; it included "methodologies that could be used to assess how many physicians of each specialty were required for populations of various sizes." *Id.* Montes-Ewing applied one of the methodologies in the paper and concluded "that a city the size of Laredo should have at least 20 cardiologists." *Id.* ¶ 50. Plaintiffs preferred that "most, if not all, of these 20 cardiologists would be interventional cardiologists so that they could provide the full suite of less invasive cardiology medical procedures to patients, including PCI." *Id.*

At the time, however, Laredo had only seven cardiologists. *Id.* ¶ 51. Dr. Cigarroa and his family, according to the amended complaint, accounted for four of the five interventional

cardiologists in Laredo. *Id.* ¶ 52. These included Dr. Cigarroa, his son Dr. Cigarroa II, and his nephew Dr. Joaquin Cigarroa. *Id.* Given the shortage of interventional cardiologists in Laredo, Plaintiffs began "recruiting new interventional cardiologists to Laredo[.]" *Id.* ¶ 4. In particular, Montes-Ewing first tried to recruit Dr. Blanc, "a qualified interventional cardiologist whom she had known from her prior jobs in hospital administration and management." *Id.* ¶ 60.

Dr. Cigarroa perceived Montes-Ewing's interest in bringing interventional cardiologists to Laredo as a "threat to his dominant market position." *Id.* ¶ 5. According to the amended complaint, Dr. Cigarroa is "a prominent interventional cardiologist in Laredo" and "has personally boasted to others that he controls 90% of the market." *Id.* Dr. Cigarroa allegedly opposed Plaintiffs' recruitment of new interventional cardiologists "because any new interventional cardiologist hired by [LPG] having medical staff privileges at [DHL] would compete with Dr. Cigarroa for providing interventional cardiological medical care in Laredo." *Id.* ¶ 62.

Upon learning that Plaintiffs were recruiting Dr. Blanc, Dr. Cigarroa sent Montes-Ewing a series of text messages stating that he was against any recruitment. *Id.* ¶ 63. In these text messages. Dr. Cigarroa allegedly revealed that he disapproved of Plaintiffs' recruitment efforts because his son "was 'just beginning' and should be 'given . . . a chance to set his feet' and establish his own cardiology practice without worrying about competition from additional interventional cardiologists." *Id.* ¶ 63 (quoting ECF No. 22-1 at 4). Dr. Cigarroa also told Montes-Ewing that he would have preferred that Plaintiffs recruit interventional cardiologists through the Cigarroa Institute, "so that he would have and maintain control." *Id.* Dr. Cigarroa considered Plaintiffs' recruitment efforts "a stinging rebuke," called Montes-Ewing a "witch CEO," and stated that she "was falling into the 'the usual [CEO] pitfall' of not sufficiently consulting with him." *Id.* ¶¶ 64, 65 (quoting ECF No. 22-1 at 9, 11, 12).

Dr. Blanc declined LPG's offer of employment "upon learning of Dr. Cigarroa's vehement and organized opposition." *Id.* ¶ 70. In October and December 2020, Dr. Blanc explained to Montes-Ewing several times that his reasons for declining the opportunity revolved around Dr. Cigarroa's alleged anticompetitive conduct. *Id.* Dr. Blanc "did not want to risk moving to Laredo and being unable to build a practice [due to] Dr. Cigarroa's powerful opposition." *Id.*

Plaintiffs also allege that in May 2021, Dr. Cigarroa, the Cigarroa Institute, and LMC entered into a conspiratorial agreement to deprive DHL and LPG "of the doctors, employees and patients needed to compete and provide interventional cardiological services to the Laredo market." *Id.* ¶ 6. They assert that the anticompetitive conspiracy unfolded in two main steps. First, Dr. Cigarroa threatened to "backlist" any new interventional cardiologist to Laredo by preventing them from receiving patient referrals. *Id.* ¶ 10. Plaintiffs claim, for instance, that when they tried to recruit Dr. Feldman of UTSA, Dr. Cigarroa spoke to Dr. Feldman's supervisor, Dr. Anderson, and threatened to stop referring patients who needed cardiovascular surgery to UTSA. *Id.* ¶¶ 88–89. Dr. Anderson, in response, threatened to confiscate Dr. Feldman's laboratory and funding at UTSA if Dr. Feldman accepted Plaintiffs' offer of employment. *Id.* ¶ 95. Although Dr. Feldman had signed a letter of intent with LPG, he ultimately declined LPG's offer of employment. *Id.* ¶¶ 80, 104. "[W]hen Dr. Feldman informed UTSA that he would not be joining [LPG's] practice group in Laredo, UTSA's funding of his research laboratory was restored." *Id.* ¶ 105.

Second, Dr. Cigarroa, his son, and his nephew informed DHL that they would "be responding to emergency calls from and referring their patients to [DHL's] only competitor in Laredo: LMC." *Id.* ¶ 11. Before doing so, Dr. Cigarroa and his son had continued to express their opposition to new interventional cardiologists at DHL's staff and committee meetings. *Id.* ¶¶ 86, 97. Plaintiffs allege that Defendants also tortiously induced Dr. Santos to leave his employment

and breach the noncompete provision in his Agreement with LPG to join LPA. *Id.* ¶¶ 15, 125. Plaintiffs argue that the tortious interference was "part of their overall plan to unlawfully deprive [them] of the necessary doctors and staff to maintain their cardiology program." *Id.* ¶ 133. Defendants also allegedly "targeted Plaintiffs' cardiothoracic surgery technicians to induce them to join LMC and work with Dr. Cigarroa and Dr. Santos." *Id.* ¶ 16. When Dr. Santos relocated to LPA, Defendants convinced four employees to quit LPG and follow Dr. Santos to LPA. *Id.* ¶ 137.

Plaintiffs' allegations plausibly establish that Dr. Cigarroa, the Cigarroa Institute, and LMC engaged in a conspiracy and that the goal of the conspiracy was to "restrain the supply of interventional cardiologists in Laredo to benefit Dr. Cigarroa, the Cigarroa Institute and LMC and, simultaneously, prevent Plaintiffs from maintaining a cardiology program by depriving it of patients and necessary staff." *Id.* ¶ 75. The amended complaint also plausibly alleges, in accordance with the rule of reason, that Dr. Cigarroa, the Cigarroa Institute, and LMC's anticompetitive conspiracy imposed an unreasonable restraint on trade by limiting the supply of interventional cardiology services in Laredo. *Id.* ¶ 111.

Dr. Cigarroa and the Cigarroa Institute contend that Plaintiffs' allegations are vague and merely describe rational competitive conduct. *See* ECF No. 34 at 19– 20; *see also* ECF No. 40 at 8–12, 14–24. LMC and LPA similarly argue that Plaintiffs' allegations only speculate that the alleged anticompetitive conspiracy harmed competition. *See* ECF No. 35 at 10, 12–13; *see also* ECF No. 42 at 12–13. But Plaintiffs' detailed amended complaint is neither vague nor speculative; it contains far more than a "bare assertion of conspiracy" or "conclusory allegation of agreement[.]" *Twombly*, 550 U.S. at 556–57. While it may be true that the alleged anticompetitive conspiracy arose from competitive motivations, the question before the Court at this stage of the proceedings is whether Plaintiffs have alleged sufficient facts plausibly establishing that Dr.

Cigarroa, the Cigarroa Institute, and LMC engaged in an anticompetitive conspiracy that unreasonably restrained trade. Plaintiffs have done so, and Defendants' counterarguments suggesting otherwise are arguments for another day.

Dr. Cigarroa and the Cigarroa Institute also argue that Plaintiffs cannot assert an antitrust claim because the amended complaint, at most, alleges that the anticompetitive conspiracy harmed Plaintiffs, not competition. *See* ECF No. 34 at 20; *see also* ECF NO. 40 at 12–14. They submit that Plaintiffs' recruitment of Dr. Çilingiroğlu proves that competition in Laredo's market for interventional cardiologists has not suffered. *See* ECF No. 34 at 20; *see also* ECF No. 40 at 14.

But "[a]n agreement to restrain trade may be unlawful even though it does not entirely exclude its victims from the market." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 (1983). Indeed, Plaintiffs allege that Dr. Cigarroa, the Cigarroa Institute, and LMC's anticompetitive conspiracy unreasonably restrained trade by limiting the supply of interventional cardiology services in Laredo. That Plaintiffs managed to recruit Dr. Çilingiroğlu does not foreclose the possibility that the alleged anticompetitive conspiracy limited the supply of interventional cardiology services in Laredo. Plaintiffs' allegations, after all, make clear that the alleged conspiracy prevented them from recruiting Dr. Feldman. Defendants' arguments to the contrary fail to appreciate that the alleged anticompetitive conspiracy harmed competition by harming Plaintiffs, the only other competitor in Laredo's market for interventional cardiologists. As the Fifth Circuit has made clear, "injury to a competitor can be some evidence of injury to the competition[.]" *Doctor's Hosp.*, 123 F.3d at 311.

Finally, Dr. Cigarroa and the Cigarroa Institute argue that Plaintiffs have failed to state an antitrust claim because the events alleged in the amended complaint viewed in isolation do not constitute anticompetitive conduct. *See* ECF No. 34 at 17–29; *see also* ECF No. 40 at 8–12, 14–

24. Yet, "[t]he Supreme Court has time and again reminded us that analysis 'rest[ing] on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.'" *Pulse*, 30 F.4th at 493 (alteration in original) (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (citation omitted)). Plaintiffs' allegations viewed together plausibly establish that Dr. Cigarroa, the Cigarroa Institute, and LMC engaged in an anticompetitive conspiracy that unreasonably restrained trade by limiting the supply of interventional cardiology services in Laredo. It is therefore not the case that Plaintiffs' allegations simply establish that "[n]othing plus nothing is still nothing." ECF No. 40 at 31. Quite the opposite, the amended complaint alleges "something" and that "something" is a plausible anticompetitive conspiracy that unreasonably restrained trade in Laredo's market for interventional cardiology services in violation of the antitrust laws.[4] No more is needed at this stage of the proceedings.

### 2. Plaintiffs plausibly allege that Dr. Cigarroa, the Cigarroa Institute, and LMC engaged in monopolization and attempted monopolization in violation of § 2 of the Sherman Act.

Section 2 of the Sherman Act "declares that a firm shall not 'monopolize' or 'attempt to monopolize.'" *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quoting 15 U.S.C. § 2). To state a claim for unlawful monopolization, plaintiffs must show "that the asserted violator 1) possesses monopoly power in the relevant market and 2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident." *Stearns Airport Equip. Co., Inc. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)). To state a claim for unlawful attempted

---

[4] Dr. Cigarroa and the Cigarroa Institute claim that they cannot be liable for an antitrust conspiracy because they "have a 'uniformity of interest,' requiring their treatment as a 'single enterprise' for antitrust purposes." ECF No. 34 at 27 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771 (1984)). But Plaintiffs allege that Dr. Cigarroa and the Cigarroa Institute independently and jointly conspired with LMC, not merely among themselves.

monopolization, plaintiffs must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). Dr. Cigarroa and the Cigarroa Institute argue that Plaintiffs have failed to identify a relevant market. *See* ECF No. 34 at 29–32; *see also* ECF No. 40 at 24–27. In particular, they contend that Plaintiffs have failed to allege a plausible geographic market. ECF No. 34 at 31.

A claim under the Sherman Act must define the "relevant market." *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 454 (5th Cir. 2021). The relevant market for an antitrust claim "is the pool a court must assess to determine the ripple effect of any purported antitrust conduct on competition." *Shah v. VHS San Antonio Partners LLC*, --- F. Supp. 3d ----, No. SA-18-CV-00751-XR, 2020 WL 1854969, at *5 (W.D. Tex. Apr. 9, 2020), *aff'd sub nom. Shah*, 985 F.3d at 450. As Dr. Cigarroa and the Cigarroa Institute suggest, the relevant market "has two components: a product market and a geographic market." *Id.* "Both must be defined not just in terms of where the purportedly excluded competitor operates, but where consumers are affected by anticompetitive conduct and whether they may turn for alternatives." *Id.* (citing *Doctor's Hosp.*, 123 F.3d at 311; *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002)). "The geographic market must correspond to the commercial realities of the industry[.]" *Apani*, 300 F.3d at 626 (internal quotation marks and citation omitted). "When determining whether a geographic market corresponds to commercial realities, courts have taken into account practical considerations such as the size, cumbersomeness, and other characteristics of the relevant product." *Id.* The relevant market asserted in this case is the market for interventional cardiology services in Laredo. *See* ECF No. 22 ¶¶ 18, 34, 69, 83, 94, 106, 110, 112, 143–53.

Plaintiffs allege that "interventional cardiology is a subspecialty of cardiology that constitutes a distinct product market because it is not fungible and there are no reasonable substitutes." *Id.* ¶ 143. Plaintiffs submit that "[p]atients with acute cardiac conditions who require certain procedures, including [PCIs] to treat [STEMIs], require immediate care from interventional cardiologists." *Id.* Indeed, "[c]urrent data and guidelines based on treating STEMIs with PCS . . . state that the goal should be for a patient to arrive at a hospital within 90 minutes of the onset of symptoms." *Id.* ¶ 45. Any delay in transporting a patient to the hospital can lower "the patient's survival rate." *Id.* ¶ 46. The amended complaint also makes clear that DHL and LMC are the only two acute-care hospitals that offer interventional cardiological services in Laredo. *Id.* ¶ 146. The next closest hospitals are more than two hours away by car. *Id.* ¶ 151. As a result, "Laredo patients with acute interventional cardiology needs will go to one of the two options in Laredo that are closest to them: [DHL] or LMC." *Id.* ¶ 147.

Plaintiffs also allege that "[i]ndividuals who live outside of Laredo do not travel to Laredo for acute cardiological services[,]" but "instead go to the acute-care hospital closest to them." *Id.* ¶ 148. Likewise, "[t]he only reason a Laredo resident would not go to LMC or [DHL] to be treated for an acute cardiological event like a STEMI is a lack of availability based on a restricted supply of interventional cardiologists." *Id.* ¶ 149. These allegations sufficiently define, at this stage of the proceedings, a relevant market based on where Laredo patients reasonably seek interventional cardiological services. *Cf. Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 309 F.3d 836, 840 (5th Cir. 2002) ("Absent a showing of where people could practicably go for inpatient services, [plaintiff] failed to meet its burden of presenting sufficient evidence to define the relevant geographic market."). Dr. Cigarroa and the Cigarroa Institute emphasize that the amended complaint alleges that Dr. Cigarroa refers patients to UTSA in San

Antonio for cardiovascular services and that Plaintiffs and Defendants solicit employees and patients inside and outside of Texas. ECF No. 34 at 32. Dr. Cigarroa and the Cigarroa Institute's observations, however, fail to appreciate that the product market Plaintiffs assert has been interfered with is interventional cardiology services. It is therefore inconsequential that Dr. Cigarroa refers patients to UTSA for non-interventional cardiology services, as is that Plaintiffs and Defendants provide other non-interventional cardiology services within and beyond Texas.

Contrary to Dr. Cigarroa and the Cigarroa Institute's arguments, Plaintiffs have also plausibly alleged that Dr. Cigarroa, the Cigarroa Institute, and LMC possess monopoly power or have a dangerous probability of achieving monopoly power. "Monopoly power is the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). Plaintiffs assert that before the alleged anticompetitive conspiracy began, LMC already provided 59% of the interventional cardiology services in Laredo. ECF No. 22 ¶ 32. What is more, Laredo then had seven cardiologists, five of which were interventional cardiologists. *Id.* ¶ 51. Dr. Cigarroa and his family accounted for four of these interventional cardiologists. *Id.* ¶ 52.

Plaintiffs also allege that since the alleged anticompetitive conspiracy was formed in May 2021, Dr. Cigarroa, his son, and his nephew care for the vast majority, if not all, of their patients at the Cigarroa Institute and LMC. *Id.* ¶¶ 112–17. Plaintiffs submit that since September 2020, Dr. Cigarroa has also performed about 81% fewer inpatient consultations and about 96% fewer interventional cardiology procedures at DHL. *Id.* ¶ 118. "If left unchecked," Plaintiffs allege, "Defendants' conspiracy will result in them controlling 100% of the market for interventional cardiological services in Laredo, with no competition and increased costs for Laredo patients." *Id.* ¶ 110. These allegations, accepted as true, plausibly establish that Dr. Cigarroa, the Cigarroa

Institute, and LMC have the power to exclude competition and therefore either possess monopoly power or have a dangerous probability of achieving monopoly power.

Finally, LMC and LPA argue that LMC, as a matter of law, cannot monopolize or attempt to monopolize because the hospital competes in the market for hospital-facility services, not interventional cardiology services. *See* ECF No. 35 at 7–10; *see also* ECF No. 42 at 3–5. But the amended complaint plausibly alleges that LMC provides facilities, equipment, and services to interventional cardiologists. The asserted product market is interventional cardiology services. Fairly construed at this stage of litigation, the Court finds that the asserted product market includes the facilities, equipment, and staff that interventional cardiologists rely on and LMC provides. *See Doctor's Hosp.*, 123 F.3d at 311 ("The relevant product and geographic markets must reflect the realities of competition."); *see also United States v. Phillipsburg Nat. Bank & Tr. Co.*, 399 U.S. 350, 359 (1970) ("It is true, of course, that the relevant product market is determine[d] by the nature of the commercial entities involved and by the nature of the competition that they face.").

Antitrust laws also reach co-conspirators that may not compete in the relevant market. *See Spectators'*, 253 F.3d at 221 ("Conspirators who are not competitors of the victim may have no interest in curtailing competition in a market in which they do not compete; nevertheless, when they have been enticed or coerced to share in an anticompetitive scheme, there is still a combination within the meaning of the Sherman Act."); *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*, 200 F.3d 307, 315 (5th Cir. 2000) ("Section 2 of the Sherman Antitrust Act provides a cause of action against 'single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize.'" (quoting *McQuillan*, 506 U.S. at 454)). The amended complaint alleges that LMC conspired with Dr. Cigarroa and the Cigarroa Institute. ECF No. 22 ¶ 72. "[B]y allowing Dr. Cigarroa, his son (Dr. Cigarroa II), and his nephew (Dr. Joaquin

Cigarroa) to transfer their practice from [DHL] to LMC while impeding Plaintiffs' recruitment of additional cardiologists, LMC would gain patients and revenue while simultaneously weakening its only competitor." *Id.* ¶ 74. And although LMC and LPA claim that "a monopoly cannot be shared[,]" ECF No. 42 at 4, binding precedent says otherwise. *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 814–15 (1946) (affirming judgment against multiple petitioners for conspiracy to monopolize); *United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1118 (5th Cir. 1984) ("At the same moment, the offense of joint monopolization would have been complete."). LMC and LPA's remaining counterarguments simply propose a different interpretation of the events alleged in the amended complaint and are therefore misplaced at this stage of the proceedings. LMC is a proper defendant for Plaintiffs' monopolization and attempted monopolization claims.

### 3. Plaintiffs plausibly allege that the Cigarroa Institute and LMC conspired to tortiously interfere with prospective business relations.

The elements of a civil conspiracy claim are: "1) two or more persons; 2) an object to be accomplished; 3) a meeting of the minds on the object or course of action; 4) one or more unlawful, overt acts; and 5) damages as the proximate result." *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 404–05 (5th Cir. 2013). "Civil conspiracy is a derivative tort; therefore, liability for a civil conspiracy depends on participation in an underlying tort." *Id.* at 402. "In order to adequately plead a claim for civil conspiracy, a plaintiff must adequately plead the underlying tort." *Id.* In Texas, the elements of a claim for tortious interference with prospective business relations are:

> 1) [T]here was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

Plaintiffs allege that the Cigarroa Institute and LMC entered into a conspiracy with Dr. Cigarroa to intentionally interfere with LPG's prospective business relations with Dr. Feldman. ECF No. 22 ¶ 213. They claim that on July 15, 2021, Dr. Feldman signed a letter of intent with LPG and that the Cigarroa Institute and LMC knew that Dr. Feldman had signed the letter of intent. *Id.* ¶ 214. Plaintiffs also assert that the Cigarroa Institute and LMC knew that Dr. Cigarroa intended to and did tortiously interfere with LPG's prospective business relations with Dr. Feldman. *Id.* ¶ 215. According to Plaintiffs:

> The Cigarroa Institute and LMC agreed with Dr. Cigarroa's plan to tortiously interfere with the prospective contract between [LPG] and Dr. Feldman because it was part and parcel of the broader conspiracy to force Plaintiffs to close their cardiology program and thus eliminate the only competitor of the Cigarroa Institute and LMC for acute interventional cardiological services in Laredo.

*Id.* ¶ 216. Plaintiffs allege that the Cigarroa Institute and LMC's tortious interference was independently unlawful because it furthered the alleged anticompetitive conspiracy. *Id.* ¶ 217. Plaintiffs also submit that the Cigarroa Institute and LMC's "intentional interference proximately caused [them] to suffer actual damage or loss by preventing Dr. Feldman from joining [their] practice." *Id.* ¶ 218. These allegations plausibly establish that the Cigarroa Institute and LMC conspired to tortiously interfere with LPG's prospective business relations with Dr. Feldman.

LMC and LPA counter that Plaintiffs' allegations simply show that only one defendant, presumably Dr. Cigarroa, could have committed the alleged tortious interference. ECF No. 35 at 14. But the allegations in the amended complaint say otherwise. Plaintiffs specifically allege that Dr. Cigarroa, the Cigarroa Institute, and LMC had distinct roles and motivations in the civil conspiracy. "[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." *Tilton v.*

*Marshall*, 925 S.W.2d 672, 681 (Tex. 1996). It is therefore not the case that Plaintiffs "fail to distinguish between and among the Defendants in asserting their state law claims." *Id.*

That Dr. Feldman did not sign the letter of intent with LPG until two months after Dr. Cigarroa and LMC first agreed to enter into the civil conspiracy also does not render Plaintiffs' claim implausible. Plaintiffs' claim for conspiracy to tortiously interfere with prospective business relations is not premised solely on Dr. Cigarroa's meeting with LMC in May 2021. Rather, Plaintiffs allege that after this meeting, "LMC agreed to work with Dr. Cigarroa and the Cigarroa Institute." ECF No. 22 ¶ 72. In other words, each of these defendants allegedly engaged in distinct acts with different motivations, but in fulfillment of the same civil conspiracy to tortiously interfere with prospective business relations. It is settled law in Texas "that co-conspirators are jointly and severally liable for all acts done in furtherance of the unlawful combination." *Homoki*, 717 F.3d at 405. Plaintiffs have thus alleged sufficient facts plausibly establishing that the Cigarroa Institute and LMC are liable for conspiring to tortiously interfere with prospective business relations.

### 4. Plaintiffs fail to plausibly allege that Dr. Cigarroa, the Cigarroa Institute, LMC, and LPA tortiously interfered with an existing contract.

In Texas, "[t]o establish a claim for tortious interference with a contract, a plaintiff must establish: (1) the existence of a valid contract subject to interference; (2) that the defendant willfully and intentionally interfered with the contract; (3) that the interference proximately caused the plaintiff's injury; and (4) that the plaintiff incurred actual damage or loss." *Cmty. Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017). "Intentional interference does not require intent to injure, only that 'the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it.'" *Id.* (quoting *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.*, 843 S.W.2d 470, 472 (Tex. 1992)).

Plaintiffs allege that Defendants tortiously interfered with Dr. Santos's contract. But the facts alleged in the amended complaint fail to establish that any defendant, either alone or in combination, willfully and intentionally interfered with Dr. Santos's contract. Plaintiffs recite that "Defendants willfully and intentionally interfered with Dr. Santos's Agreement . . . by inducing him to breach his Agreement and agree to join Defendants' cardiology practice[.]" ECF No. 22 ¶ 222. Plaintiffs also submit that Defendants induced Dr. Santos to breach the non-solicitation provision in the Agreement by convincing other employees to resign. *Id.* These allegations, however, are too conclusory to plausibly allege that Defendants tortiously interfered with Dr. Santos's existing contract. There is no indication of when, where, or how any of the defendants interfered with Dr. Santos's Agreement. The allegations are too speculative to give rise to a claim upon which relief may be granted. Plaintiffs have therefore failed to allege sufficient facts plausibly establishing that Defendants are liable for tortious interference with an existing contract.

**C.   The Court has supplemental jurisdiction over Plaintiffs' state-law claims concerning Dr. Feldman for tortious interference with prospective business relations and conspiracy to tortiously interfere with prospective business relations.**

Federal courts have supplemental jurisdiction over state-law claims that "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." *Wis. Dep't of Corr. v. Schacht,* 524 U.S. 381, 387 (1998). It is plain that Plaintiffs' claim for tortious interference with prospective business relations against Dr. Cigarroa, as well as their claim for conspiracy to tortiously interfere with prospective business relations against the Cigarroa Institute and LMC, are so related to their antitrust claims that they form part of the same case. The Court will therefore exercise supplemental jurisdiction over Plaintiffs' state-law claims for tortious interference with prospective business relations against Dr. Cigarroa and conspiracy to tortiously interfere with prospective business relations against the Cigarroa Institute and LMC.

## CONCLUSION

Accordingly, the motion to dismiss filed by Defendants Dr. Ricardo Cigarroa and the Cigarroa Heart and Vascular Institute (ECF No. 34) is **DENIED**.

The motion to dismiss filed by Defendants Laredo Medical Center and Laredo Physician Associates (ECF No. 35) is **GRANTED IN PART AND DENIED IN PART**. Plaintiffs' claim concerning Dr. Santos for tortious interference with an existing contract against Defendants Dr. Ricardo Cigarroa, the Cigarroa Heart and Vascular Institute, Laredo Medical Center, and Laredo Physician Associates is **DISMISSED WITHOUT PREJUDICE** on failure to state a claim grounds. The Clerk's Office is **DIRECTED** to terminate Defendant Laredo Physician Associates from this case.

All other claims may proceed against Defendants Dr. Ricardo Cigarroa, the Cigarroa Heart and Vascular Institute, and Laredo Medical Center.

It is so **ORDERED**.

**SIGNED** this August 17, 2022.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE