**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| DOCTORS HOSPITAL OF LAREDO, | § | |
| LAREDO PHYSICIANS GROUP, | § | |
| *Plaintiffs* | § | SA-21-CV-01068-XR |
| | § | |
| -vs- | § | |
| | § | |
| DR. RICARDO CIGARROA, | § | |
| CIGARROA HEART AND VASCULAR | § | |
| INSTITUTE,  LAREDO TEXAS | § | |
| HOSPITAL COMPANY, LP, D/B/A | | |
| LAREDO MEDICAL CENTER; | | |
| *Defendants* | | |

## ORDER

On this date, the Court considered Plaintiffs' motion to dismiss the Cigarroa Defendants' counterclaim (ECF No. 136), the Cigarroa Defendants' response (ECF No. 140), and the Plaintiffs' reply (ECF No. 142). After careful consideration, the Court issues the following order.

### FACUTAL BACKGROUND

### I.    Procedural History

This antitrust case concerns the provision of interventional cardiology services in Laredo. Texas. Filed originally in October 2021, Plaintiffs Doctors Hospital of Laredo ("DHL") and Laredo Physicians Group ("LPG")[1] assert claims against Defendants Dr. Ricardo Cigarroa, the Cigarroa Heart and Vascular Institute,[2] and the Laredo Texas Hospital Company, LP d/b/a Laredo Medical Center ("LMC") arising under §§ 1 and 2 of the Sherman Act as well as under state law. ECF Nos. 22, 64.[3]

---

[1] LPG is an affiliate of DHL. ECF No. 131 ¶ 2.

[2] Hereinafter, the Court refers to Defendants Dr. Ricardo Cigarroa and the Cigarroa Heart and Vascular Institute collectively as the "Cigarroa Defendants."

[3] Plaintiffs previously asserted claims against Laredo Physician Associates ("LPA"). *See* ECF No. 22. However, the Court has since dismissed Plaintiffs' claims against LPA. ECF No. 64.

On January 18, 2022, Plaintiffs filed their first amended complaint ("FAC"). In the FAC, Plaintiffs allege that a conspiracy between Defendants sought to "deprive [Plaintiffs] of the doctors, employees and patients needed to compete and provide interventional cardiological services to the Laredo market" and "remove [Defendant] LMC's only competitor from the market." ECF No. 22 ¶¶ 6–7. Plaintiffs contend that Defendants achieved this objective by blacklisting new interventional cardiologists, having Dr. Cigarroa and other interventional cardiologists related to him[4] refuse to respond to emergency calls at DHL, and luring Dr. Arthur Santos ("Dr. Santos"), the only cardiovascular surgeon in Laredo, away from DHL's affiliate, LPG, to LMC. *Id.* ¶¶ 6–16. As alleged in Plaintiffs' FAC, these efforts were "a win-win-win for Defendants," suppressing "competition for interventional cardiological services," leaving LMC "as the only hospital provider of acute cardiological services in Laredo." *Id.* ¶ 18. Plaintiffs further allege that, as a result, "[DHL's] acute-care cardiology program is threatened with extinction." *Id.* And Plaintiffs assert that "[t]he losers of Defendants' conspiracy, in addition to Plaintiffs, are Laredo patients, who are left with higher health care costs and greater health risks, and without competitive market alternatives."[5] *Id.* ¶ 19.

On February 9, 2022, the Cigarroa Defendants and LMC[6] filed motions to dismiss the FAC. ECF Nos. 34, 35. On August 17, 2022, the Court subsequently denied the Cigarroa Defendants' motion to dismiss and granted in part and denied in part LMC's motion to dismiss. ECF No. 64. In its order, the Court dismissed Plaintiffs' claim concerning Dr. Santos for tortious interference with an existing contract against all Defendants; however, the Court held that (1) Plaintiffs

---

[4] Specifically, Plaintiffs refer to Dr. Cigarroa's son and nephew, who along with Dr. Cigarroa allegedly represented "more than half of the interventional cardiologists in Laredo" when Plaintiffs filed their First Amended Complaint. ECF No. 22 ¶ 11.

[5] For a detailed recitation of Plaintiffs' version of the facts, see ECF No. 64.

[6] LMC filed its motion to dismiss alongside LPA. *See* ECF No. 35. As mentioned above, the Court subsequently dismissed LPA from the suit in ruling on that motion. ECF No. 64.

plausibly allege that they have antitrust standing, (2) Plaintiffs plausibly allege that Dr. Cigarroa, the Cigarroa Institute, and LMC restrained trade in violation of § 1 of the Sherman Act, (3) Plaintiffs plausibly allege that Dr. Cigarroa, the Cigarroa Institute, and LMC engaged in monopolization and attempted monopolization in violation of § 2 of the Sherman Act, and (4) Plaintiffs plausibly allege that the Cigarroa Institute and LMC conspired to tortiously interfere with prospective business relations. *Id.*

More than a year later, in December 2023, the Cigarroa Defendants sought leave to assert a counterclaim against Plaintiffs for attempted monopolization, claiming that critical allegations in the FAC were intentional misrepresentations and that Plaintiffs filed this suit as part of a broader effort to control the practice of cardiology in Laredo. *See* ECF Nos. 121, 131. Though Plaintiffs opposed, the Court allowed the Cigarroa Defendants to assert that counterclaim in January 2024. ECF No. 130.

On February 23, 2024, Plaintiffs moved to dismiss the Cigarroa Defendants counterclaim, arguing that (1) the claim is barred by *Noerr-Pennington* immunity, (2) the counterclaim fails to adequately allege a cognizable antitrust injury, and (3) the counterclaim fails to adequately allege a claim for attempted monopolization under § 2 of the Sherman Act. ECF No. 136.

## II.    The Counterclaim[7]

The counterclaim describes a concerted effort by Plaintiffs, not Defendants, to gain control of cardiology in Laredo, with the present lawsuit being a piece of that broader effort. According to the Cigarroa Defendants, "Plaintiffs' allegations are bunk" and discovery has allegedly revealed that "it was the *Plaintiffs* who sought to control the practice of cardiac medicine in Laredo[.]" ECF No. 131 ¶ 1.

---

[7] The Court recites the facts as alleged in the Cigarroa Defendants' counterclaim. ECF No. 131.

In 2019, the Cigarroa Defendants allege that Dr. Cigarroa constructed his own cath lab[8] in Laredo without DHL's involvement. *Id.* ¶ 20. Independent of that endeavor, "Dr. Cigarroa and cardiovascular surgeon Dr. Santos routinely met with hospital administrators at DHL to advocate for investments in facilities, equipment, and personnel that would aid in their practices." *Id.* ¶ 21.[9] In February and March 2020, "Dr. Cigarroa and Dr. Santos met with Charles Stark, a [Universal Health Services, Inc. ("UHS")] Regional Vice President who was overseeing DHL" at the time, and during those meetings, Mr. Stark "explained that, in any effort to grow cardiology, DHL would want to 'partner' with Dr. Cigarroa in his new cath lab." *Id.* ¶ 22. In May 2020, when Dr. Santos followed up with Mr. Stark, the Cigarroa Defendants allege, "Mr. Stark made it plain to Dr. Santos that if Dr. Cigarroa and Dr. Santos wanted DHL's cooperation, the Cigarroas would have to place their cath lab under DHL's control." *Id.* ¶ 23.

In August 2020, DHL hired Emma Montes-Ewing as its new CEO. Thereafter, Dr. Cigarroa approached Ms. Montes-Ewing and reiterated his desire for DHL to invest in cardiology, asking "whether DHL still intended to develop facilities for a structural [cardiology] program, as he had discussed with Mr. Stark." *Id.* ¶ 25. According to the Cigarroa Defendants, Ms. Montes-Ewing responded "no, because she believed the cardiologists were no longer bringing all their cardiology procedures to DHL," and "[s]he made clear that DHL would not consider such a program until the cardiologists brought all their 'volume' to DHL." *Id.* The Cigarroa Defendants allege that in September 2020, because Ms. Montes-Ewing and Mr. Stark believed that "Dr. Cigarroa and the other Laredo-based independent cardiologists were insufficiently loyal to DHL," they then decided

---

[8] According to the counterclaim, "'cath labs' are facilities with the specialized equipment and imaging devices needed to perform catheter-based interventions." ECF No. 131 ¶ 19.

[9] At the time, Dr. Santos was employed by LPG, an affiliate of DHL. ECF No. 131 ¶¶ 2, 37.

to work to "sideline" Dr. Cigarroa and "to replace Dr. Santos." *Id.* ¶¶ 26–27. Thereafter, Plaintiffs worked towards recruiting additional cardiologists to Laredo. *See id.* ¶¶ 27–29.

In August 2021, the Cigarroa Defendants contend, DHL became suspicious that LMC was attempting to recruit Dr. Santos, but "DHL managers, who believed Dr. Santos was not as productive as they desired and were already planning on dismissing him, were happy to see him go." *Id.* ¶ 34. That same month, "Dr. Cigarroa and [his son] gave notice that they would no longer provide call coverage at DHL, though Dr. Cigarroa assured DHL he would continue accepting patients needing consultations at DHL," but DHL was allegedly indifferent to losing the Cigarroas. *Id.* ¶ 36.

By September 2021, Dr. Santos terminated his employment with DHL's affiliate, LPG, effective December 16, 2021. *Id.* ¶ 37. But according to the counterclaim, DHL had already planned on forcing out Dr. Santos by the end of November 2021. *Id.* ¶¶ 34, 37. Nonetheless, Plaintiffs allegedly decided they would enforce a non-compete agreement against Dr. Santos to prevent him from practicing at LMC. *Id.* ¶ 35.

In October 2021, Plaintiffs filed suit. According to the Cigarroa Defendants, Plaintiffs filed the instant lawsuit based on known falsehoods to harm their only competition—the Cigarroa Defendants and LMC—as part of a broader effort to "own the practice of medicine in Laredo." *Id.* ¶¶ 5–13. For example, the FAC alleges that the Cigarroa Defendants sought to deprive Plaintiffs of a major component of their cardiology program, divert patients from Plaintiffs to Defendants, and force Plaintiffs to shut down their cardiology program through recruiting Dr. Santos. *Id.* ¶¶ 39–42; ECF No. 22 ¶ 17. But as mentioned above, the Plaintiffs had allegedly already decided to force out Dr. Santos before he terminated his employment. ECF No. 131 ¶ 37. And, according to the Cigarroa Defendants, even though the FAC alleges that "Dr. Cigarroa and his son's decision

to terminate call at DHL were part of a conspiracy to deprive Plaintiffs of services needed to operate," Plaintiffs themselves "did not actually believe they needed those on-call services to compete, and in fact were glad to be rid of the Cigarroas." *Id.* ¶ 43; *see also id.* ¶ 28–29. Further, the Cigarroa Defendants contend that Plaintiffs, either knowingly or with reckless disregard, asserted that Dr. Cigarroa had engaged in efforts to block other cardiologists from entering the Laredo market and "threatened Dr. Allen Anderson of University of Texas Health Science Center-San Antonio ("UTHSCSA") that he would withhold referrals to UTHSCSA if Marc Feldman, a UTHSCSA-affiliated physician, came to work for DHL/LPG in Laredo." *Id.* ¶¶ 44–47. To date, the Cigarroa Defendants allege, "DHL and LPG have not identified . . . any evidence of 'blacklisting.'" *Id.* ¶ 45. And "Dr. Anderson has likewise confirmed in testimony these allegations were false." *Id.* ¶ 46.

Additionally, around that time, the Cigarroa Defendants allege that "LPG initiated an arbitration against Dr. Santos to enforce his non-competition agreement." *Id.* ¶ 40. Thereafter, according to the counterclaim, Dr. Santos reached a settlement with LPG regarding the non-competition agreement, but LPG did not finalize that settlement. *Id.* Allegedly, "LPG simply left the matter open and unresolved for the entirety of Dr. Santos's original non-compete period." *Id.*

Distilled, the Cigarroa Defendants allege that discovery has revealed that Plaintiffs' suit stems not from a desire to prevent anti-competitive conduct, but from a desire to harm Plaintiffs' only competition in the Laredo market. On this theory, the Cigarroa Defendants assert a counterclaim for attempted monopolization under § 2 of the Sherman Act against Plaintiffs, seeking to recover the attorney's fees incurred in defending this suit. *See* ECF No. 131 ¶¶ 51–58.

**DISCUSSION**

**I.    Legal Standard**

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A claim for relief must contain: (1) "a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain statement of the claim showing that the pleader is entitled to the relief"; and (3) "a demand for the relief sought." FED. R. CIV. P. 8(a). A plaintiff "must provide enough factual allegations to draw the reasonable inference that the elements exist." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 995 F. Supp. 2d 587, 602 (N.D. Tex. Feb. 3, 2014) (citing *Patrick v. Wal–Mart, Inc.-Store No. 155,* 681 F.3d 614, 617 (5th Cir. 2012)); *see also Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 384 (5th Cir. 2009) ("[T]he complaint must contain either direct allegations or permit properly drawn inferences to support every material point necessary to sustain a recovery.") (internal quotation marks and citations omitted).

In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint should be taken as true, and the facts are to be construed in the light most favorable to the nonmoving party. *Fernandez-Montes v. Allied Pilots Ass'n.*, 987 F.2d 278, 284 (5th Cir. 1993). Still, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "'[N]aked assertions'

devoid of 'further factual enhancement,'" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (stating that the Court should neither "strain to find inferences favorable to the plaintiffs" nor accept "conclusory allegations, unwarranted deductions, or legal conclusions").

## II.    Analysis

### a.  *Noerr Pennington* **Immunity**

To begin, Plaintiffs argue that they are entitled to *Noerr Pennington* immunity for filing this suit as the Cigarroa Defendants do not "plausibly alleg[e] that: (1) Plaintiffs' claims are objectively baseless; (2) Plaintiffs targeted business relationships via the litigation; and (3) Plaintiffs made intentional falsehoods that deprived the proceedings of their legitimacy." ECF No. 136 at 18.

Under the *Noerr-Pennington* doctrine, parties are entitled to immunity where they seek judicial relief that is anti-competitive in nature. *See E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965). Based on the First Amendment's right to petition, *Noerr-Pennington* immunizes "lobbying and other efforts to obtain legislative or executive action . . . even when those efforts are intended to eliminate competition or otherwise restrain trade." *Acoustic Sys., Inc. v. Wenger Corp.*, 207 F.3d 287, 294 (5th Cir. 2000). "The doctrine was subsequently extended to efforts to obtain judicial and quasi-judicial actions." *Id.* (citing *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972)). And courts often employ a strong presumption that *Noerr-Pennington* applies. *See Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F. Supp. 1544, 1552 (S.D. Tex. 1991) ("[A]n

antitrust plaintiff attempting to base liability on successful petitioning must overcome a strong inference that *Noerr-Pennington* applies and in many cases may be unable to do so."); *see also Hanover 3201 Realty, LLC v. Vill. Supermarkets, Inc.*, 806 F.3d 162, 180 (3d Cir. 2015).

However, though *Noerr–Pennington* immunity is broad, it is not limitless. The Supreme Court has held that a party is not entitled to immunity when that party brings "sham" litigation. *See Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) ("*PREI*"). According to the Supreme Court, to fall within the "sham" litigation exception's scope, a party must plausibly allege that (1) "the lawsuit [is] objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits," and (2) that "the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor, through the use of the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *Id.* at 60–61 (cleaned up).

Other courts have recognized a different formulation of the "sham" litigation exception, explaining that "in the context of a judicial proceeding, if the alleged anticompetitive behavior consists of making intentional misrepresentations to the court, litigation can be deemed a sham if 'a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.'" *Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1060 (9th Cir. 1998) (first citing *Liberty Lake Inv., Inc. v. Magnuson*, 12 F.3d 155, 158 (9th Cir.1993); and then citing *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1260 (9th Cir.1982)); *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 843 (7th Cir. 2011) ("[A] misrepresentation renders an adjudicative proceeding a sham only if the misrepresentation (1) was intentionally made, with knowledge of its falsity; and (2) was material, in the sense that it actually altered the outcome of the proceeding."). To this end, other district courts in the Fifth Circuit have

Page **9** of **17**

noted that "[t]he law is clear that *Noerr–Pennington* 'does not protect deliberately false or misleading statements.'" *Pension Advisory Grp., Ltd. v. Country Life Ins. Co.*, 771 F. Supp. 2d 680, 699 (S.D. Tex. 2011) (quoting *U.S. v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1123 (D.C. Cir. 2009)).

While Plaintiffs caution the Court not to follow the latter approach, *see* ECF No. 136 at 25–28, these two formulations are flip sides of the same coin and lead to the same result here. *See Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 123 (3d Cir. 1999) (explaining the relationship between the *PREI* approach and fraudulent misrepresentations). Indeed, a misrepresentation alone does not cause *Noerr-Pennington* to fall away. Rather, the cloak of *Noerr-Pennington* fades where a litigant has made "a material misrepresentation that affects the very core of a litigant's . . . case." *Id.* at 124. Notably, in urging the Court to refuse to recognize the latter formulation, Plaintiffs point to no binding authority rejecting that approach. *See* ECF No. 136 at 25–28.

Contrary to Plaintiffs' claims otherwise, the Cigarroa Defendants allege sufficient facts to overcome—at the motion to dismiss stage—Plaintiffs' claim of *Noerr-Pennington* immunity. Applying the latter formulation of the sham litigation exception, the Cigarroa Defendants plausibly allege that Plaintiffs made intentional, false allegations cutting at the core of Plaintiffs' case.

First, the Cigarroa Defendants plausibly allege that Plaintiffs knowingly made misrepresentations. To start, in the FAC, Plaintiffs alleged that the Cigarroa Defendants sought, through recruiting Dr. Santos, to deprive Plaintiffs of a major component of their cardiology program, divert patients from Plaintiffs to Defendants, and force Plaintiffs to shut down their cardiology program. ECF No. 22 ¶¶ 17–18. And the FAC also alleges that by losing Dr. Santos and the Cigarroas, Plaintiffs' "cardiology program [was] in jeopardy." *Id.* ¶¶ 15–18, 113–114. However, according to the counterclaim, Plaintiffs already decided to force out Dr. Santos as well

as the Cigarroas, and Plaintiffs did not believe when filing this suit that they needed Dr. Santos or the Cigarroas to compete with LMC. ECF No. 131 ¶¶ 34–43. Next, the FAC alleges that Dr. Cigarroa attempted to block other cardiologists from entering the Laredo market and "had directly threatened UTSA through Dr. Allen Anderson, Chair of UTSA's Cardiology Department." ECF No. 22 ¶¶ 88–92. The FAC also asserts that because of Dr. Cigarroa blocking Dr. Feldman, Plaintiffs would be forced to hire more expensive "locum tenens ('Locum') interventional cardiologists to serve the Laredo patient population" and because of these increased costs, their cardiology program would "likely be shuttered." ECF No. 22 ¶¶ 108–110. However, the counterclaim contends that Plaintiffs intentionally misrepresented the impact of losing Dr. Feldman and have allegedly been unable to produce evidence that Dr. Cigarroa blacklisted or threatened other physicians or Dr. Anderson. ECF No. 131 ¶¶ 44–50.

Second, these alleged misrepresentations cut to the core of Plaintiffs' case. That is, the Court relied on these specific allegations in holding that Plaintiffs adequately alleged antitrust injury:

> Plaintiffs allege that in May 2021, Dr. Cigarroa, the Cigarroa Institute, and LMC formed an agreement, "with the goal of stealing Plaintiffs' patients for their own gain and ultimately forcing Plaintiffs to close their cardiology program." "Dr. Cigarroa's pitch to . . . LMC was straightforward: by allowing Dr. Cigarroa, his son (Dr. Cigarroa II), and his nephew (Dr. Joaquin Cigarroa) to transfer their practice from [DHL] to LMC while impeding Plaintiffs' recruitment of additional cardiologists, LMC would gain patients and revenue while simultaneously weakening its only competitor." Dr. Cigarroa would prevent Plaintiffs from recruiting new interventional cardiologists. LMC, meanwhile, would facilitate the transfer of Dr. Cigarroa's, Dr. Cigarroa II's, and Dr. Joaquin Cigarroa's patients to its hospital.
>
> Plaintiffs assert that Dr. Cigarroa prevented them from recruiting Dr. Feldman and expanding their interventional cardiology practice in Laredo. When Dr. Cigarroa, his son, and his nephew gave notice that they would no longer treat patients with acute heart issues at DHL, they also "put the viability of [DHL's] acute cardiology program in jeopardy by removing more than half of the interventional cardiologists who had been responding to

emergency calls at [DHL]." Their departure from DHL left Plaintiffs "with too few interventional cardiologists to provide 24-hour, seven-day-a-week emergency coverage" and placed them at a competitive disadvantage because "[s]plitting 24/7 coverage between two cardiologists day after day and month after month is untenable."

Plaintiffs submit that Dr. Cigarroa, the Cigarroa Institute, and LMC's anticompetitive conspiracy also increased their operating costs. The successful obstruction of Dr. Feldman's hiring has further required Plaintiffs to spend additional funds on recruiting interventional cardiologists. Plaintiffs' inability to recruit Dr. Feldman, combined with Dr. Cigarroa, his son, and his nephew's departure from DHL, has also decreased Plaintiffs' revenue by limiting their capacity to treat patients with acute heart issues at DHL. Plaintiffs, in turn, were forced to hire temporary physicians at a cost of at least two to three times greater than the cost of hiring a permanent full or part-time resident cardiologist. Dr. Santos's departure from LPG compounded Plaintiffs' costs, forcing them to retain a cardiovascular surgery team on a temporary basis and at a greater cost.

Plaintiffs' alleged economic losses and competitive disadvantage "fall easily within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case."

ECF No. 64 at 15–16 (citations omitted). However, the Court's reasoning would ring hollow if (1) Plaintiffs planned to rid themselves of Dr. Santos and the Cigarroas all along and had no belief that the loss of Dr. Santos and the Cigarroas would hurt them, (2) Plaintiffs falsely claimed that Dr. Cigarroa was blocking Plaintiffs from recruiting cardiologists, and (3) already intended to incur the costs they claimed were caused by Defendants. Without these allegations, the FAC's core allegations of antitrust injury would be gone.

In addition, applying the traditional *PREI* test, the Cigarroa Defendants have plausibly alleged that Plaintiffs' claims were objectively baseless and made with the subjective intent of using this litigation to interfere with competition. First, as the Cigarroa Defendants point out and the Court has already discussed, the alleged false allegations are central to Plaintiffs' claims. *See* ECF No. 140 at 4–5. While Plaintiffs are correct that "the objective merit of a lawsuit is judged at the outset," ECF No. 136 at 19, the counterclaim alleges that Plaintiffs' suit "contain[s] knowingly

false factual claims." ECF No. 131 ¶ 38. That is, the Cigarroa Defendants contend that the false allegations were known to be false from the start. If the Cigarroa Defendants prove that the allegations are false and Plaintiffs asserted these allegations without belief in their truth, then Plaintiffs' claims would lack objective merit. Of course, Plaintiffs point out that "the Court has already denied two motions to dismiss Plaintiffs' antitrust claims." ECF No. 136 at 21. However, Plaintiffs' argument ignores that the Court's decision rests on the allegedly fraudulent misrepresentations. *See* ECF No. 64. A claim premised on fraudulent misrepresentations does not become meritorious simply because a court relies on those fraudulent misrepresentations.

Second, the Cigarroa Defendants plausibly allege that Plaintiffs had the subjective intent to interfere with competition by using the litigation process as a weapon. Here, Plaintiffs take issue with two aspects of the Cigarroa Defendants' counterclaim. First, Plaintiffs contend that "the Counterclaim does not identify *any* 'specific business relationships' that Plaintiffs have tried to impact with their claims." ECF No. 136 at 22. However, the Cigarroa Defendants have alleged that the present litigation was brought to discourage competition from other providers and burden its sole competitor with litigation expenses. ECF No. 131 ¶¶ 10–12, 50, 55. At the pleading stage, this is sufficient. *See In re Gabapentin Pat. Litig.*, 649 F. Supp. 2d 340, 366 (D.N.J. 2009); *Re/Max Int'l v. Realty One, Inc.*, 900 F. Supp. 132, 161 (N.D. Ohio 1995), *aff'd sub nom. Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995 (6th Cir. 1999). Plaintiffs also contend that "the Counterclaim fails to allege with any specificity that Plaintiffs have weaponized the litigation process itself." ECF No. 136 at 23–24. But the Cigarroa Defendants allege that documents disclosed in discovery demonstrate that this litigation was brought only to burden a competitor with litigation expenses and discredit Dr. Cigarroa. ECF No. 131 ¶¶ 48–50. This is sufficient at the pleading stage.

Lastly, the Court notes that the sham litigation analysis is best addressed at the summary judgment stage, where the Court can look to the evidence to determine whether there are genuine issues of material fact regarding the objective merit of a lawsuit, the subjective intent of the Plaintiff, or the known falsity of critical allegations in the complaint. *See Wolf v. Cowgirl Tuff Co.*, No. 1:15-CV-1195-RP, 2016 WL 4597638, at *9 n.7 (W.D. Tex. Sept. 2, 2016) ("[Sham litigation] inquiries are typically only "properly analyzed through a consideration of evidence outside of the pleadings . . . and as such, are not appropriately considered in the present Rule 12(b)(6) context."); *EchoStar Satellite, L.L.C. v. Viewtech, Inc.*, No. 07-CV-1273 W (AJB), 2009 WL 1668712, at *2– 3 (S.D. Cal. May 27, 2009) ("Because the facts underlying EchoStar's complaint are in dispute, the Court cannot determine whether the litigation is objectively reasonable.").

Accordingly, presuming the Cigarroa Defendants' allegations as true as it must at this stage, it concludes that the Cigarroa Defendants plausibly alleged sufficient facts to overcome Plaintiffs' claim of *Noerr-Pennington* immunity.

### b. Antitrust Injury[10]

Next, Plaintiffs argue that the counterclaim fails to adequately allege an antitrust injury. Plaintiffs contend "[t]he Cigarroa Defendants' attorney's fees are individual harms, not harms to competition," and they argue the counterclaim reveals that the Cigarroa Defendants' injury really arises from increased competition. ECF No. 136 at 28–30.

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat,*

---

[10] To demonstrate antitrust standing, a claimant must plausibly allege "1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022) (quoting *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997)). In their motion to dismiss and reply, Plaintiffs do not argue that the Cigarroa Defendants failed to plausibly allege an injury-in-fact or that the Cigarroa Defendants are not the proper claimants; rather, Plaintiffs focus solely on the alleged lack of antitrust injury. *See* ECF Nos. 136, 142.

*Inc.*, 429 U.S. 477, 489 (1977). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* In other words, the injury should be "the type of loss that the claimed violations . . . would be likely to cause." *Zenith Radio Corp. v. Hazeltine Rsch.*, 395 U.S. 100, 125 (1969).  And"[a]ntitrust injury fleshes out the basic idea that the antitrust laws were enacted for the protection of *competition*, not *competitors*." *Pulse*, 30 F.4th at 488 (internal quotation marks and citation omitted). In analyzing antitrust injury, the Court assumes as true the Cigarroa Defendants' allegations that Plaintiffs' conduct amounts to an antitrust violation. *See Sanger Ins. Agency v. HUB Intern., Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015).

The Cigarroa Defendants' claimed injury is based on the litigation costs "they have been forced to bear" to "defend[] themselves in the instant sham lawsuit." ECF No. 131 ¶ 58. However, Plaintiffs assert that these litigation costs are insufficient, on their own, to properly establish antitrust injury. ECF No. 142 at 17 (citing *Chip-Mender, Inc. v. Sherwin-Williams Co*., 2006 WL 13058, at *6 (N.D. Cal. 2006); *see also* ECF No. 136 at 29 ("The Cigarroa Defendants' attorney's fees are individual harms, not harms to competition."). Indeed, "litigation costs alone do not qualify as antitrust injury without some allegation that said expenses incurred in defending 'sham' litigation influenced competition, on the price, quantity or quality of Defendant's products, or prevented Defendant from pursuing its entry into the market." *Miller Indus. Towing Equip. Inc. v. NRC Indus.*, 659 F. Supp. 3d 451, 468 (D.N.J. 2023). Nonetheless, where only two competitors are vying for control of a market, allegations of litigation costs are sufficient at the motion to dismiss stage when a party alleges it has been forced to bear the cost of defending itself in sham litigation and those costs have deterred its efforts in the market. *See id.*

Here, the counterclaim depicts only two competitors vying for control of a single market. ECF No. 131 ¶ 2; ECF No. 22 ¶ 3; *see also* ECF No. 64 at 17 ("Where, as here, the market for the

provision of a particular service consists of only two competitors, one competitor's anticompetitive conduct injures the second competitor *and* the competition." (citing *Phototron Corp. v. Eastman Kodak Co.*, 842 F.2d 95, 99 (5th Cir. 1988)). However, despite their general allegations that Plaintiffs intend to drive competitors to financial ruin through litigation expenses, the Cigarroa Defendants do not allege any specific facts demonstrating that they have been deterred in their efforts in the Laredo market, that they have been excluded from offering services in the market, or that their operating costs have increased because of the litigation. ECF No. 131 ¶ 13, 58.

Of course, the counterclaim alleges that LPG's enforcement of a non-competition agreement and LPG's arbitration demand prevented Dr. Santos from performing heart surgery for a year. *See* ECF No. 131 ¶ 40; ECF No. 140 at 15–16. But to the extent that the Cigarroa Defendants rely on these allegations to establish antitrust injury, such reliance is improper.

To begin, the *counterclaim* does not disclose any injury to the Cigarroa Defendants stemming from the "ghost arbitration demand" or Plaintiffs' enforcement of Dr. Santos's non-competition agreement. *See* ECF No. 131. While a claimant can establish antitrust injuries based on a broader scheme of conduct, *Rochester Drug Co-op., Inc. v. Braintree Lab'ys*, 712 F. Supp. 2d 308, 317–18 (D. Del. 2010), that broader scheme must have still caused a sufficient injury to the claimant, *see* HOLMES AND MANGIARACINA, ANTITRUST LAW HANDBOOK § 9:6 ("[T]he claimed injury *to the plaintiff* must be of a type that the antitrust laws were meant to prevent (e.g., a business's lost profits from a reduced ability to compete, or a consumer's injury from having to pay an artificially inflated price)." (emphasis added)).

In addition, the Cigarroa Defendants mention only in their response that Plaintiffs' sham suit and LPG's arbitration demand against Dr. Santos prevented Dr. Cigarroa and LMC from performing open heart surgeries and "treat[ing] inpatient interventional cardiology patients for

whom a backup surgeon must be available." ECF No. 140 at 15–16. But as the Plaintiffs point out, "a complaint may not be amended by the briefs in opposition to a motion to dismiss." ECF No. 142 at 18–19 (quoting *Jaraba v. Blinken*, 568 F. Supp. 3d 720, 727 (W.D. Tex. 2021)).

Further, even if the counterclaim alleged that the Cigarroa Defendants or LMC had been prevented from performing certain procedures because Dr. Santos was sidelined, the Cigarroa Defendants do not otherwise allege that Plaintiffs prevented LMC from retaining a different surgeon during this time to serve as a backup. *See generally* ECF No. 131. Thus, while the counterclaim alleges this litigation was intended to harm a competitor, the Cigarroa Defendants fail to plausibly allege that this purported sham litigation blocked competition from that competitor. ECF No. 142 at 18.

### c. Attempted Monopolization

As the Court holds that the counterclaim fails to adequately allege antitrust injury, the Court need not address whether the counterclaim plausibly alleges a claim for attempted monopolization under § 2 of the Sherman Act.

### CONCLUSION

For the foregoing reasons, Plaintiffs' motion to dismiss the Cigarroa Defendants' counterclaim (ECF No. 136) is **GRANTED**. The Cigarroa Defendants' counterclaim is **DISMISSED**.

It is so **ORDERED**.

**SIGNED** this 16th day of July, 2024.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE