**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| DOCTORS HOSPITAL OF LAREDO, § | | |
| LAREDO PHYSICIANS GROUP, § | | |
| *Plaintiffs* § | | SA-21-CV-01068-XR |
| § | | |
| -vs- § | | |
| § | | |
| DR. RICARDO CIGARROA, § | | |
| CIGARROA HEART AND VASCULAR § | | |
| INSTITUTE,  LAREDO TEXAS § | | |
| HOSPITAL COMPANY, LP, D/B/A § | | |
| LAREDO MEDICAL CENTER, § | | |
| *Defendants* § | | |

## SUMMARY JUDGMENT ORDER

On this date, the Court considered Defendants' motion for summary judgment (ECF Nos. 145, 164), Plaintiffs' response (ECF No. 167), Defendants' reply (ECF No. 169), Plaintiffs' sur-reply (ECF No. 175), and Defendants' response to the sur-reply (ECF No. 178). The Court also considered Defendants' objections to Plaintiffs' summary judgment evidence and motion to strike (ECF No. 171), Plaintiffs' response (ECF No. 172), and Defendants' reply (ECF No. 176)). After careful consideration of the briefing, the parties' oral arguments on December 20, 2024, and the parties' supplemental submissions (ECF Nos. 181, 182, 183), the Court **GRANTS** the motion.[1]

## INTRODUCTION

This antitrust case concerns the provision of interventional cardiology services in Laredo, Texas. Plaintiffs and Defendants compete against each other and are the sole players in the market. Plaintiffs are Doctors Hospital of Laredo ("DHL") and the Laredo Physicians Group ("LPG"),

---

[1] The parties submitted sealed exhibits that the Court *sua sponte* revisited, consistent with the Fifth Circuit's standard that "the court must undertake a document-by-document, line-by-line balancing of the public's common law right of access against the interests favoring nondisclosure" and the "working presumption [] that judicial records should not be sealed." *June Medical Services, LLC v. Phillips*, 22 F.4th 512, 518 n. 3, 521 (5th Cir. 2022) (citations and internal quotation marks omitted); *see* Text Orders, January 5, 14, 2025. The Court refers to the unsealed record throughout.

which is affiliated with DHL and employs interventional cardiologists and other physicians. Defendants are Dr. Ricardo Cigarroa ("Dr. Cigarroa"), an interventional cardiologist in Laredo, the Cigarroa Heart and Vascular Institute ("CHVI," a/k/a the "Cigarroa Clinic," together the "Cigarroa Defendants"), and Laredo Texas Hospital Company, LP, d/b/a/ Laredo Medical Center ("LMC").[2]

For years, Dr. Cigarroa has treated patients at DHL, LMC, and his own clinic, the Cigarroa Clinic. Beginning in August 2020, Plaintiffs sought to expand their interventional cardiology practice on their own. But they ran into roadblocks. Plaintiffs (i) failed to hire new interventional cardiologists they attempted to recruit, (ii) lost Dr. Cigarroa (and his son, Dr. Cigarroa II, also an interventional cardiologist), who moved their practice to LMC, and (iii) lost their only cardiovascular surgeon—Dr. Anthony Santos—and related employees, who were recruited by LMC. Plaintiffs have not gone out of business; they have successfully hired new interventional cardiologists and continue to provide interventional cardiology treatment to patients in Laredo. Still, Plaintiffs insist that the roadblocks they encountered were not due to market competition but to Defendants' anticompetitive conduct.

Plaintiffs assert that these roadblocks were the result of illicit agreements and conspiracies to (i) prevent Plaintiffs from recruiting new interventional cardiologists, (ii) refuse to deal with Plaintiffs, and (iii) solicit and poach DHL's staff, all to stamp out competition and monopolize the interventional cardiology market. Accordingly, they bring claims under Sections 1 and 2 of the Sherman Act and Texas state law.

On summary judgment, Defendants assert that Plaintiffs have marshaled insufficient evidence to support their claims and that Plaintiffs lack antitrust injury. The Court agrees.

---

[2] Defendant Laredo Physicians Associates was previously terminated from this case. *See* ECF No. 64 at 37.

While there is evidence of some of these conspiracies, the record lacks evidence that they caused anticompetitive effects, nor is much of the conduct anticompetitive itself. Plaintiffs' state law claims fail because Defendants did not engage in independently actionable tortious conduct. As Plaintiffs' counsel acknowledged at oral argument, Plaintiffs filed this action to stop Defendants' conduct. They may have succeeded. But that does not mean that the conduct violated the antitrust laws.

## BACKGROUND

The Court recites the relevant facts, unless stricken under the Court's rulings on Defendants' motion to strike. *See* Analysis, Part I. These are undisputed, unless otherwise stated.

### A. Interventional Cardiology

Cardiology is the field of medicine that involves monitoring, diagnosing, and treating diseases of the cardiovascular system—the heart and blood vessels. ECF No. 167-1 at 21. Interventional cardiology is a board-certified subspecies of cardiology that uses non-invasive or minimally invasive procedures to treat patients with certain heart issues. *Id.* at 21–22. The practice of interventional cardiology is considered distinct from, but works in tandem with, the practice of general cardiology.

Patients with heart issues are treated in a variety of ways, including (i) medical care (e.g., drugs and behavioral modifications), (ii) surgeries (e.g., bypass and other open-heart procedures, which are performed by a cardiothoracic surgeon), (iii) interventional procedures (e.g., catheter-based treatments, which are performed by an interventional cardiologist) and (iv) structural procedures (e.g., valve replacements, which are performed by an interventional cardiologist and surgeon working together). ECF No. 145 at 5. Interventional procedures include treating an "ST-segment elevation myocardial infarction" ("STEMI")—a heart attack. ECF No. 167-1 at 23.

Structural procedures, a newer development, include transcatheter aortic valve replacement ("TAVR"), which can treat severe aortic stenosis, a disease in which the aortic valve narrows (and even closes), reducing blood flow. *Id.* at 26. Previously only treatable by open heart surgery, this procedure is easier on patients, who are now often discharged the next day. *Id.* As interventional cardiology has developed, the need for surgical procedures, such as open-heart surgery, has decreased. *Id.* at 168.

Interventional cardiology procedures require a catheterization lab ("Cath Lab") to perform treatment. Depending on the severity of the patient's symptoms, treatment is provided outpatient or inpatient. *Id.* at 22–23. Outpatient services are for elective treatment and low-risk patients who have less severe symptoms and need not be performed at a hospital. *Id.* Inpatient treatment is for non-emergency patients who are admitted to the hospital, high-risk patients, and emergencies such as STEMIs. *Id.* at 23, 239. Inpatient treatment must be performed at a hospital. *Id.* at 23. A patient with a heart-related issue may not initially know if he needs inpatient or outpatient treatment.

When treating STEMIs, "time is muscle" and the goal is to have patients seen and treated within 90 minutes of arriving at a hospital. *Id.* at 27. For a hospital to provide care to heart attack patients, it must have at least one interventional cardiologist and the corresponding support staff on call 24/7: during nights, weekends, and holidays. *Id.* at 25. Without these resources, a hospital may need to turn away heart attack patients. *Id.* at 25.

**B. Who's-Who in Laredo's Cardiology Market**

**Doctors Hospital of Laredo and Laredo Medical Center**. Defendant LMC is the largest hospital in Laredo, with 326 beds; Plaintiff DHL is the second-largest, with 183 beds. ECF No. 167 at 13. LMC and DHL are the only acute-care hospitals that provide interventional cardiology

services in Laredo. ECF No. 167-1 at 226. Each is the other's primary competitor for inpatient treatment, and both compete for outpatient treatment as well. *Id.*

If a patient needs inpatient cardiology services in Laredo, they can go to DHL or LMC. A patient who does not want to go to either would have to leave Laredo and travel to a hospital in a different geographic area.

**Laredo Physicians Group.** Plaintiff LPG is a physician group affiliated with DHL. ECF No. 188-2 at 12. LPG employs and contracts with the physicians who provide medical services at DHL, including interventional cardiologists and locums tenens contract physicians. *Id.* at 13. Locums tenens physicians are temporary positions that physicians take as independent contractors. *Id.* at 23. Under locum contracts, physicians are required to work specific shifts, rather than a per-diem physician role. *Id.* According to Plaintiffs' expert, Dr. Weston C. Hickey, locums physicians "do not offer the same benefits as a full-time physician, such as continuity of care for patients, and are often more expensive for a hospital to use." ECF No. 167-1 at 17.

**Dr. Cigarroa.** Dr. Cigarroa is a well-known physician and a general and interventional cardiologist in Laredo, where he has practiced since he completed his training in 1990. *Id.* at 165. Dr. Cigarroa is an independent physician, which means he owns a private practice and performs services at medical facilities where he holds privileges. ECF No. 167 at 14.

In his first ten years of practice in Laredo, Dr. Cigarroa only practiced at LMC. ECF No. 167-1 at 174. Over the next decade, he practiced primarily at DHL, while continuing to perform some procedures at LMC. *Id.* Today, he performs procedures only at LMC,[3] *id.*, and provides outpatient treatment at his own clinic, the Cigarroa Clinic, *id.* at 236.

---

[3] While Dr. Cigarroa retained privileges at DHL, he no longer practices there. *Id.* at 173.

**The Cigarroa Clinic.** The Cigarroa Clinic—previously known as CHVI—provides, among other services, interventional cardiology treatment in Laredo. ECF No. 145 at 6. While the Cigarroa Clinic sees "new patients [and] consults," outpatient interventional cardiology procedures are not performed there. ECF No. 167-1 at 237–38. Instead, they are performed using the Cath Lab at the Cigarroa Interventional Institute, which Dr. Cigarroa opened in 2020.[4] *Id.* at 238; ECF No. 145 at 7. As neither the Cigarroa Clinic nor the Cigarroa Interventional Institute is a hospital, no inpatient procedures are performed at either. LMC views the Cigarroa Interventional Institute as a "competitor for the provision of outpatient interventional cardiology procedures." ECF No. 167-1 at 742.

**Other Cigarroas.** The Cigarroas have deep roots in Laredo, and many family members have practiced medicine in the area, including three Cigarroas who are interventional cardiologists. Dr. Cigarroa's brother, Dr. Carlos Cigarroa, continues to hold privileges and practice at DHL. ECF No. 167 at 14. Dr. Joaquin Guzman, Dr. Cigarroa's nephew, practiced at the Cigarroa Clinic and LMC, but recently moved to Austin. ECF No. 167-1 at 165.

Dr. Ricardo Cigarroa II ("Dr. Cigarroa II"), Dr. Cigarroa's son, started practicing in Laredo in August 2020. *Id.* at 208. At the time, he was the only interventional cardiologist in Laredo trained in structural heart procedures, including TAVRs. ECF No. 167 at 15. Although he signed a salary subsidiary agreement with LMC before he arrived,[5] he treated patients at DHL, LMC, and the Cigarroa Clinic when he started practicing. ECF No. 167-1 at 208–09. Today, he works exclusively at LMC and the Cigarroa Clinic. *Id.* at 210.

---

[4] The parties treat the Cigarroa Clinic and the Cigarroa Interventional Institute as the same, and so the Court does also for purposes of this motion.

[5] Dr. Joaquin Guzman signed a similar salary subsidy agreement with LMC when he arrived in Laredo around July 2021. ECF No. 167-1 at 210.

When Dr. Cigarroa II arrived in Laredo, he reached out to Dr. Allen Anderson ("Dr. Anderson") at the University of Texas Health Science Center – San Antonio ("UTHSCSA") to build an academic relationship and a referral network for patients who need complex care, including TAVRs, that could not be performed in Laredo. *Id.* at 213. Dr. Cigarroa II refers patients who require TAVRs (or other structural heart procedures) to UTHSCSA. *Id.* at 241.

After Dr. Cigarroa II began to practice, the Cigarroas accounted for three out of the four practicing interventional cardiologists in Laredo. The other was Dr. Pedro Diaz, who held privileges and practiced only at DHL. ECF No. 167 at 14. Like Dr. Cigarroa, the other interventional cardiologists are independent physicians. *Id.*

**Dr. Arthur Santos.** Dr. Santos, a cardiothoracic surgeon and a friend of Dr. Cigarroa, was the only cardiothoracic surgeon in Laredo before the start of this case and performed procedures at DHL under an exclusive contract with LPG. ECF No. 167-1 at 329–30. In fact, because surgical and structural cardiology procedures must be performed by cardiothoracic surgeons, DHL was therefore the only hospital that provided cardiovascular surgeries.

In May 2020, Dr. Santos signed a new three year-employment agreement with LPG, which included a one-year covenant not to compete and a two-year covenant not to solicit DHL's employees upon termination of the employment agreement. *Id.* at 365–75. At that time, Dr. Santos asked DHL to work with him on a succession plan so he could retire at the end of this new term. ECF No. 145-2 at 190. Yet as of September 2020—mere months after he signed his extension— DHL admitted internally that it was DHL's "choice as to how long [it] should keep Dr. Santos," given the availability of potential replacements. ECF No. 167-1 at 704.

## C. Structural Heart Program Expansion and Disputes with DHL

In the first half of 2020, Dr. Cigarroa and Dr. Santos met with Charles Stark, a Universal Health Services Regional Vice President overseeing DHL while it was between CEOs.[6] ECF No. 145-2 at 266–68. They discussed DHL's needs for cardiology services, a potential expansion and opportunity for collaboration, including a potential structural heart practice that would require DHL to hire an interventional cardiologist and cardiothoracic surgeons and invest in specialized equipment. *Id.*; ECF No. 167-1 at 360.

In a follow-up letter to Dr. Cigarroa and Dr. Santos, Mr. Stark noted that "as part of our collective efforts to grow the cardiac program," DHL wanted to meet about the potential to "work with" Dr. Cigarroa in the Cath Lab he already built. ECF No. 145-2 at 268. Mr. Stark stated that "[w]orking collaboratively" would be "essential" to supporting the TAVR program." DHL even floated a potential joint venture with the Cigarroa Clinic's new Cath Lab. *Id.* at 278.

This partnership did not come to fruition.

## D. DHL Attempts to Expand Their Cardiology Practice On Their Own

In August 2020, DHL hired a new CEO, Emma Montes-Ewing. Ms. Montes-Ewing "very quickly" realized that a partnership between DHL and the Cigarroa Defendants was unlikely to be successful due to an unalignment of interests,[7] and set off to build DHL's structural heart practice independently. ECF No. 167-1 at 704.

---

[6] Universal Health Services is DHL's parent company. *Id.* at 734.

[7] DHL was dissatisfied with Dr. Cigarroa's requests that DHL invest in its own facilities, equipment, and providers while he separately pursued his and his families' own business opportunities, including his Cath Lab and family partnerships with LMC. ECF No. 167-1 at 704. Dr. Cigarroa, for his part, expressed frustration with DHL's facilities, noting DHL's "aging" equipment, inadequate capacity for his patients, and lack of cardiologists and cardiovascular surgeons. ECF No. 145-2 at 277, 450–51. According to Dr. Cigarroa, he conveyed these concerns to DHL but "did not believe [DHL] was taking the actions needed to address these concerns." *Id.* at 451.

After analyzing Laredo's market, Ms. Montes-Ewing concluded that, to serve its population of over 260,000, Laredo needed at least twenty cardiologists, most of whom should be interventional cardiologists. *Id.* at 732. Not only was this below the level Laredo had at that time, but Ms. Montes-Ewing was concerned about a lack of coverage at DHL given that Dr. Cigarroa and his brother would often provide concurrent STEMI coverage at DHL and LMC. *Id.* She believed that this practice, known as "stacked coverage," could lead to unsafe delays in care. *Id.*

Ms. Montes-Ewing embarked on a plan to expand DHL's interventional cardiologist practice by attempting to recruit new interventional cardiologists. According to DHL's own internal communications, the goal of the initiative was to "better control [its] business" and create "independence," "rather than relying on the Cigarroa cardiologists," who could leave DHL at any time and shift their practice to a competitor. ECF Nos. 186-4 at 7, 145-2 at 281. Ms. Montes-Ewing relayed to Mr. Stark at the time that "building our program without the Cigarroas is the intention." ECF No. 145-2 at 276.

**Dr. Michael Blanc Recruitment.** In September 2020, Ms. Montes-Ewing contacted Dr. Michal Blanc to gauge his interest in moving to Laredo to practice full-time. ECF No. 167-1 at 733. Ms. Montes-Ewing asked Dr. Blanc if he was interested in establishing a cardiology clinic, as well as providing inpatient services and STEMI call coverage to supplement the existing set of physicians in the community. *Id.* at 733. This was no guarantee, as Ms. Montes-Ewing believed Dr. Blanc was only "60% 'sold' on Laredo." *Id.* at 704. On September 11, Dr. Blanc traveled to Laredo to meet with Plaintiffs and local physicians—including Dr. Carlos Cigarroa and Dr. Cigarroa II—and tour DHL's facilities. *Id.* at 183, 452.

The day before—after Ms. Montes-Ewing told Dr. Cigarroa of her plan to recruit Dr. Blanc, *id.* at 303—Dr. Cigarroa texted her that he was "against" DHL's recruitment of Dr. Blanc or any

other interventional cardiologist to Laredo before his son was "given . . . a chance to set his feet" and establish his own practice, *id.* at 440. Dr. Cigarroa said that he "would have preferred [she] discuss this with us in person . . . and have recruited through our own practice." *Id.* While Dr. Cigarroa told her that he believed hiring Dr. Blanc was the "wrong approach," he also said Ms. Montes-Ewing should "do as [she] see[s] fit," and that "we will both move in different directions [sic]." *Id.* at 442, 447. Dr. Cigarroa testified that he believed Ms. Montes-Ewing "ha[d] an entirely different plan for cardiology [in Laredo] and that that plan [was] going to be without the Cigarroas." ECF No. 145-2 at 68. These conversations were between the two of them and no evidence suggests these sentiments were shared with Dr. Blanc.

On October 7, nearly a month after Dr. Blanc visited, Dr. Blanc texted Ms. Montes-Ewing and asked her if there was "[a]ny conversation on bridging the divide with the Cigarroa [sic] family." ECF No. 167-1 at 461. She did not directly respond. On October 16, Plaintiffs sent Dr. Blanc a draft Letter of Intent under which he would provide interventional cardiology services as a full-time employee of LPG at DHL. ECF No. 167 at 18. In response, Dr. Blanc requested a Medical Directorship at an hourly fee of $300 for 40-50 hours per month. ECF No. 167-1 at 464. DHL's own communications reveal there was no "way [it] could get close to those numbers," that DHL did "not have any doctor at [that hourly fee] for medical direction and no one at 40-50 hours per month, and that it," "[could not] pay [Dr. Blanc] more than any others." *Id.*

While DHL commissioned a "Fair Market Value" analysis that aligned with the hourly rate, this analysis calculated a maximum of 360 hours annually, ECF No. 186-10 at 2, which is below the 40-50 hours per month that Dr. Blanc requested. Dr. Blanc later declined Plaintiffs' offer. ECF No. 167-1 at 733.

The record does not contain testimony from Dr. Blanc. But Ms. Montes-Ewing testified that Dr. Blanc told her that he did not think he was "welcome[]" in Laredo, that it would be a "challenge . . . to recruit," and that he did not want to "start a war" with Dr. Cigarroa. *Id.* at 311, 315. Ms. Montes-Ewing also testified that Dr. Blanc used the word "monopoly" and "blacklist" in reference to Dr. Cigarroa but did not offer the specific context. *Id.* at 315. Dr. Blanc, however, never met with or spoke to Dr. Cigarroa. Nor is there any evidence that Dr. Cigarroa communicated with or threatened Dr. Blanc or any other doctors at DHL.[8]

**Dr. Feldman Recruitment**. According to Ms. Montes-Ewing, the relationship with Dr. Cigarroa "beg[an] to deteriorate." ECF No. 145-2 at 32. Months went by and recruitment continued. ECF No. 167-1 at 316. In July 2021, two new candidates came forward: Dr. Mehmet Cilingiroglu ("Dr. Mehmet") and Dr. Marc Feldman. ECF No. 167 at 21. Dr. Mehmet lived in San Diego and was interested in practicing in Laredo. *Id.* Dr. Feldman was an adjoint professor at the University of Texas Health Science Center – San Antonio ("UTHSCSA"),[9] held a research lab, and was also interested in practicing part-time in Laredo. *Id.* Unlike Dr. Blanc, who was recruited for a full-time position, Plaintiffs' goal for Dr. Mehmet and Dr. Feldman was to have them provide part-time heart attack call coverage per month, build and establish a cardiology clinic at DHL, and eventually build a pipeline of medical residents from San Antonio to help grow DHL's cardiology program. ECF No. 167 at 21–22. DHL was also interested in having them start a structural heart program. *Id.* at 22. While Dr. Mehmet eventually signed with DHL, Dr. Feldman did not.

---

[8] While Plaintiffs cite Ms. Montes-Ewing's testimony to support the idea that several other members of the medical staff told her that Dr. Cigarroa opposed Dr. Blanc coming to Laredo, ECF No. 167 at 9, her testimony says no such thing. Instead, Ms. Montes-Ewing testified that, "*in the past*" Dr. Cigarroa had not supported new interventional cardiologists and so she "belie[ved] that he did so at present. ECF No. 167-1 at 314 (emphasis added). Nor is this testimony admissible. *See infra* Part I(B)(1).

[9] An adjoint professor is one who teaches and does research but does not do patient care. ECF No. 167-1 at 509.

After getting wind of Dr. Feldman's recruitment, Dr. Cigarroa publicly opposed it. During a medical staff meetings at DHL, he stated that Dr. Feldman would "create a great danger to [Laredo]" and raised concerns over "bringing in physicians that don't live in our community and giving them full privileges," which Dr. Cigarroa claimed the "bylaws protected" against. ECF No. 167-1 at 188. When asked about these comments, Dr. Cigarroa testified he was concerned about the structural heart program that was being started and that part-time physicians would not "maintain quality of care" and lead to "high morbidity and mortality." *Id.* Dr. Cigarroa also opposed new interventional cardiologists because he believed Laredo needed more general cardiologists instead. *Id.* at 188–89. After voicing these concerns, Ms. Montes-Ewing later told Dr. Cigarroa that DHL was not moving forward with the plan to establish a structural heart program. *Id.* at 188.[10]

Notwithstanding this opposition, Dr. Feldman signed a Letter of Intent with LPG on July 15, 2021, under which Dr. Feldman would perform around seven days of STEMI coverage and five days of clinic coverage each month at DHL. ECF No. 186-11 at 3.

Dr. Cigarroa did not relent on Dr. Feldman's hiring. A few days later, on July 22, Dr. Cigarroa texted and spoke with Dr. Anderson, Dr. Feldman's supervisor at UTHSCSA.[11] ECF No. 167-1 at 719. The only evidence about their conversations is from Dr. Cigarroa and Dr. Anderson themselves. According to Dr. Cigarroa, they spoke about Dr. Feldman's intent to provide structural cardiology services at DHL. *Id.* He stated his concern was safety-related, that Ms. Montes-Ewing gave Dr. Feldman an incorrect impression that the program would be feasible in the near term, and

---

[10] Nor was DHL ready to do so. *See id.* at 734; *see also id.* at 527 (Ms. Montes-Ewing stating, on July 21, 2021, that DHL is "NOT planning to start a structural program at this point"); *but see id.* at 543 (Ms. Montes-Ewing stating, on July 22, 2021, that "[t]he structural heart is a program that we must plan to start for Q3 or Q3 of 2022, perhaps sooner").

[11] The two texted each other two days in the weeks prior, but these messages were deleted. ECF No. 167 at 23. No evidence in the record reveals what the contents of these messages were.

so asked Dr. Anderson to "share this concern" with Dr. Feldman. *Id.*; *see also* ECF Nos. 167-1 at 190 (I called Dr. Anderson "to find out if Dr. Anderson was properly trained to do structural cardiology"). Dr. Anderson confirmed this, testifying that Dr. Cigarroa only "mentioned that Dr. Feldman might be coming to Laredo for a TAVR program." ECF No. 145-2 at 219.

During this time, Dr. Cigarroa also texted his nephew, Dr. Joaquin Guzman, stating that Dr. Feldman's "presence as hospitalist cardiologists is controversial" and not to discuss the issue with Dr. Feldman. ECF No. 167-1 at 547.

A few weeks later, in early August 2021, Dr. Anderson called Dr. Feldman.[12] Dr. Feldman testified that Dr. Anderson told him that if he started working in Laredo part-time, he would lose his research lab. *Id.* at 510. Dr. Anderson disputes this and testified that he never threatened Dr. Feldman. ECF No. 192-1 at 10. Wanting to figure out the reason behind this threat, and that "no one . . . was willing to reveal to [him] the motivation for why Dr. Anderson told [him his] lab could be at risk," ECF No. 145-2 at 128, Dr. Feldman met with Dr. William Henrich, the then-President of UTHSCSA. ECF No. 167-1 at 510. Dr. Henrich told him he was unaware of any threat and merely said he would investigate.[13] *Id.* at 510–11. To remove the threat, Dr. Feldman later sent Dr. Henrich a proposal in which DHL, with Dr. Feldman and Dr. Mehmet on board, could "shift"— refer—Laredo patients to UTHSCSA. ECF Nos. 167-1 at 515; 182-11.

After this meeting, Dr. Feldman also emailed Dr. Henrich about his lab "slush fund," which had been taken away from him in the interim. ECF No. 167-1 at 552. While this turned out to be a clerical error and unrelated to Laredo, *id.* at 514, Dr. Henrich responded that he "spoke with Dr.

---

[12] The parties dispute whether this was a routine meeting or not. *Compare* ECF No. 181 at 1 (routine meeting) *with* ECF No. 182 at 4 (not a routine meeting).

[13] Dr. Cigarroa also made a statement about his market share to UTHSCSA, which was relayed to Dr. Feldman by Dr. Henrich. *Id.* at 550. The record is unclear when this statement was made or in what context.

Anderson . . . last night," that he "believe[d] there is an amicable resolution to these matters" and "ask[ed] that [Dr. Feldman] work directly with Dr. Anderson in order to make a plan for the future." *Id.* at 552.

Dr. Feldman did not meet with Dr. Anderson again. Instead, he spoke with George Hernandez, the then-CEO of UTHSCSA. *Id.* at 515. During this meeting, Dr. Feldman did not mention any threat to his lab by Dr. Anderson. *Id.* at 516. After this meeting, Dr. Feldman forwarded the same proposal he had sent to Dr. Henrich to "shift" Laredo patients to UTHSCSA from DHL. *Id.* at 515. Following this meeting, Mr. Hernandez also had a call with Ms. Montes-Ewing, and then spoke with Dr. Anderson. *Id.* at 579. Mr. Hernandez testified that none of these conversations relayed anything about LMC "doing something wrong." *Id.*

Dr. Feldman then emailed Mr. Hernandez on August 26 to ask about the outcome of his conversation with Ms. Montes-Ewing, stating she "told me she shared with you [Dr.] Anderson's comment that [his] research lab would be taken away from [him] if [he] worked in Laredo." *Id.* at 585. Mr. Hernandez responded that he was unaware of any threat, that UTHSCSA was supportive of receiving cardiology patients from DHL, but that his understanding was that DHL had previously not been "interested" in that relationship. *Id.* at 584. In response, Dr. Feldman specifically relayed Dr. Anderson's threat. *Id.* at 583. Mr. Hernandez did not respond and instead sent the email to in-house counsel. *Id.* at 587.

Dr. Feldman's attempts to remove the threat was futile. Unhappy with the potential loss of his lab, Dr. Feldman turned down DHL's offer, but confirmed he would have stayed but-for Dr. Anderson's warning. *Id.* at 518. Dr. Feldman eventually took another job in Kerrville that, without threats, permitted him to continue to retain his lab. *Id.* at 518–19.

While the record does not contain evidence that establishes the reason behind Dr. Anderson's threat, Dr. Feldman testified that Dr. Anderson never told him he was threatened by Dr. Cigarroa. *Id.* at 517. Nor did Dr. Henrich tell him Dr. Anderson was threatened by Dr. Cigarroa. *Id.* Dr. Anderson likewise testified that Dr. Cigarroa did not discuss withholding of referrals nor threaten him on their call. ECF No. 145-2 at 219–20.

### E. Dr. Cigarroa Leaves DHL for LMC

In March 2021, amid DHL's recruitment campaign, Dr. Cigarroa emailed LMC's CEO, Jorge Leal ("Mr. Leal"), to propose a partnership in which "Cigarroa Heart" would commit its services to LMC as part of an "aggressive" campaign to secure LMC's market share in Webb County—much like his proposal to DHL in 2020. ECF No. 185-1 at 2. Dr. Cigarroa highlighted the "chaos" that "new leadership at [DHL] ha[d] created" and recommended expanding LMC's own cardiology capabilities with new Cath Labs, equipment, and personnel. *Id.* Dr. Cigarroa also outlined a plan for launching a structural heart program at LMC, starting with the recruitment of Dr. Santos from DHL. *Id.* With a structural heart program, LMC could provide the full suite of cardiology services: surgical, interventional, and structural.

To facilitate this expansion, Dr. Cigarroa offered that he and other CHVI physicians would support LMC with call coverage and perform some inpatient procedures at LMC. *Id.* In closing, Dr. Cigarroa stated that he knew the "tight alignment will be fabulous for our community."[14] *Id.* In response, LMC expressed support, with Mr. Leal noting this would be a "huge opportunity." *Id.*

As the months progressed, this partnership became reality. In May 2021, Dr. Cigarroa, on behalf of all the Cigarroas, texted Mr. Leal that "[w]e met as a family and all are on board to

---

[14] CHS is Community Health Systems, the parent company of LMC. ECF No. 167 at 20.

committing to LMC," and laid out the step-by-step plan of shifting their practices, including who else needed to be hired and when they would provide notice to DHL. ECF No. 167-1 at 490.

In August 2021—during the time Dr. Feldman was being recruited—Dr. Cigarroa and Dr. Cigarroa II revealed their plan by formally shifting their inpatient practice exclusively to LMC. *Id.* at 607 (notice to DHL to cease providing STEMI call coverage and that Dr. Cigarroa II was downgrading his medical privileges).

Privately, Dr. Cigarroa II referenced the reason for his departure as "due to some politics" but that the situation is "hopefully not too long." *Id.* at 610. But Dr. Cigarroa and Dr. Cigarroa II stopped providing treatment at DHL. *Id.* at 649. Yet internal communications at DHL reveal management indifference to Dr. Cigarroa's departure, with Mr. Stark noting that the "termination notice [was] not unexpected" and instead "reflects [the Cigarroa's] inability to accept a direction that they do not/cannot absolutely control." ECF No. 145-2 at 295. Another DHL executive agreed that the Cigarroas were "[d]oing [DHL] a favor and removing cost for which we get nothing." *Id.*

### F. Dr. Santos and Others Leave DHL for LMC

The shift from DHL to LMC was not just the Cigarroas. Defendants sought to recruit DHL's own employees: Dr. Santos, nurses, and technicians who worked alongside him.[15] The discussions for this shift also began during DHL's recruitment. In May 2021, Dr. Cigarroa and Mr. Leal discussed how hiring nurses and staff to support Dr. Santos were necessary "to make [the partnership] work." ECF No. 167-1 at 500. By doing so, LMC would have the upper hand in staffing. Until formal notice was given, this plan remained secret. *See id.* (Dr. Cigarroa telling Mr.

---

[15] Dr. Santos testified he had independent reasons for leaving, as DHL was planning to bring on Dr. Mark Morales and his group—itinerant heart surgeons employed by one of UHS's other hospitals (the "Morales Group"). ECF No. 167-1 at 357. Dr. Santos believed that this method of treatment—rotating from city to city and not being available for patients after the surgery—was problematic. *Id.* at 358–59. The Morales Group began performing surgeries at DHL in October 2021, after Dr. Santos left. ECF No. 145-2 at 204. According to Dr. Santos, they were eventually fired after a tenure that included a high mortality rate among patients. *Id.* at 181.

Leal that he "will remain quiet" regarding the plan to hire DHL's nurses). But as of August 16, LMC knew that Dr. Santos was under a noncompete with DHL. ECF No. 192-3.

Internal documents demonstrate this plan in action. On August 3, Dr. Cigarroa told Mr. Leal that Dr. Santos would be going on vacation and "may never operate [at DHL] again," ECF No. 167-1 at 602, a preview for Dr. Santos' eventual departure from DHL. On August 10, LMC discussed recruiting DHL's then-current Director of its Cath Lab and referred to it as a "strategy play." *Id.* at 612. LMC also discussed opening the open-heart program "by end of year" and that "[b]ringing the heart team from DHL is a must." ECF No. 192-3 at 3–4.

On August 23, Dr. Santos signed a Letter of Intent with LMC. ECF No. 185-14 at 2–3. When Ms. Montes-Ewing called a meeting with DHL managers to try to retain the nurses, Dr. Cigarroa was informed and relayed the information to Mr. Leal, who responded "[j]ust wait till we take [Dr. Santos] and the heart team." ECF No. 185-6 at 3.

Following Dr. Santos' path were DHL's nurses and technicians who worked alongside him. In early September, Mr. Leal and Dr. Santos discussed nurses that LMC would recruit from DHL, including a specific list with their contact information. ECF No. 167-1 at 635–36, 639. Dr. Santos agreed that LMC "should reach out to" them. *Id.* at 620. During this time, Mr. Leal also texted Dr. Cigarroa to tell him that he spoke with Dr. Santos and that LMC would be "going after" the "surgical techs [then employed by DHL]." *Id.* at 655.

On September 15, 2021, Dr. Santos informed Plaintiffs that he was terminating his employment contract.[16] *Id.* at 659. During the next several months, Dr. Cigarroa II also participated in LMC's efforts to recruit from DHL, for example by responding to LMC Chief Operating Officer's question about "tak[ing]" the staff at the cardiac rehab at DHL to LMC with "lala . . .

---

[16] Due to his noncompete, Dr. Santos did not start at LMC in Fall 2021 and instead opened his own office until the clause expired, after which he began performing surgeries at LMC. *Id.* at 347, 349.

knows a lot." *Id.* at 669. In total, four of Plaintiffs' employees who worked with Dr. Santos left to LMC. *Id.* at 346.

But it was not only Defendants' conduct that caused Dr. Santos and DHL's employees to leave. Dr. Mehmet testified that some were unhappy with the conditions and pay at DHL, and that Ms. Montes-Ewing refused to give them a pay raise. *Id.* at 275. Dr. Santos likewise had independent reasons to leave. *See infra* note 15. And like Dr. Cigarroa's departure, internal DHL communications reveal it had anticipated Dr. Santos' departure prior to Dr. Santos handing in his notice. DHL decided "it's ok if he tries to go" because (i) Dr. Santos was not "very productive" and (ii) DHL had already hired the Morales Group, who did not "think it [was] a good idea to have Santos and his group overlap too long." ECF No. 145-2 at 297, 299. DHL also noted that "it might be beneficial strategically to not allow [Dr. Santos] to just go over to LMC" and that "it shouldn't be easy" for him to go. *Id.* at 297.

### G. Defendants' Purpose Behind the Recruitment

The evidence reveals that this "massive exodus," in the words of Dr. Mehmet, ECF No. 167-1 at 273, was intended to strip DHL of its resources and establish Defendants' dominance in the market for interventional cardiology services in Laredo. Mr. Leal told Dr. Cigarroa that the plan was to "take everything from [Plaintiffs]." *Id.* at 680. Dr. Cigarroa responded by stating DHL "have nothing . . . no cath lab nurses no call team . . . stemi went on diversion . . . [that] they were totally inept . . . [and] this digs them [further] into incompetence." *Id.* Internal documents reference competitive strategy undergirding the recruitment efforts: LMC's wanted to "[b]eat out the competition (DHL continues to be DHL)." ECF No. 192-3 at 3.

On August 31, after the Cigarroas had handed in their 90 days and Dr. Santos signed a Letter of Intent with LMC, Mr. Leal circulated an internal document titled LMC "Cardiovascular Business Strategy" that stated

> Competition: The shift in Cardiology focus from Doctors Hospital of Laredo to Laredo Medical Center is significant. Left without a Cardiothoracic Surgeon and a minority group of Cardiologists will be detrimental to our main competitor. If LMC is able to capitalize and build a quality-focused service line with positive outcomes, we will be in a position to lead the market in Cardiovascular for years to come.

ECF No. 185-15 at 7.

This document states that LMC was positioned to grow a "significant share of Cardiovascular services in the market," in part based on the Cigarroa's shift to LMC. *Id.* at 5; *see also id.* at 11 ("Cigarroa family of Cardiologists encompasses majority of Cardiology market in Laredo; LMC alignment with Cigarroa family is essential to current and future success."). It noted that with Dr. Santos, "LMC will lead the Laredo market of Cardiothoracic Surgery, leaving DHL with a need to rebuild and/or recruit new Cardiothoracic Surgeon[s] with limitations in referral base." *Id.* It stated that "[t]he addition of new services and Cardiac procedures [would] allow for a mitigation of outward migration to San Antonio," as LMC could now begin to cover procedures previously referred out of Laredo. *Id.* at 7. And it acknowledged that threats include "DHL new physicians" along with "DHL Legal involvement (w/Physicians)." *Id.* at 8. LMC's Director of Human Resources, Danielle Flores, agreed that "physician recruitment by any other entity is always something that is discussed as a threat," as "volume can change." ECF No. 167-1 at 618.

LMC touted its successful recruitment efforts in converting "two cardiology market splitters [the Cigarroas] into sole LMC loyalists, effective December of [2021]." ECF No. 185-17 at 2. "LMC loyalists" were "medical staff who either only practiced at LMC . . . or . . . that mostly practiced" at LMC. ECF No. 167-1 at 619. Alongside investing in its own cardiology practice

(both interventionalist and surgical), LMC five-year goal was to have 90% market share in cardiology and 70% market share in vascular within five years, through "[c]ontinued partnership with [the] Cigarroas" and "Dr. Santos['] employment . . . + NP [Nurse Practitioners]."[17] ECF No. 187-2 at 9. To date, LMC has "invested in excess of $6 Million Dollars into its new Cath Lab and associated equipment" to further these aims. ECF No. 145-2 at 439.

Of course, DHL was also trying to increase its market share and decrease its outmigration as well. *Id.* at 250 (noting goal was to "increase market share [for cardiovascular] to 60%" between 2021 to 2024, as well as a decrease in outmigration to San Antonio for complicated procedures).

## H. What Happened Post-Exodus

Even after Dr. Cigarroa, Dr. Cigarroa II, Dr. Santos, and DHL's nurses and technicians all moved to LMC, DHL did not close shop. To replace Dr. Santos, DHL brought on the Morales Group. ECF No. 167-1 at 323. DHL was also able to hire Dr. Mehmet.[18] But even with Dr. Mehmet, DHL only had three interventional cardiologists: Dr. Carlos Cigarroa, Dr. Diaz, and Dr. Mehmet, down from five. That said, until May 2022, DHL did not change its practices and was able to cover its interventional cardiology services by relying on these three physicians. ECF No. 188-2 at 74; ECF No. 167-1 at 322. Plaintiffs also continued to recruit on a nationwide basis for interventional cardiologists and hired Dr. Yunus Moosa in August 2023. ECF No. 167-1 at 736. Two new interventional cardiologists is only one less than internal United Health Services' documents state was the goal by 2025. ECF No. 145-2 at 244. Indeed, the total number of interventional cardiologists in Laredo has increased since this case began. ECF No. 185-8 at 60.

---

[17] The two-year goal was 75% and 60% respectively. *Id.*

[18] Dr. Mehmet recently resigned due to animosity with Dr. Cigarroa. *Id.* at 260.

After May 2022, so as not to "burn out" Dr. Carlos Cigarroa and Dr. Diaz, ECF No. 167-1 at 322, Plaintiffs contracted with multiple cardiologists on a locum tenens basis. Several locum tenens have provided both clinic coverage and nightly on-call coverage but at higher rates than DHL was paying for non-locums interventional cardiologists for the coverage. The parties dispute the nature of, and harm caused by the locum tenens use. Plaintiffs' expert, Dr. Kevin Pflum ("Dr. Pflum"), concluded that because of Dr. Feldman's exclusion and the Cigarroas' departure, DHL was forced to rely on locums to provide clinic and STEMI call coverage. ECF No. 188-2 at 75. On top of the additional costs, Dr. Pflum concluded that the use of locums caused "delays in [DHL's] development plans" and "may . . . ultimately result[] in lower quality patient experience," such as being "denied the ability to develop a physician-patient relationship with the interventional cardiologist that treated them." *Id.*; ECF No. 188-5 at 46.

Defendants have a different picture: they contest the notion that locums had anything to do with Dr. Feldman's failed recruitment or the Cigarroas departure given that no locums were used before May 2022—months after both events. ECF No. 169 at 22. They also assert that Plaintiffs have put forth no evidence that locums *actually* provided lower-quality care or that any patient was adversely affected. *Id.* at 35.

The parties also use different data and dispute the correct measure to determine whether interventional cardiology procedures have increased overall in Laredo. Relying on Dr. Pflum's own data, Defendants' expert, Dr. Robert S. Maness ("Dr. Maness"), noted there were 2,869 interventional cardiology procedures performed in 2020, compared to 2,888 in 2012. ECF No. 185-8 at 59.[19] Plaintiffs dispute this for two reasons. First, they argue that these numbers include

---

[19] According to Dr. Maness, Defendants' data likewise showed an increase in procedures as well from 2020 to 2022. *Id.*

procedures done at the Cigarroa Clinic, and that the proper comparison must be based on what volume would have occurred with the Cigarroa Clinic "open but absent the alleged conduct." ECF No. 188-5 at 39. Second, they claim 2020 is not representative due to COVID and that the data shows that "overall interventional cardiology procedure volume has *declined* since 2019," noting a more than fifty percent decrease in DHL's procedure counts. *Id.* at 40–41.

## II.   <u>Procedural History</u>

Plaintiffs filed their initial complaint in October 2021. ECF No. 1. In January 2022, they filed the operative amended complaint. ECF No. 22. Plaintiffs assert Section 1 and Section 2 claims under the Sherman Act, as well as Texas state law claims for tortious interference with contract and prospective business relations. ECF No. 22.

In April 2022, the Court dismissed Plaintiffs' claims concerning Dr. Santos for tortious interference with an existing contract against all Defendants but permitted the other claims to move forward.[20] ECF No. 64. Defendants seek summary judgment on the remaining claims.

## <u>ANALYSIS</u>

The Court first analyzes Defendants' evidentiary objections before turning to the merits of their motion for summary judgment.

## I.   <u>Defendants' Objections to Plaintiffs' Evidence and Motion to Strike Dr. Pflum's Conclusions</u>

Defendants move to strike certain sworn testimony by Ms. Montes-Ewing, Dr. Feldman, and Dr. Mehmet and portions of Dr. Pflum's expert report on damages. ECF No. 171 at 4–10. The Court addresses each in turn.

---

[20] Two years into this case, the Cigarroa Defendants sought leave to assert a counterclaim against Plaintiffs for attempted monopolization, claiming that critical allegations in the Amended Complaint were intentional misrepresentations and that Plaintiffs filed this suit as part of a broader effort to control the practice of cardiology in Laredo. ECF No. 121. The Court permitted the counterclaim, ECF No. 130, but granted Plaintiffs' motion to dismiss in July 2024, ECF No. 162.

## A. Applicable Law

At summary judgment, "the evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial." *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012). A party asserting that a fact "is genuinely disputed must support the assertion by" "citing to particular parts of materials in the record, including depositions, documents . . . [and] affidavits or declarations." FED. R. CIV. P. 56(c)(1)(A). "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical and Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017). "[T]he burden is on the proponent to show that the material is admissible as presented to or to explain the admissible form that is anticipated." *Lee*, 859 F.3d at 355 (quoting Advisory Committee's Note to 2010 Amendment)).

"Hearsay is not competent summary judgment evidence unless its proponent can show that the statement can be presented in admissible form at trial." *Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 218 (5th Cir. 2024) (citations omitted). "Nor [are] statements made without personal knowledge [] capable of being so presented." *D'Onofrio v. Vacation Publications, Inc.*, 888 F.3d 197, 208 (5th Cir. 2018); FED. R. EVID. 602. Federal Rule of Civil Procedure 56(c) requires an "affidavit or declaration . . . to be made on personal knowledge," and "a district court is entitled to strike affidavits that do not comply with this rule," *Akin v. Q-L Investments, Inc.*, 959 F.2d 521, 530 (5th Cir. 1992).

## B. Analysis

Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. FED. R. EVID. 801(c).

> Whether an out-of-court statement is hearsay depends on whether it
> is offered for its truth or merely for the fact that it was made. Where

the alleged fact is only so if the substance of the statement is the truth, the statement constitutes hearsay. On the other hand, where the alleged fact may be so regardless of whether the statement is true or false, the statement is not hearsay.

*United States v. Webster*, 549 F.2d 346, 359 (5th Cir. 1981) (internal citations omitted).

Federal Rule of Evidence 801(d)(1)(B) provides that a statement is not hearsay if it "is consistent with the declarant's testimony and is offered" to "rebut an express or implied charge that the declarant recently fabricated it."

Federal Rule of Evidence 803(3) provides an exception to the rule against hearsay for a "statement of the declarant's then-existing state of mind," including "motive, intent, or plan" or "emotional, sensory, or physical condition," including "mental feeling."

Under Federal Rule of Evidence 805, "[h]earsay within hearsay" can only be admitted if "each part of the combined statements conforms with an exception to the rule."

### 1. Ms. Montes-Ewing's Testimony

Defendants object to fourteen statements from Ms. Montes Ewing's testimony as hearsay that also lacks foundation under Federal Rule of Evidence 602. ECF No. 176-1 at 1–11. All consist of out-of-court statements by Dr. Blanc, Dr. Feldman, Dr. Ralph Nimchan,[21] and other DHL physicians. Plaintiffs respond that these physicians have personal knowledge and that the statements are not hearsay under Federal Rule of Evidence 803(3), relying on the "motive" and "state of mind" exceptions. ECF No. 172 at 3–5. Because the Court finds for Defendants even considering eleven out of fourteen of these objections, it overrules these objections as moot. *See* ECF No. 176-1 at 1–4, 6–9, 11 (Obj. Nos. 1–2, 4–5, 7–11, 13–14).[22]

---

[21] Dr. Nimchan is a general cardiologist at DHL. ECF No. 145-2 at 12.

[22] Dr. Blanc's statements would fall under Federal Rule of Evidence 803(3) as "motive." Plaintiffs concede that Dr. Blanc's state of mind is relevant in explaining why he chose to not to move to Laredo. ECF No. 172 at 4. Accordingly,

The remaining three objections are sustained, as discussed below.

**Objection 3.** Defendants object to the statement by Ms. Montes-Ewing that Dr. Lyons and two other physicians "had heard it was difficult to enter a market in cardiology in Laredo" as hearsay. ECF No. 176-1 at 2. Plaintiffs argue that it falls under the state of mind exception.

This statement is hearsay that cannot be cured by the state-of-mind exception, as Ms. Montes-Ewing is testifying about what *others* told these doctors. Plaintiffs have offered no exception to this second layer of hearsay.

**Objection 6.** Defendants object to Ms. Montes-Ewing statement that she had heard from "different members of the medical staff and different people that [new interventional cardiologists] was something that in the past [Dr. Cigarroa] had not supported" as hearsay. ECF No 176-1 at 5. There are two layers of hearsay here: the medical staff's statements to Ms. Montes-Ewing and Dr. Cigarroa's statement to the medical staff (assuming they did not hear it second-hand). Even assuming Dr. Cigarroa made these statements as a party-opponent, Plaintiffs have not cured this second layer of hearsay.

**Objection 12.** Defendants object to Ms. Montes-Ewing's statement that

> [Dr. Feldman] shared the phone call that he had received from Dr. Anderson. And he elaborated on the fact that Dr. Anderson had said to him that he couldn't come to Laredo, otherwise Dr. Ricardo Cigarroa would pull the volume he was sending to UTSA and TAVRs and other things, and that he owned 90 percent of the market. That was said during that call.

ECF No. 176-1 at 10.

There are multiple layers of hearsay here: Ms. Montes-Ewing testified about Dr. Feldman's statement, who retold Dr. Anderson's statement of what Dr. Cigarroa said. Plaintiffs do not contest

the Court does not treat these statements as made for the truth-of-the-matter asserted. *See* ECF No. 176-1 at 1–4, 6, 9 (Obj. Nos. 1, 2, 4, 5, 7, 8, 11).

this is hearsay but argue that it is admissible as a prior consistent statement under Rule 801(d)(1)(B). ECF No. 172 at 8–9.

This exception is inapplicable here because Plaintiffs do not explain how this statement is *consistent* with Dr. Feldman's prior testimony. To the contrary, Dr. Feldman's sworn testimony is *inconsistent* with his prior testimony.

Dr. Feldman testified that Dr. Anderson did *not* tell him that Dr. Cigarroa threatened to stop referring patients to UTSA and instead send them to their competitor, nor did Dr. Anderson tell him that Dr. Cigarroa claim to have a 90% market share in Laredo. ECF No. 145-2 at 126–127. These two statements—that Dr. Anderson told Dr. Feldman that Dr. Cigarroa threatened to pull volume and owned 90% of the market, and that he did not—are *inconsistent*, and so Rule 801(d)(1)(B) does not apply.[23] While Dr. Feldman testified that Dr. Anderson threatened to withhold his lab, this is neither consistent nor inconsistent with his statement that Dr. Cigarroa threatened Dr. Anderson. And although Plaintiffs claim that Dr. Feldman's credibility will be a "key disputed issue at trial," credibility does not cure hearsay.

### 2. Dr. Feldman's Testimony

Defendants object to two statements by Dr. Feldman in two exhibits and two statements in Dr. Feldman's deposition testimony.[24] ECF No. 176-1 at 14–16, 18 (Obj Nos. 20–22, 24). Because the Court finds for Defendants even considering two of these statements, it overrules these objections as moot. ECF No. 176-1 at 14, 18 (Obj. Nos. 20, 24).

---

[23] While Federal Rule of Evidence 801(d)(1)(A) provides that a prior inconsistent statement is not hearsay if it "was given under penalty of perjury at a trial, hearing, or other proceeding or in a deposition," this statement was not. It was allegedly relayed to Ms. Montes-Ewing by Dr. Feldman in conversation.

[24] Defendants previously objected to seven statements, *see* ECF No. 176-1 at 12–16 (Obj. Nos. 15–22), but withdrew five objections, *id.* (Obj. Nos. 15–19).

**Deposition Testimony.** Defendants object to two statements by Dr. Feldman which restate what Dr. Henrich told him. ECF No. 176-1 at 15–16 (Obj. Nos. 21–22). In both, Dr. Feldman testified that Dr. Henrich told him he knew Dr. Cigarroa and "hypothesized" that Dr. Cigarroa was the cause of Dr. Anderson's threat. ECF No. 167-1 at 517. Defendants seek to rely on these statements for the fact that Dr. Cigarroa was the "cause of Dr. Anderson's threat." ECF No. 167 at 26. Defendants claim this is hearsay that lacks foundation. Plaintiffs argue that these meet the co-conspirator exception and that foundation is established based on Dr. Henrich's relationship with Dr. Cigarroa. ECF No. 172 at 7–8.

Assuming the co-conspirator exception under Federal Rule of Evidence 801(d)(2)(E) is met,[25] Plaintiffs fall short of Federal Rule of Evidence 602's requirement that Dr. Henrich have personal knowledge to testify as to his belief.

Under Rule 602, courts can "reasonably infer[]" personal knowledge and competence from the declarant's "positions and the nature of their participation in the matters to which they swore." *DIRECTTV Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005) (citation omitted). Personal knowledge "may include inferences and opinions so long as they are grounded in personal observation and experience." *Garcia v. Delta Co.*, No. 3:20-CV-03194-X-BH, 2023 WL 2950632, at *12 (N.D. Tex. Feb. 23, 2023). Even if Dr. Henrich made this statement, merely "know[ing] the city" and Dr. Cigarroa, ECF No. 167-1 at 517, is insufficient to form this opinion under Rule 602. Being friends with someone is far too broad to serve as a basis to speculate about such a specific issue. Plaintiffs have not explained how this relationship rises to the level of "personal observation and experience" from which Dr. Henrich could form a belief that Dr. Cigarroa was behind the threat. Defendants' objection is sustained.

---

[25] Plaintiffs assert a conspiracy among Dr. Henrich, Dr. Anderson, and Dr. Cigarroa to prevent Dr. Feldman from coming to Laredo, given that they all communicated with each other about, and with, Dr. Feldman. ECF No. 172 at 8.

### 3. Dr. Mehmet's Testimony

Defendants object to four statements in Dr. Mehmet's deposition testimony and one statement in an exhibit. ECF No. 167-1 at 17–24 (Obj. Nos. 23, 25–28).

**Deposition Testimony**. Defendants' object to Dr. Mehmet's statements that (i) recite what Dr. Feldman told him about his discussions with Mr. Hernandez and Dr. Henrich, (ECF No. 176-1 at 17, 19–21, Obj. No. 23, 25), (ii) characterize Dr. Cigarroa's tactics as "bullying" and "sabotage," (ECF No. 176-1 at 22–23, Obj. No. 26), and (iii) ask Ms. Montes-Ewing "[w]ill I be safe in town while [the Cigarroas] are clearly after us?" (ECF No. 176-1 at 23, Obj. No. 27). As to the last one, Defendants only object to the word "us." *Id.*

For the statements that recite what Dr. Feldman told Dr. Mehmet, Plaintiffs rely on Federal Rule of Evidence 801(d)(1)(B)'s prior consistent statement exception. ECF No. 172 at 8. This fails. While the retelling is consistent with Dr. Feldman's own testimony, there is no claim that Dr. Feldman fabricated these meetings or the contents of them. Plaintiffs offer no other exception for these statements; they are hearsay because they restate Dr. Feldman's out-of-court statements to Dr. Mehmet, and so Defendants' objections are sustained.

As to Dr. Mehmet's characterization and question about his safety, Defendants' objections are overruled. Dr. Mehmet was involved in the recruitment process alongside Dr. Feldman and can testify, under Federal Rule of Evidence 602, to his own perception surrounding the process.

### 4. Ms. Montes-Ewing's Declaration

Defendants object to five statements in Ms. Montes-Ewing's declaration.[26] ECF No. 176-1 at 25–23 (Ms. Montes-Ewing Declaration, ¶¶ 9–11, 19–20).

---

[26] Defendants previously objected to seven statements, *see* ECF No. 176-1 at 25–29 (¶¶ 9–11, 19–21, 23), but withdrew two objections, *id.* (¶¶ 21, 23), to the extent they refer to Dr. Feldman's plans under Federal Rule of Evidence 803(3).

Defendants' objections to Paragraphs 9–11 in Ms. Montes-Ewing's declaration, which consist of statements by Ms. Montes-Ewing that restate what Dr. Blanc told her were his concerns about coming to Laredo, are overruled as moot to the extent the statements refer to Dr. Blanc's statements about his state of mind. *See* Part I(B)(1).

Defendants' objections to Paragraphs 19–20 in Ms. Montes-Ewing's declaration are sustained. Paragraph 19 repeats what Dr. Feldman told Ms. Montes-Ewing about his conversation with Dr. Anderson and his threat to lose his lab. While Dr. Feldman's testimony about what Dr. Anderson told him would be admissible as a co-conspirator statement, Dr. Feldman's statement to Ms. Montes-Ewing is "double hearsay." Paragraph 20 repeats what Dr. Henrich told Dr. Feldman about his hypothesis regarding Dr. Cigarroa. Not only is this hypothesis inadmissible, *see* Part I(B)(2), but "double hearsay" applies for the same reason as Paragraph 19.

### 5. Dr. Pflum's Expert Report

Defendants object to two conclusions in Dr. Pflum's expert report under Federal Rule of Evidence 702: (i) that Plaintiffs use of locums tenens "raises Plaintiffs' costs," and (ii) that Defendants' conduct is anticompetitive. ECF No. 171 at 6–10. Defendants' objection to the second conclusion is based on the argument that the increased costs analysis is flawed.

The Court denies these objections as moot, given its finding that Defendants' conduct did not cause anticompetitive effects, even assuming Plaintiffs' use of locums tenens increased its costs.

## II. <u>Defendants' Motion for Summary Judgment</u>

### A. Legal Standard

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R.

CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non–moving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en banc*, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Although Rule 56(e) does not allow a party to rest upon the mere allegations or denials of his pleading when his adversary moves for summary judgment, the Rule does not relieve the movant of his duty to establish the absence of a genuine issue as to material facts. The moving party still has the initial burden, under Rule 56(c), of showing the absence of a genuine issue concerning any material fact, and of showing that judgment is warranted as a matter of law." *Boazman v. Econ. Lab'y, Inc.*, 537 F.2d 210, 213–14 (5th Cir. 1976) (citations and quotation marks omitted).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving,*

*Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

### B. Standing

Section 4 of the Clayton Act provides that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States." 15 U.S.C. § 15(a). "The Supreme Court has read this language to impose on antitrust plaintiffs threshold requirements that go beyond Article III standing." *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022).

The Fifth Circuit has "distill[ed] those requirements to three elements: '1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3)

proper plaintiff status, which assures that other parties are not better situated to bring suit.'" *Id.* (quoting *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997)).

As for proper plaintiff status, the Fifth Circuit examines factors such as "(1) whether the plaintiff's injuries or their causal link to the defendant are speculative, (2) whether other parties have been more directly harmed, and (3) whether allowing this plaintiff to sue would risk multiple lawsuits, duplicative recoveries, or complex damage apportionment." *Norris v. Hearst Tr.*, 500 F.3d 454, 465 (5th Cir. 2007) (citation omitted).

**Injury-in-fact**. Plaintiffs contend that Defendants' conduct caused DHL to lose the services of Dr. Cigarroa, Dr. Cigarroa II, and Dr. Santos and his team, and this caused DHL to seek medical services from locum tenens at a higher cost.[27] This is classic economic injury that establishes an injury-in-fact. *See Pulse*, 30 F.4th at 489 n. 9.

**Proper Plaintiffs.** DHL and LPG are proper plaintiffs. A reasonable jury could find a causal link between this injury-in-fact and Defendants' conduct, Plaintiffs' harm is distinct, and there is no risk of multiple lawsuits or duplicative recovery as no other party (such as a patient, insurer, or physician) could recover for Plaintiffs' injury.

**Antitrust Injury.** The crux of the dispute is whether Plaintiffs have suffered antitrust injury. Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). "The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Id.* In other words, the injury should be "the type of loss that the claimed violations . . . would be likely to cause." *Zenith Radio*

---

[27] Defendants dispute the extent of the injury given alternative resources, but this is still economic injury. Even if Plaintiffs found "an alternative source [of physicians], [they] may still be injured if [they] would have been better off without the [anticompetitive conduct]." *Malcolm v. Marathon Oil Co.*, 642 F.2d 845, 863 (5th Cir. Unit B 1981).

*Corp. v. Hazeltine Rsch.*, 395 U.S. 100, 125 (1969). "Antitrust injury fleshes out the basic idea that the antitrust laws were enacted for the protection of *competition*, not *competitors*." *Pulse*, 30 F.4th at 488 (internal quotation marks and citation omitted). Whether there is an antitrust injury turns on whether there was a "competition-*reducing* aspect or effect" of Defendants' conduct. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 324, 344 (1990).

"Though the 'threat of decreased competition' is not enough to establish antitrust injury, 'competitors may be able to prove antitrust injury before they are actually driven from the market and competition is thereby lessened.'" *Tesla v. Louisiana Auto. Dealers Ass'n*, 113 F.4th 511, 528 (5th Cir. 2024) (citations omitted). Since antitrust injury is "viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition," "losses and competitive disadvantage . . . fall[s] easily within the conceptual bounds of antitrust injury." *Doctor's Hosp.*, 123 F.3d at 305; *see also Pulse*, 30 F.4th at 491 (being "squeezed out of the market" because of anticompetitive conduct is "textbook antitrust injury").

If there is no antitrust violation, there is no antitrust injury. That is the case here. Yet the Fifth Circuit directs that where a party fails to create a material issue of fact on an antitrust violation, courts should grant summary judgment on the merits, not on standing. *See Doctor's Hosp.*, 123 F.3d at 306. Accordingly, the Court proceeds to the merits of Plaintiffs' claims under the Sherman Act, beginning, as always, by defining the relevant market. *Shah v. VHS San Antonio Partners, LLC*, 985 F.3d 450, 454 (5th Cir. 2021) ("Without a definition of a relevant market there is no way to measure a defendant's ability to lessen or destroy competition.") (citation omitted).

### C. Market Definition[28]

The relevant market for an antitrust claim "is the pool a court must assess to determine the ripple effect of any purported antitrust conduct on competition." *Shah v. VHS San Antonio Partners LLC*, 18-CV-751-XR, 2020 WL 1854969, at *5 (W.D. Tex. Apr. 9, 2020)*, aff'd sub nom. Shah*, 985 F.3d at 450. It "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956).

The relevant market "has two components: a product market and a geographic market." *Shah*, 2020 WL 1854969. "Both must be defined not just in terms of where the purportedly excluded competitor operators, but where consumers are affected by anticompetitive conduct and whether they may turn for alternatives." *Id.* "The geographic market must correspond to the commercial realities of the industry and be economically significant." *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002) (internal quotation marks and citations omitted).

The Court finds that interventional cardiology services in Laredo is a relevant market in which to evaluate the effects of Defendants' conduct. Plaintiffs' expert, Dr. Pflum, concluded that there are no reasonably interchangeable substitutes for interventional cardiology services and providers outside of Laredo are too distant for patients to practicably go to receive those services. ECF No. 188-2 at 6, 34–37. Dr. Pflum first explained that interventional cardiology services requires certain inputs: interventional cardiologists and Cath Labs, along with other physicians, nurses, staff, and equipment used to care for patients. *Id.* at 41. These "upstream" inputs combine

---

[28] For the purpose of this motion, the relevant market is undisputed. *See* ECF Nos. 145 at 44 (the relevant market "is interventional cardiology services provided to patients"); 167 at 33 (the relevant market is "interventional cardiological services"); 181 at 3.

to form the "downstream" interventional cardiology service, which is provided to patients and paid for by insurers. *Id.* In combining these inputs, Dr. Pflum applied a "cluster" approach[29] and concluded that "it is economically appropriate and expedient to analyze such services together, giving patients and insurers the ability to turn to a similar set of providers for each service." *Id.* at 42.

Dr. Pflum stated that his conclusions would not change even if he considered the submarkets of inpatient and outpatient cardiology treatment separately; separating inpatient and outpatient care is immaterial as the relevant shares in these submarkets are proportional to each other and both "face independent but similar demand conditions." *Id.* at 33–34. Thus, is this *set* of services—interventional cardiology services—that represents the distinct economic product market.

Dr. Pflum also concluded that Laredo is the relevant geographic market. ECF No. 188-2 at 6. DHL and LMC are the only two hospitals physically located in the area and, alongside the Cigarroa Clinic (and Cigarroa Interventional Institute), are the only providers of interventional cardiology services in the area. *Id.* at 45. Dr. Pflum noted that insurance plans are required by regulation to include in-network interventional cardiology services in Laredo, Laredo residents "strongly prefer local Laredo interventional cardiology services," and patients and their insurers "do not view interventional cardiology services provided outside of Laredo as substitutable with local Laredo providers." *Id.* at 45–50.

---

[29] A "cluster approach is appropriate where the product package is significantly different from, and appeals to buyers on a different basis from, the individual products considered separately." *JBL Enterprises, Inc. v. Jhirmack Enterprises, Inc.*, 698 F.2d 1011, 1016 (9th Cir. 1983); *see also United States v. Phillipsburg Nat. Bank & Tr. Co.*, 399 U.S. 350 (1970) (cluster market appropriate where firm offers wide range of services and is the only type of firm to gather all of them in one place).

Using a two-stage bargaining approach to market definition (provider competition for insurer inclusion as well as competition to attract patients), Dr. Pflum applied the "hypothetical monopolist test" and concluded that a hypothetical monopolist of interventional cardiology services could profitably impose a small but significant and non-transitory increase in price on insurers. *Id.* at 44.

### D. Section 1 Claim

#### 1. Applicable Law

Under Section 1 of the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1. "Although § 1 could be read to outlaw all contracts, it has long been interpreted to only proscribe unreasonable restraints." *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008). To establish a violation of § 1 of the Sherman Act, plaintiffs "must demonstrate that: '(1) [the defendants] engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market.'" *Marucci Sports, LLC v. National Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014) (quoting *Apani*, 300 F.3d at 627).

A "necessary ingredient" of a section 1 claim is a showing of concerted action. *Tunica Web Advert v. Tunica Casino Operators Ass'n*, 496 F.3d 403, 409 (5th Cir. 2007). To establish concerted action, plaintiffs "must present 'evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Id.* (quoting *Monsanto Co. v. Spray-Rite Sev. Corp.*, 465 U.S. 752, 768 (1984)). "In other words, '[t]here must be evidence that tends to exclude the possibility of independent action.'" *Id.* (quoting *Monsanto*, 465 U.S. at 768).

"Concerted action may be shown by either direct or circumstantial evidence." *Id.* at 409. "Direct evidence of concerted action is that which explicitly refers to an understanding between the alleged conspirators, while circumstantial evidence requires additional inferences in order to support a claim of conspiracy." *Id.* (cleaned up). "Circumstantial evidence of a conspiracy in restraint of trade must be strong in order to survive summary judgment, because 'antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)).

"[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Id.* (quoting *Matsushita*, 475 U.S. at 588). "[A] plaintiff can survive summary judgment only if it 'show[s] that the inference of conspiracy is reasonable in light of the competing inferences of independent conduct or collusive action that could not have harmed' the plaintiff.'"[30] *Id.* (quoting *Matsushita*, 475 U.S. at 588).

"Only after an agreement is established will a court consider whether the agreement constituted an unreasonable restraint of trade." *AD/SAT, Div. of Skylight, Inc. v. Associated* Press, 181 F.3d 216, 232 (2d Cir. 1999). "Once a plaintiff establishes that a conspiracy occurred, whether it violates § 1 is determined by the application of either the *per se* rule or the rule of reason." *Golden Bridge Tech.*, 547 F.3d at 271. "If the requisite factors for a per se refusal to deal violation are not met, the proper course is to examine the conduct under the rule of reason." *St. Bernard Gen. Hosp., Inc. v. Hosp. Serv. Ass'n of New Orleans, Inc.*, 712 F.2d 978, 988 (5th Cir. 1983) (citation omitted).

---

[30] Plaintiffs argue summary judgment "is especially disfavored in 'complex, fact-sensitive antitrust cases.'" ECF No. 167 at 24 (citing *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1245 (5th Cir. 1985)). Not only was *Control Data* decided before the Supreme Court's clarification of the summary judgment threshold in *Celotex* and *Matsushita*, but it noted that "the requirements of Rule 56 are no less applicable in antitrust actions." *Id.* Accordingly, the Court applies the prevailing Rule 56 standard.

## 2. Analysis

Plaintiffs allege a conspiracy "to try to shut down Plaintiffs' interventional cardiology program among Defendants and their co-conspirators," with the aim of restraining DHL's ability to compete in Laredo's market for interventional cardiology services. ECF Nos. 167 at 36; 22 ¶ 156 ("Defendants have conspired to prevent Plaintiffs from providing acute cardiological services in Laredo"). In support, they point to: (i) an agreement between Defendants and Dr. Cigarroa II to not deal with DHL, (ii) an agreement between Dr. Cigarroa, LMC, and Dr. Santos to solicit Dr. Santos's staff in violation of Dr. Santos's noncompete and non-solicitation agreement, (iii) concerted action among Dr. Cigarroa and Dr. Anderson for Dr. Anderson to threaten and cause Dr. Feldman to not practice in Laredo, and (iv) circumstantial evidence of concerted action among Dr. Cigarroa and other cardiologists to coerce Dr. Blanc to not practice in Laredo. ECF No. 167 at 36–37.

The Court takes each in turn, first considering whether there is concerted action before turning to whether a *per se* or rule of approach is appropriate.

### a) Is There a Conspiracy?

#### i. Cigarroa-LMC Refusal to Deal with DHL

The Court agrees that Defendants' explicit statements constitute direct evidence a concerted refusal to deal with DHL. Many text messages and emails between the Cigarroas and LMC—over the course of multiple months beginning in March 2021—discuss the Cigarroas plan to cease practicing at DHL and move their practice to LMC. These begin with discussions between Dr. Cigarroa and Mr. Leal that discussed "Cigarroa Heart" "commit[ting] our services to Laredo Medical Center" in order "to take full advantage and secure Webb County marketshare at LMC." ECF No. 185-1 at 2. The messages continue to more explicit acknowledgements by LMC that "the

Cigarroa family would drop privileges at DHL and just practice exclusively at LMC." ECF No. 182-12 at 7. And further reveal an intent to "take everything from [Plaintiffs]" leave them "totally inept." ECF No. 167-1 at 680.

While Defendants argue that it was DHL all along who caused the shift due to their inadequate facilities and investment in new programs, this does not negate Defendants' own actions. Dr. Cigarroa and Mr. Leal's sworn declarations that deny any *unlawful* conspiracy does not affect whether there is an agreement to not deal with LMC. ECF No. 145-2 at 348–440, 449–454.

### ii.    Poaching of Dr. Santos and His Support Staff

The Court likewise agrees that there is direct evidence of an agreement to solicit Dr. Santos in violation of his noncompete and his staff from DHL to LMC. Plaintiffs point to text messages, emails, and internal LMC documents that reveal a coordinated effort to recruit them while still employed at DHL. Defendants do not seriously contest this. They only argue that the evidence suggests that DHL had already secretly decided to let Dr. Santos go by November 2021. ECF No. 145 at 34. And they point to other employees who were dissatisfied at DHL as well. But like the Cigarroa-LMC refusal to deal, what Plaintiffs were planning to do with Dr. Santos, or what other employee sentiments were at the time, does not negate Defendants' own actions.

### iii.    Dr. Feldman Exclusion

Plaintiffs claim there is evidence of concerted action between Dr. Cigarroa and Dr. Anderson that caused Dr. Feldman to not practice in Laredo. They assert it permits an inference that Dr. Cigarroa threatened Dr. Anderson to pull referrals to UTHSCSA, which caused Dr.

Anderson to threaten Dr. Feldman with his lab and, in turn, led to Dr. Feldman's rejection of DHL's offer.[31]

It is disputed whether Dr. Anderson threatened Dr. Feldman to pull his lab: Dr. Feldman testified he did, Dr. Anderson testified he did not. While this creates a fact issue, the material issue turns on whether a reasonable jury could find that Dr. Cigarroa and Dr. Anderson conspired to prevent Dr. Feldman from coming to Laredo, rather than Dr. Anderson acting independently when he threatened Dr. Feldman.

Plaintiffs first argue there is direct evidence of a conspiracy, as "[e]vidence of threats to refuse to deal, combined with accession to the threats, 'can show concerted action that is not independent conduct.'" ECF No. 167 at 40 (citing *MM Steel v. JSW Steel (USA) Inc.*, 806 F.3d 835 (5th Cir. 2015) and *Monsanto*, 465 U.S. at 767–68)). True, but in both cases, there was evidence of "actual threats in the form of ultimatums." *MM Steel*, 806 F.3d at 845; *Monsanto*, 465 U.S. at 768. Here, there is no admissible evidence of any "actual threat" from Dr. Cigarroa to Dr. Anderson. Plaintiffs are left with circumstantial evidence.

In *MM Steel*, the Fifth Circuit held that a reasonable jury could conclude that the independent decision to not deal was pretextual, *given that there was evidence of threats from distributors*. 806 F.3d at 845. The evidence of threats or "other traditional conspiracy evidence" is

_____

[31] Defendants launch two procedural challenges to this conspiracy. First, they argue this claim fails because no evidence in the record establishes that *Defendants* conspired to exclude Dr. Feldman—only that Dr. Cigarroa allegedly did. ECF Nol. 169 at 14. But Plaintiffs are not required to show that Defendants "knew of or participated in every transaction in furtherance of or related to the alleged conspiracy." *In re Magnesium Oxide Antitrust Litig.*, No. 10-CV-5954-DRD, 2011 WL 5008090, at *17 (D.N.J. Oct. 20, 2011) (citing cases). Second, they argue Plaintiffs have impermissibly amended their complaint to add this new claim. But Plaintiffs set forth the same allegations about Dr. Feldman's exclusion in its amended complaint, ECF No. 22 ¶¶ 88–96, and an identified co-conspirator need not be a named defendant to support a conspiracy claim against named parties. Unlike *Wesley Health Sys., LLC v. Forrest Cty. Bd. of Sup'rs*, No. 12-CV-59-KS-MTP, 2014 WL 232109, at *11 (S.D. Miss. Jan. 22, 2014), which Defendants rely on, there is no prejudice or surprise here given Plaintiffs' allegations. Even if this were a new claim, "[a] response to a motion for summary judgment raising a new claim may be treated as a motion to amend the complaint." *La Union de Pueblo Entro v. Federal Emergency Mgmt. Agency*, 141 F. Supp. 3d 681, 701 (S.D. Tex. 2015) (citing FED. R. CIV. P. 15(a)(2), 16(b)(4)).

key, as "pretext alone does not create a reasonable inference of a conspiracy." *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 411 (3d Cir. 2015) (citing cases). Plaintiffs have identified sufficient evidence that "the inference of conspiracy is reasonable in light of the competing inferences of independent conduct." *Tunica*, 496 F.3d at 409.

They rely on the phone call between Dr. Cigarroa and Dr. Anderson on July 22, 2021, during Dr. Feldman's recruitment process.[32] It is undisputed that on this call, Dr. Cigarroa opposed Dr. Feldman's transfer to Laredo and "asked Dr. Anderson to share this concern with Dr. Feldman." ECF No. 167-1 at 719. They also point to (i) Dr. Cigarroa's prior public statements at a DHL meeting in which he opposed Dr. Feldman coming to Laredo, (ii) the lack of opposition by Dr. Anderson to Dr. Feldman providing part-time interventional cardiology services in other cities, (iii) Dr. Feldman's offer to Dr. Henrich that he could "shift" more cases to UTHSCSA (and so his arrival in Laredo would be profitable for UTHSCSA), and (iv) and Dr. Cigarroa II's continued stream of referrals to UTHSCSA after Feldman declined DHL's offer. ECF No. 182 at 6–9.

Together with Dr. Anderson's threat to Dr. Feldman, this is traditional conspiracy evidence that creates a disputed issue of fact as to whether Dr. Cigarroa conspired with Dr. Anderson by threatening to pull referrals unless Dr. Feldman was prevented from coming to Laredo.

Defendants first argue that Dr. Cigarroa's public statements are "expression[s] of opinion about a competitors' plans [that] cannot provide the basis for an antitrust claim," *Arnett Physician Group, P.C. v. Greater LaFayette Health Servs. Inc.*, 382 F. Supp. 2d 1092, 1096 (N.D. Ill. 2005). The Fifth Circuit has not adopted this broad statement, the Court does not eliminate circumstantial

---

[32] Plaintiffs also point to text messages between the two that were deleted. ECF No. 167 at 23. Dr. Anderson and Dr. Cigarroa both testified that they routinely delete their text messages. ECF No. 192-1 at 14 (Dr. Anderson); ECF No. 167-1 at 187 (Dr. Cigarroa). Plaintiffs did not move for spoliation sanctions and the Court declines to adopt any adverse inference from this fact alone.

evidence piecemeal, and so treats this as evidence that Dr. Cigarroa opposed Dr. Feldman coming to Laredo.

The next piece of evidence—UTHSCSA's sudden opposition to Dr. Feldman's part-time work—supports an inference of a conspiracy. "For a change in conduct to create an inference of conspiracy, the shift in behavior must be a 'radical' or 'abrupt' change from the industry's business practices." *Chocolate*, 801 F.3d at 409–10 (quoting *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 935 (7th Cir. 2000)). Before attempting to practice in Laredo, Dr. Feldman practiced in a similar capacity in McAllen without opposition. ECF No. 167-1 at 513. And he was permitted to practice in Kerrville—following his withdrawal from Laredo—without opposition as well. The only time he faced opposition was when he attempted to practice in Laredo, immediately following the conversation between Dr. Cigarroa and Dr. Anderson. Because the record does not support any historic behavior of opposing part-time work of its employees, including Dr. Feldman, a reasonable jury could find this change in practice supports a conspiracy. In a similar vein, that Dr. Cigarroa continued referring patients to UTHSCSA after Dr. Feldman withdrew from consideration could support an inference that this practice remained unchanged due to the successful threat.

Dr. Feldman's offer to shift referrals to UTHSCSA from DHL also supports an inference of a conspiracy. As Plaintiffs argue, when a conspirator "reject[s] offers that would be economically superior absent the conspiracy," this strengthens the inference of conspiracy. ECF No. 182 at 6 (citing *Milgram v. Loew's, Inc.*, 192 F.2d 579, 583 (3d Cir. 1951)). Dr. Feldman emailed Dr. Henrich and Mr. Hernandez with a proposition to "shift" patients by referrals to UTHSCSA once at DHL. A reasonable jury could conclude that absent the threat from Dr. Cigarroa, Dr. Anderson and UTHSCSA would have preferred to get referrals from DHL *and* LMC,

an economically superior relationship; more referrals equals more revenue. Defendants do not contest this but argue that there is no evidence this offer was made to UTHSCSA. ECF No. 183 at 5. But Dr. Feldman testified he sent this proposal to Mr. Hernandez—the then-CEO of UTHSCSA. Although the record is silent on whether the specifics were shared with Dr. Anderson, Mr. Hernandez discussed receiving cardiology patients from DHL with Dr. Anderson *after* Dr. Feldman shared this with Mr. Hernandez, ECF No. 167-1 at 584, and the Court views the evidence in the light most favorable to Plaintiffs at this stage.

Plaintiffs finally assert pretext. The Court agrees there is some evidence that Dr. Cigarroa's explanation for opposing Dr. Feldman was pretextual.

Plaintiffs argue that a week after the July 22, 2021 phone call, Dr. Cigarroa texted his nephew, Dr. Joaquin Cigarroa, that Dr. Feldman (and Dr. Mehmet's) "presence as hospital cardiologists is controversial" and to "not give [Dr. Feldman] an opening to discuss." ECF No. 167-1 at 547. According to Plaintiffs, this was after Ms. Montes-Ewing stated there would be no structural cardiology program started, Dr. Cigarroa could no longer have been concerned, and so instead opposed Dr. Feldman all along for anticompetitive reasons. Dr. Cigarroa did admit that Ms. Montes-Ewing alleviated his concerns after the meeting. But internally, Ms. Montes-Ewing acknowledged DHL would start the program the next year, or perhaps sooner. It is true that Dr. Cigarroa could just as well have not believed Ms. Montes-Ewing and continued with his independent conduct of opposing Dr. Feldman. But Dr. Cigarroa's message did not reference his concerns with structural cardiology at all, and his instruction to not allow Dr. Feldman an "opening to discuss" suggests that Dr. Cigarroa was not concerned with alleviating this specific concern but opposed to Dr. Feldman coming to Laredo to practice at all.

While this supports pretext, the remaining evidence does not. Plaintiffs claim Dr. Cigarroa II explained that he was not "doing too much at DHL" because of "some politics." ECF No. 167-1 at 217. But this message does not mention Dr. Feldman at all and was sent to a different doctor on October 20, 2021, nearly three months after the alleged threat and during the same time as the Cigarroa-DHL shift was in full swing. It is too vague to infer Dr. Cigarroa's pretextual explanation for opposing Dr. Feldman's arrival in Laredo. Plaintiffs also argue that Dr. Cigarroa's lack of concern with his son's qualifications, as compared to Dr. Feldman's, demonstrates pretext. At best, this demonstrates nepotism. Moreover, Dr. Cigarroa II was trained in structural cardiology. ECF No. 169 at 13 n. 4. Nor is there evidence in the record to suggest that Dr. Cigarroa II was planning to start a structural cardiology program anytime soon. To the contrary—Dr. Cigarroa testified Defendants had a five-year plan. ECF No. 145-2 at 90.

Taken together, a reasonable jury could conclude that Dr. Cigarroa conspired with Dr. Anderson to prevent Dr. Feldman from coming to Laredo by threatening to withhold referrals from UTHSCSA, rather than each acting independently.

Defendants claim that this is insufficient to establish a conspiracy because Dr. Anderson had an "independent self-interest to protect th[e] stream of patients [from Dr. Cigarroa to UTHSCSA] unilaterally," which would dry up if Dr. Feldman started a structural program at DHL. ECF No. 169 at 16. According to Defendants, because Plaintiffs did not introduce evidence that "tends to exclude" this theory of independent action, they cannot survive summary judgment. This is unconvincing.

First, this independent reason does not appear in the record. Dr. Anderson denied making this threat, and the Court does not credit this independent motive, created by counsel, considering Dr. Anderson's denial. Defendants' reliance on *MM Steel* misses the mark, as there the party did

not deny the refusal to deal and so the record supported the independent reason. 806 F.3d at 846. Plaintiffs need not introduce evidence that "tends to exclude" an independent reason that was not offered by Dr. Anderson himself. Without this independent reason, the Court is hard-pressed to see why Dr. Anderson would make such a threat without pressure from Dr. Cigarroa.

Second, Plaintiffs need not "exclude" or "dispel" the possibility of independent conduct under the "tends to exclude" theory. *See In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012). "[I]f a plaintiff relies on ambiguous evidence to prove its claim, the existence of a conspiracy must be a reasonable inference that the jury could draw from that evidence; it need not be the sole inference;" i.e., a "reasonable factfinder [may] infer that the conspiratorial explanation is more likely than not." *Id.*; *see also Eastman Kodak Co. v. Image Tech. Services, Inc.*, 504 U.S. 451, 568 (1992) (the "tends to exclude" standard "demands only that the nonmoving party's inferences be reasonable in order to reach the jury"). A reasonable jury could infer, based the abrupt shift in practice in threatening Dr. Feldman, rejecting an economically superior proposal, and Dr. Cigarroa's pretextual explanation, that it is more likely than not that Dr. Cigarroa and Dr. Anderson conspired to exclude Dr. Feldman from Laredo.

Third, the "tends to exclude" standard is justified, in part, due to the need to limit the range of permissible inferences from ambiguous evidence to prevent "procompetitive conduct" from being "deter[red]." *Matsushita*, 475 U.S. at 593; *see also In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004) (identifying this as one of "two important circumstances underlying the [Supreme] Court's decision in *Matsushita*"). Defendants have not pointed to any procompetitive justifications for Dr. Anderson's threat to Dr. Feldman.

### iv. Dr. Blanc Exclusion

On the other hand, the Court finds no reasonable jury could find concerted action to exclude Dr. Blanc. It is undisputed that Dr. Blanc did not accept his offer from DHL. And the evidence shows that Dr. Blanc made comments over the course of his recruitment that touched on Defendants' position in the market as a reason behind his hesitation to come to Laredo. Relying on this, Plaintiffs claim that the real reason Dr. Blanc rejected the offer was because Dr. Cigarroa blacklisted him.

No reasonable jury could conclude this. It is true that Dr. Cigarroa was upset with DHL's decision to recruit Dr. Blanc and opposed these plans, as voiced through his text messages to Ms. Montes-Ewing the day before Dr. Blanc arrived in Laredo. But nepotistic desire does not establish a conspiracy and, voicing private disagreement is not blacklisting absent evidence of conduct to do so.

Plaintiffs admit that Dr. Cigarroa never met or spoke with Dr. Blanc. Nor have Plaintiffs offered any evidence that Dr. Cigarroa threatened to block referrals to Dr. Blanc. Instead, Plaintiffs put forth evidence of Dr. Blanc's own perception of the lack of a competitive environment in Laredo. But much like private disagreement does not amount to blacklisting, one's perception of being blacklisted does not suffice either. At best, a reasonable jury could conclude that Dr. Blanc, aware of Defendants' position in Laredo, did not want to enter the market. This does not show Defendants conspired to exclude him.

Plaintiffs also seek to rely on the general allegation that Dr. Cigarroa had "influence" and an "ability to intimidate other physicians," ECF No. 167 at 18, referencing a statement by the chief of DHL's medical executive committee that he once left the room because he was "fearful" of "having a [particular] discussion" with Dr. Cigarroa. ECF No. 167-1 at 294. This generic

statement, untethered to any discussion of Dr. Blanc, would not allow a reasonable jury to find a conspiracy between Defendants to exclude Dr. Blanc. While circumstantial evidence may support an antitrust claim, mere conjecture cannot.

### b) *Per Se* or Rule of Reason

Having found there is competent summary judgment evidence that Defendants engaged in concerted action to exclude Dr. Feldman, refused to deal with LMC, and poached Dr. Santos and DHL's employees, the Court now turns to whether the *per se* or rule of reason approach is proper. Plaintiffs argue that Defendants' refusal to deal alone is a *per se* unlawful group boycott. The Court disagrees.

### i. Applicable Law

Under Section 1, "certain kinds of agreements will so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances. An agreement of such kind is unlawful *per se*." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998) (internal citations omitted). The Supreme Court has "found the *per se* rule applicable in certain group boycott cases." *Id.*

For example, the Supreme Court condemned as *per se* unlawful an agreement among a collection of several competing fashion designers, manufacturers, and suppliers to pressure their retailers into boycotting rival designers to drive them out of the market. *See Fashion Originators' Guild of Am. v. FTC*, 312 U.S. 457, 460–63 (1941). And it applied the *per se* prohibition to find it unlawful for a large department store chain to use its "'monopolistic' buying power" to organize a boycott with manufacturers and distributors of its much smaller rival, Klor's. *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 209 (1959). In *Klor*'s, which Plaintiffs rely on, the

Supreme Court observed that the boycott "t[ook] from Klor's its freedom to buy . . . in an open competitive market," drove "it out of business as a dealer in the defendants' products," and "deprive[d] the manufacturers and distributors of their freedom to sell to Klor's." *Id.* at 213.[33]

The Supreme Court, however, has curtailed the reach of the *per se* rule in later decisions. In *Northwest Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co.*, the Supreme Court clarified that the "mere allegation" of a group boycott cannot by itself justify *per se* condemnation "because not all concerted refusals to deal are predominately anticompetitive." 472 U.S. 284, 298 (1985). There, the Court refused to apply the *per se* rule when a cooperative buying agency comprising various retailers expelled a member without providing any procedural protections. *Id.* at 285–86, 298. Instead, "[t]he decision to apply the *per se* rule turns on 'whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output . . . or instead one designed to increase economic efficiency and render markets more, rather than less, competitive.'" *Id.* (quoting *Broadcast Music, Inc. v. Columbia Broad. System, Inc.*, 441 U.S. 1, 19–20 (1979)). The Court noted that "[e]xactly what types of activity fall within the forbidden category is . . . far from certain," *id.* at 294, but provided certain indicia where *per se* treatment would be appropriate: (i) whether the boycott "cut off access to a supply, facility, or market necessary to enable the boycotted firm to compete," (ii) whether the group "possesse[s] a dominant position in the relevant market," and (iii) whether the practice is "not justified by plausible arguments that they were intended to enhance overall efficiency and make markets more competitive." *Id.* at 294; *id.* at 295 ("[a] concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment"). In these situations, "the likelihood of anticompetitive

---

[33] *Klor*'s is an example of a hub-and-spoke conspiracy, in which the hub has vertical relationships with the other co-conspirators, who have a horizontal one. The retailer held vertical relationships with the manufacturers and distributors, who themselves horizontally agreed to hurt Klor's.

effects is clear and the possibility of countervailing procompetitive effects is remote." *Id.* (citation omitted).

The next year, in *Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447 (1986) the Court continued this shift away from *per se* treatment. While noting "it ha[d] in the past stated that group boycotts are unlawful *per se*," the Court declined to "pigeonhole" the collective action of a group of dentists who refused to submit dental x-rays to insurance companies for use in determining benefits to be paid, instead applying the rule of reason. *Id.* at 458–59.

In *NYNEX*, the Court continued further in this direction, limiting the *per se* rule "to cases involving horizontal agreements among direct competitors." 525 U.S. at 135. The Court declined to apply the *per se* rule to an agreement by a purchaser to buy goods or services from one supplier rather than another, even though there were no legitimate business reason for the purchasing decision. *Id.* This relationship—between the purchaser and supplier—was vertical, unlike the relationship in *Klor*'s, which involved both horizontal and vertical agreements that together constituted the illegal boycott. *Id.* at 136. In *NYNEX*, the Court noted that a decision by a buyer to switch suppliers was typically not anticompetitive but was rather "close to the heart of the competitive process that the antitrust laws seek to encourage." *Id.* at 137.

Thus, the *per se* rule survives today only in "group boycotts involving a horizontal conspiracy to foreclose a market participant[.]" *MM Steel*, 806 F.3d at 848; *cf. United States v. Brewbaker*, 87 F.4th 563, 576 n. 10 (4th Cir. 2023), *cert denied*, No. 24-124, 2024 WL 4743079 (Nov. 12, 2024) (noting that "[t]he only restraints that the Supreme Court has held to be *per se* unreasonable are purely horizontal, or, in other words, are agreements between entities who are *only* related as competitors").

### ii.    Analysis

The parties agree that LMC and the Cigarroa Clinic compete for outpatient services. ECF No. 167 at 45, ECF No. 145 at 4. This horizontal relationship, Plaintiffs argue, is sufficient to warrant a *per se* approach. The Court disagrees.

"The Supreme Court has explained that whether a restraint is horizontal or vertical depends on the relationship between the parties to the agreement that imposes the restraint." *Brewbaker*, 87 F.4th at 575. Defendants relationship is both horizontal and vertical, and it is the vertical relationship that plays the larger role here. *See Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (unlike horizontal restraints, vertical restraints are agreements among firms at different levels of distribution— e.g., between sellers and buyers of goods—about matters on which they do not compete); *cf. Brewbaker*, 87 F.4th at 575 (applying rule of reason to "hybrid restraint" while noting that the Supreme Court has "not yet" answered whether the *per se* rule applies).

The Cigarroa Defendants provide physician services and outpatient services, and LMC provides inpatient and outpatient services. But LMC and the Cigarroa Defendants do not compete on inpatient services, nor can they—the Cigarroa Defendants do not provide inpatient treatment outside of LMC. Rather, the Cigarroas are the physicians who "sell" the service and LMC is the hospital that "buys" the service. LMC and the Cigarroa Clinic cannot come to "agreement . . . on the way in which they will compete with one another" for inpatient services because they are not competitors in that market. *NCAA v. Board of Regents*, 468 U.S. 85, 99 (1984). Because the alleged boycott stems from the parties' vertical relationship, Defendants do not occupy the "same level of the market," *Tunica*, 496 F.3d at 412, and so the *per se* rule does not apply.

Further, application of the *per se* rule "is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if they can predict with

confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin*, 551 U.S. at 886–87 (internal citations omitted). To justify a *per se* approach, a restraint must have "manifestly anticompetitive effects and lack . . . any redeeming virtue." *Id.* at 886 (citations omitted). Defendants identify benefits of their agreement to both Defendants and Laredo as a whole: the Cigarroas committed to providing emergency call coverage exclusively to LMC in exchange for LMC upgrading its Cath Labs and resuming its open-heart surgery program to field a heart care option. ECF No. 169 at 18–20. This agreement limits the risk that a hospital will have to turn away heart attack patients or have patients wait when an on-call physician performs coverage at multiple hospitals. *Cf. Diaz v. Farley*, 215 F.3d 1175, 1184 (10th Cir. 2000) (rejecting *per se* approach where "the conduct at issue . . . concerns decisions relating to health care . . . [b]ecause agreements pertaining to the provision of health care services often raise issues of professional medical judgment").

Plaintiffs alternative argument—that *per se* treatment is warranted under the Fifth Circuit's reasoning in *Tunica*—fares no better. ECF No. 167 at 46–47. In *Tunica*, the Fifth Circuit reversed summary judgment where the district court concluded that the *per se* rule applies only to group boycott cases "where one of the conspirators is a direct competitor of the victim." 496 F.3d at 414–15. The Fifth Circuit rejected this "bright-line rule" and remanded the case to the district court to consider the set of factors under *Northwest Wholesale Stationers*. *Id.* at *413.* While the Fifth Circuit has recognized that "*Tunica* potentially expanded per se liability," it did so only to the extent that the "direct competitor of the victim" requirement was jettisoned. *MM Steel*, 806 F.3d at 850. *Tunica* did not alter the underlying *Northwest Wholesale Stationers* factors, nor did it remove the requirement that the relationship must be horizontal, i.e., "between firms that ordinarily compete at the same level of the market." *Tunica*, 496 F.3d at 412, 414–15.

Even assuming the Cigarroas and LMC share a horizontal relationship, Plaintiff do not meet the *Northwest Wholesale Stationers* factors. To begin, as Defendants correctly point out, the Cigarroa-LMC refusal to deal did not "cut off access to a supply, facility, or market *necessary* to enable [DHL] to compete." *Id.* at 413 (quoting *Northwest Wholesale Stationers*, 472 U.S. at 294) (emphasis added). DHL hired two additional interventional cardiologists since the alleged boycott began and used locums physicians to staff shifts. Being cut off from certain physicians, nurses, and technicians who would have provided services to compete does not mean that access was cut off "necessary" to compete. Plaintiffs suggest that, under *Malcolm v. Marathon Oil Co.*, they "need only show that the defendants' illegal conduct was a material cause of *some* of [their] damages." 642 F.2d at 863 (emphasis added), and that losing access to *some* cardiologists would satisfy that requirement. *Malcolm*, however, considered causation in its analysis of damages—where an anticompetitive conduct had already been established. *Id.* Here, the Court must determine whether there is an antitrust violation ab initio. A "material cause" of some damage is not equivalent to "cut[ting] off access to a market . . . necessary" to compete.

Defendants also point out that there were procompetitive reasons for shifting the Cigarroas' practice to LMC—it positioned LMC to compete against DHL by constructing new facilities with new equipment. According to Plaintiffs' expert Dr. Maness, these investments benefited both physicians and patients. There are now more Cath Labs in Laredo and more interventional cardiology procedures being performed in Laredo, with a higher proportion of those procedures being low-cost outpatient procedures. ECF No. 185-8 at 53, 60. Dr. Pflum's mere disagreements with these justifications does not mandate a *per se* approach.

Indeed, both the vertical relationship between the parties and the nature of the restraint imposed weigh against applying a *per se* rule. As the Supreme Court has cautioned, "the category

of restraints classed as group boycotts is not to be expanded indiscriminately." *Ind. Fed'n of Dentists*, 476 U.S. at 458. The Court declines to do so here and proceeds under the rule of reason.

### c. Under the Rule of Reason, Are There Anticompetitive Effects?

Plaintiffs cross-reference their discussion of anticompetitive effects in both their Section 1 and Section 2 claims. *See* ECF No. 167 at 52. The Court discusses them together as the same conduct underlies both claims.[34]

Plaintiffs remaining claims are premised on the Cigarroa-LMC agreement, the poaching and soliciting of Dr. Santos and other DHL employees, and Dr. Feldman's exclusion. The Court concludes that, applying the rule of reason, a reasonable jury could not find this conduct caused anticompetitive effects in the market for interventional cardiology services in Laredo. The first two are not anticompetitive,[35] and Dr. Feldman's exclusion, whether considered separately or taken together, did not cause anticompetitive effects.

### i. Applicable Law

"The rule-of-reason inquiry uses a burden shifting framework." *Impax Laboratories, Inc. v. FTC*, 994 F.3d 484, 492 (5th Cir. 2021). Plaintiffs have the "initial burden . . . to show anticompetitive effects," after which "the burden shifts to [defendants] to demonstrate that the restraint produced procompetitive benefits." *Id.* at 492. If defendants do so, either plaintiffs "can demonstrate that any procompetitive effects could be achieved through less anticompetitive means" or the "court must balance the anticompetitive and procompetitive effects of the restraint."

---

[34] Where, like here, the plaintiffs challenge the same conduct pursuant to Sections 1 and 2, the court can "review claims under each section simultaneously." *Fed. Trade Comm'n v. Qualcomm, Inc.*, 969 F.3d 974, 991 (9th Cir. 2020); *see Mid-Texas Communications Sys., Inc. v. AT&T*, 615 F.2d 1372, 1389 n. 13 (5th Cir. 1980) ("[i]t is clear . . . that the analysis under section 2 is similar to that under section 1 regardless [of] whether the rule of reason label is applied").

[35] Plaintiffs conceded at oral argument they do not argue that Dr. Santos' poaching is anticompetitive for their Section 1 claims. For ease, the Court discusses whether the poaching is anticompetitive in this section, even though Plaintiffs rely on it only for their Section 2 claims.

*Id.* "If the anticompetitive harms outweigh the procompetitive benefits, then the agreement is illegal." *Id.*

"Under a rule of reason analysis, the factfinder considers all of the circumstances to determine whether a restrictive practice imposes an unreasonable restraint on competition." *Marucci Sports,* 751 F.3d at 374 (citation omitted). These "include the restrictive practice's 'history, nature, and effect' and '[w]hether the businesses involved have market power.'" *Id.* (quoting *Leegin*, 551 U.S. at 885–86). "[T]he rule of reason requires plaintiffs to show that the defendants' actions amounted to a conspiracy against the market—a concerted attempt to reduce output and drive up prices or otherwise reduce consumer welfare." *Consol. Metal Prods. v. American Petroleum Inst.*, 846 F.2d 284, 292–93 (5th Cir. 1988). "Under the rule of reason, the antitrust laws protect competition, not particular competitors." *Id*. at 293.

When analyzing whether there are anticompetitive effects, courts measure the cumulative effect of the defendant's conduct, rather than each instance of conduct in isolation. *See Associated Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1354 (5th Cir. 1980) (while "no one of the instances of improper conduct, standing alone, would lead to section 2 liability," "[t]aken together" they may "show a pattern of exclusionary behavior"); *Cont'l Ore Co. v. Union Carbon & Corp.*, 370 U.S. 690, 699 (1962) (Section 1). But where conduct falls "within [] well-defined categories," such as "refusing to deal," adding up instances of such lawful conduct cannot total unlawful conduct. *Duke Energy Carolinas, LLC v. NTE Carolinas II, LLC*, 111 F.4th 337, 354 (4th Cir. 2024); *see also United States v. Google LLC*, 687 F. Supp. 3d 48, 68 (D.C.C. 2023) ("[W]hen determining whether plaintiffs have met their *prima facie* burden, courts can only aggregate conduct that is itself deemed anticompetitive (even if only minimally so).").

## ii. Cigarroa-LMC Agreement

The Cigarroa Defendants assert they have no duty to deal with Plaintiffs, and so a refusal to deal cannot be anticompetitive. "[A]s a general matter, the Sherman Act 'does not restrict the long recognized right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal.'" *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)). But this right is not "unqualified." *Id.* (citation omitted). "Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct." *Id.* One of these circumstances is laid out in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), which Plaintiffs rely on. *Aspen Skiing*, however, "is at or near the outer boundary" of liability, *Trinko*, 540 U.S. at 409, and does not assist Plaintiffs.[36]

The *Aspen Skiing* exception provides that a defendant's refusal to deal may be anticompetitive where the parties previously were engaged in a voluntary, cooperative, and profitable venture that the defendant terminated and where the defendant's decision to do so cannot be explained by anything other than a desire to harm competitors. *See Aspen Skiing Co.*, 472 U.S. at 608–11; *see also Trinko*, 540 U.S. at 407–09 (discussing *Aspen Skiing*). In *Aspen Skiing*, two competitors shared profits for several years as a result of jointly issuing ski passes to both companies' mountains, until the larger of those companies abruptly ended the relationship. *Aspen Skiing*, 472 U.S. at 587–95. But it not only stopped offering the joint pass. *Id.* When its former partner tried to recreate the multi-mountain pass by offering to buy the other's tickets at retail price and offering its own vouchers to customers for the other's mountain, it refused. *Id.* Thus, the larger

---

[36] While *Aspen Skiing* was a Section 2 case, because Section 2's anticompetitive-conduct requirement is "essentially the same" as the Rule of Reason inquiry applicable to Section 1 claims, *Qualcomm, Inc.*, 969 F.3d at 991, *Aspen Skiing* shapes whether the refusal-to-deal is anticompetitive under Section 1 as well. *See infra* note 34.

company acted in a predatory fashion, deliberately harming itself (and consumers) by refusing to honor joint-mountain passes to harm its competitor more. And so the Supreme Court upheld a jury verdict, reasoning that "[t]he jury may well have concluded that [the defendant] elected to forgo these short-run benefits because it was more interested in reducing competition . . . over the long run by harming its smaller competitor." *Id.* at 608, 611.

The Supreme Court has "declined to extend the exception when presented with facts that differ materially from those presented in *Aspen Skiing*" and "the courts of appeals have followed suit." *OJ Commerce, LLC v. KidKraft, Inc.*, 34 F.4th 1232 (11th Cir. 2022) (citing cases). At least three distinguishing factors weigh against applying *Aspen Skiing* here.

First, the relationship between the Cigarroas and DHL is unlike the two companies in *Aspen Skiing*. The Cigarroas are *independent* physicians who held privileges at both DHL and LMC. They were not involved in any profit-sharing relationship or similar joint offering like *Aspen* but are instead compensated separately by insurers and the hospital itself. Second, the Cigarroas were unsatisfied at DHL, as demonstrated by Dr. Cigarroa's requests for more resources. And DHL's own statements reveal that it intended to expand without the Cigarroas involvement, and did not try to retain the Cigarroas after they put in their notice. Unlike *Aspen*, both parties here were ready to separate. Third, there is no evidence that the Defendants sacrificed "short-run benefits . . . in exchange for a perceived long-run impact on its smaller rival." *Id.* at 608. The Cigarroa Defendants and LMC both benefited from LMC's investment in new equipment and facilities, LMC was better positioned to compete against DHL, and the Cigarroas moved to a hospital that they concluded would provide "general quality" care to patients. *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 525 (5th Cir. 1999) ("Competition grounded in nonprice considerations such as reliability, maintenance support, and general quality is competition on the merits.").

In response, Plaintiffs point to *American Central Eastern Texas Gas Co. v. Union Pacific Resources Group*. 93 F. App'x 1 (5th Cir. 2004). There, the Fifth Circuit affirmed an arbitrator's finding under a clearly erroneous standard that the defendant engaged in exclusionary conduct, because it "was a monopoly," that it "refused to deal with [its competitor] by acting in bad faith and offering contract terms that were anticompetitive," and that it "had no valid business justification for refusing to deal." *Id.* at *10. Plaintiffs do not argue that Defendants acted in bad faith or offered anticompetitive contract terms, and, as discussed, the Cigarroas had independent reasons to take their practice to LMC. Moreover, in affirming the arbitrator's finding under a "clearly erroneous" standard, the Fifth Circuit did not necessarily endorse the arbitrator's reasoning. *See id.* ("Having willingly submitted its case to arbitration, [the defendant] left it to the arbitrator to determine whether the protection of the antitrust laws was warranted in this case.").

Plaintiffs' theory of harm would require that the Cigarroas stay put at DHL to avoid antitrust liability and render this Court into a "central planner" of interventional cardiology services—a role that it is "ill suited" for. *Trinko*, 540 U.S. at 408.

While the evidence shows that Defendants sought to increase their market share at the expense of DHL—indeed run them out of business—this is mere competitive intent, which does not turn a refusal to deal into an anticompetitive act. What matters is the "effect of that conduct, not [] the intent behind it." *United States v. Microsoft Corp.*, 253 F.3d 34, 59 (D.C. Cir. 2001); *see also Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1078 (10th Cir. 2013) ("Were intent to harm a competitor alone the marker of antitrust liability, the law would risk retarding consumer welfare by deterring vigorous competition.").

### iii.  Dr. Santos Poaching

Plaintiffs claim that the poaching and soliciting of Dr. Santos and DHL's employees is anticompetitive conduct.[37] In support, they rely solely on *Taylor Publishing v. Jostens, Inc.*, 216 F.3d 465 (5th Cir. 2000).

*Taylor Publishing* dealt with two competing school yearbook manufacturers, who each contracted yearly with schools to manufacturer yearbooks. *Id.* at 470. One of them developed a plan to monopolize the market, which included a campaign to circumvent non-competes, hire the other's key sales representatives, and use them to steer the competitor's former customers to the other, regardless of any remaining commitments. *Id.* at 471, 480. The Fifth Circuit held that where the monopolist (i) engages in predatory hiring intending to circumvent noncompete clauses, and (ii) intends to induce the targeted talent to act disloyally toward the competitor by steering its customers toward the monopolist, such conduct is anticompetitive. *Id.* at 482. But *Taylor Publishing* also recognized that because of the "high social and personal interest in maintaining a freely functioning market for talent," "hiring talent cannot generally be held exclusionary even if it does weaken actual or potential rivals and strengthen a monopolist," and so "merely seeking out the services of [a competitor's] employees is not predatory." *Id.* at 479 (citation omitted).

Defendants' conduct does not fit within *Taylor Publishing*'s exception to the general rule. While Defendants were aware of Dr. Santos' noncompete, there is no evidence that Defendants intended to, or did, induce Dr. Santos to "act disloyally" to DHL by "steering its [patients] to [LMC]." *Taylor Publishing*, 216 F.3d at 481 (quoting *Adjusters Replace-A-Car v. Agency Rent-A-Car, Inc.*, 735 F.2d 884, 894 (5th Cir. 1984)). Plaintiffs claim "the intent was to convert Dr. Santos's patients to Defendants," but their citations to the record do not support this. ECF No. 167

---

[37] *See infra* note 35.

at 58. While evidence reveals that Dr. Santos sought to recruit other *employees* of DHL, nothing suggests Dr. Santos sought to steer its patients away. Nor is there any evidence that Defendants sought to hire Dr. Santos and DHL's employees "for purposes of denying [them] to [DHL]." *Taylor Publishing*, 216 F.3d at 480 (citation omitted). The record reveals that LMC hired Dr. Santos and others to work at LMC, a "legitimate business need." *Id.* The only reason Dr. Santos could not immediately start was because of Plaintiffs' own noncompete agreement.

### iv.    Dr. Feldman's Exclusion

Plaintiffs do not argue that the anticompetitive effect is "increased prices [or] decreased output" in the interventional cardiology market. *Impax Labs*, 994 F.3d at 493. Instead, they argue that the original market was uncompetitive and underserved, that they tried to increase output and competition, and so the anticompetitive harm is a "*lack* of price decrease and *lack* of greater output increase," which decreased consumer welfare due to lower quality of services.[38] ECF No. 167 at 52, 62.

Plaintiffs rely solely on Dr. Pflum's conclusions to establish the anticompetitive effects of Defendants' conduct.[39] *See* ECF No. 167 at 51–52, 61–65. But Dr. Pflum offers no conclusions about a "lack of price decrease and lack of greater output increase." Dr. Pflum analyzed the anticompetitive effects in two aspects: the interference with DHL's recruiting and the refusal to deal.[40] ECF No. 188-2 at 69. According to Dr. Pflum, excluding Dr. Feldman and Dr. Blanc was anticompetitive because Defendants imposed artificial costs on potential recruits that resulted in

---

[38] The Court is skeptical of Plaintiffs' theory that anticompetitive harm in the relevant market here can be shown by a *lack* of greater output increase alone, as whether more procedures are performed in Laredo is not only dependent on how many interventional cardiologists there are, but the needs of patients and other socio-economic factors.

[39] While Plaintiffs also cite Dr. Hickey's report, it merely states general conclusions about locums physicians without tying them to this case. ECF No. 167-1 at 29.

[40] Dr. Pflum did not consider the anticompetitive effects of Dr. Santos and DHL's employees recruitment.

barriers to entry in Laredo and "restricte[d] the supply of interventional cardiology services to Laredo." *Id.* He also concluded that the Cigarroa-LMC agreement, "*when combined* with Defendants' alleged interference in DHL's recruiting," had anticompetitive effects because it "denied DHL a critical input into its services," "prevented DHL from replacing the lost input from other suppliers," and so harmed the competitive process. *Id.* (emphasis added). According to Dr. Pflum, DHL was forced to either stop providing 24/7 STEMI call coverage or use more expensive locum tenens, which "may also provide a lower quality patient experience" and prevented the development of DHL's structural heart program. *Id.* at 70, 76.

Drawing from these conclusions, Plaintiffs argue that Defendants' conduct harmed the competitive process and patients in the relevant market because DHL was (i) unable to develop a planned structural heart program, leaving Laredo residents without a local option for the service, (ii) forced to use locums tenens physicians, eroding the quality of care it could provide, (iii) blocked from hiring and retaining interventional cardiologists, leaving Laredo underserved, and (iv) excluded from serving Defendants' higher-level of care patients, leaving those patients to travel further for care. ECF No. 167 at 62.

But Dr. Feldman's exclusion from Laredo is insufficient to establish an antitrust violation under Fifth Circuit precedent. The record does not contain evidence that "sufficient competitors [did not] remain to ensure that competitive prices, quality, and service persist[ed]." *Marucci Sports*, 751 F.3d at 377 (citing *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995) ("Of course, conduct that eliminates rivals reduces competition. But reduction of competition does not invoke the Sherman Act until it harms consumer welfare.")).

Plaintiffs were able to hire additional cardiologists and locum tenens, and Ms. Montes-Ewing acknowledged that DHL's services to patients were unaffected, even after Defendants'

conduct. Indeed, no locums physicians were hired for months after Dr. Feldman turned down DHL's offer. That DHL's remaining cardiologists worked longer shifts, by itself, is not evidence of harm to patients. Nor is there any evidence that any patient in Laredo was unable to access needed services. And Dr. Pflum did not offer any conclusions that, absent Defendants' conduct, there would have been any price decreases for interventional cardiology procedures in Laredo, nor that prices were above competitive levels in Laredo at the outset. Under these circumstances, "[a] restraint should not be deemed unlawful, even if it eliminates a competitor from the market." *Marucci Sports*, 751 F.3d at 377.

While Plaintiffs argue that *Marucci Sports* does not apply because Laredo was underserved and so "there were never competitive prices, quality, or services," ECF No. 167 at 51, an underserved market is not necessarily a market devoid of competition over "prices, quality, or services," and Dr. Pflum did not offer any conclusions to support this theory. *See* ECF No. 188-2 at 63–65 (discussing underserved market without stating it affected price, quality, or services, but merely that there were barriers to entry and market power).

Nor does the record show that Defendants' conduct caused patients—the consumers in the market for interventional cardiology services in Laredo—harm. Dr. Pflum did not conclude that patient care was negatively impacted by locums, only that it "may" be. *Id.* at 76–77; *see also* ECF No. 167-1 at 29 (Dr. Hickey discussing locums effect on patients, noting that "the patient *may* never see that doctor again and would need to re-establish a relationship with a new physician") (emphasis added). Nor did Dr. Pflum conclude that prices for patients (or insurers) rose. Here again, he concluded only that "patients who require such treatment *may* have been denied the option of seeking those treatments in Laredo rather than travel to San Antonio." ECF No. 188-2 at 76. While he concluded that "[p]atients have also been denied the choice of additional

interventional cardiologists to seek care from, including for example Dr. Feldman," *id.* at 77, there is no evidence that this caused patient harm. Likewise with the proposed "pipeline" that Dr. Feldman was supposed to create or the structural heart program that DHL would build—even with Ms. Montes-Ewing's testimony about potential plans, the record does not contain evidence that any pipeline or program could have been established. Speculation does not create fact issues, and "speculation about anticompetitive effects is not enough" to show market injury. *Marucci Sports*, 751 F.3d at 376 (quoting *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994)).

Plaintiffs last effort to establish anticompetitive harm based on a theory of raising rivals costs is unpersuasive. True, Dr. Pflum concluded that Defendants' conduct was anticompetitive in that it raised DHL's costs.[41] ECF No. 188-2 at 70. But the Fifth Circuit has stated that it is "skeptical of raised costs as a standalone theory," *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 529 n. 5 (5th Cir. 2022), and Plaintiffs have failed to put forth evidence of other, non-speculative, anticompetitive harms in the relevant market. On this record, this theory is consistent with harm to a competitor, not to competition or to any consumers in the relevant market.

Without further evidence, Plaintiffs have failed to create a factual dispute over whether Defendants' conduct, taken individually or together, had anticompetitive effects in the market for interventional cardiology services in Laredo. Because Plaintiffs do not carry their burden under the rule of reason, the Court need not reach Defendants' alternative argument that their conduct is not anticompetitive as a matter of law because it merely "shuffle[s] existing market resources." *See* ECF No. 145 at 32.

---

[41] Dr. Pflum is unclear whether he considers raising rivals' costs to be antitrust injury or an anticompetitive effect.

### E.  Section 2  Claims

Section 2 of the Sherman Act "declares that a firm shall not 'monopolize' or 'attempt to monopolize.'" *Trinko, LLP*, 540 U.S. at 407 (quoting 15 U.S.C. § 2).

**Unlawful Monopolization.** To state a claim for unlawful monopolization, a plaintiff must show that a defendant (1) possesses monopoly power in the relevant market and (2) achieves or maintains its monopoly power through exclusionary—anticompetitive—conduct. 15 U.S.C. § 2; *see Trinko*, 540 U.S. at 407; *Stearns*, 170 F.3d at 522 (where the defendant "acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident"). "[T]o be condemned as exclusionary," the conduct "must have an 'anticompetitive effect'"; "it must harm the competitive *process* and thereby harm consumers," and "harm to one or more *competitors* will not suffice."[42] *Microsoft Corp.*, 253 F.3d at 58.

**Attempt to Monopolize**. To state a claim for unlawful attempted monopolization, plaintiffs must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). "[T]he conduct requirement is arguably the single most important element of this offense." *Taylor Publishing*, 216 F.3d at 474 (citation omitted).

**Conspiracy to Monopolize**. "A conspiracy to monopolize can be established only by proof of (1) the existence of specific intent to monopolize; (2) the existence of a combination or

---

[42] While the Fifth Circuit has held that Section 2 "does not explicitly require a plaintiff to prove an injury to competition" and "must prove only the existence of monopoly power and the willful continued maintenance of that power," as "[i]njury to competition is presumed to follow from the conduct proscribed by § 2," *Walker v. U-Haul Co. of Mississippi*, 747 F.2d 1011, 1013 (5th Cir. 1984), this is in the context of "standing," not the underlying antitrust violation. *See Doctor's Hosp.*, 123 F.3d at 305.

conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce." *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Centers, Inc.*, 200 F.3d 307, 316 (5th Cir. 2000) (citation omitted). Agreements that do not harm the competitive process do not amount to a conspiracy to monopolize. *NYNEX*, 525 U.S. at 139. This showing is necessary even though competitive harm is not an explicit element of a conspiracy to monopolize claim, because the purpose of the Sherman Act is "to protect the public from the failure of the market . . . against conduct which unfairly tends to destroy competition itself." *Spectrum Sports*, 506 U.S. at 458; *see also* IIIB Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 809 (4th ed. 2015) ("Any arrangement that could be considered a 'conspiracy' to monopolize [under § 2] must also be an unreasonable 'contract,' 'combination,' or 'conspiracy' in restraint of trade offending § 1.").

### 1. Plaintiffs' Section 2 Claims Fall with Their Section 1 Claims

Section 2 claims, as discussed, have a common requirement—the conduct must be anticompetitive and have anticompetitive effects.

If a plaintiff cannot show anticompetitive conduct under Section 1, there are no Section 2 claims available. *See infra* note 34; *Qualcomm*, 969 F.3d at 991 (if "a court finds that the conduct in question is not anticompetitive under § 1, the court need not separately analyze the conduct under § 2"); *Standard Oil Co. v. United States*, 221 U.S. 1, 61–62 (1911) ("[W]hen the second section [of the Sherman Act] is thus harmonized with . . . the first, it becomes obvious that the criteria to be resorted to in any given case for the purpose of ascertaining whether violations of the section have been committed, is the rule of reason guided by the established law.").

Plaintiffs admit they rely on the "same evidence of agreements that establish their Section 1 conspiracy." ECF No. 167 at 53. Given that the Court concludes no reasonable jury could find Defendants' conduct caused anticompetitive effects, *see infra* pp. 55–62, Plaintiffs' Section 2 claims all fail. Whether considered separately or together, Defendants' conduct does not amount to anticompetitive conduct that harms the relevant market under Section 2. Two out of the three conspiracies—the Cigarroa-LMC agreement and poaching and soliciting of Dr. Santos and DHL's employees—fall within "well-defined categories." *Duke Energy Carolinas, LLC*, 111 F.4th at 354; *see infra* pp. 55–59. The remaining conduct—the exclusion of Dr. Feldman—is not anticompetitive in the antitrust sense as it lacks anticompetitive effects.

## F. Tortious Interference with Prospective Relations

Plaintiffs assert two claims for tortious interference with prospective relations: one against Dr. Cigarroa and the other against the Cigarroa Clinic and LMC, alleging a conspiracy with Dr. Cigarroa. ECF No. 22 ¶¶ 202–18. Both rest on the allegation that Defendants "wrongfully and intentionally interfered with [LPG's] prospective contract and business relationship with Dr. Feldman." *Id.* ¶¶ 203, 213.

The elements of a civil conspiracy claim are: "1) two or more persons; 2) an object to be accomplished; 3) a meeting of the minds on the object or course of action; 4) one or more unlawful, overt acts; and 5) damages as the proximate result." *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 404–05 (5th Cir. 2013). "Civil conspiracy is a derivative tort; therefore, liability for a civil conspiracy depends on participation in an underlying tort." *Id.* at 402. "In order to adequately plead a claim for civil conspiracy, a plaintiff must adequately plead the underlying tort." *Id.* To prevail on a claim for tortious interference with prospective business relations, the plaintiff must establish that:

(1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.

*Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

Defendants assert there is no evidence of the second and third elements. Dr. Cigarroa openly opposed Dr. Feldman's arrival in Laredo, which supports his "conscious desire to prevent the relationship." Plaintiffs, however, fail on the third element. Plaintiffs alleged that Dr. Cigarroa's conduct was "independently tortious or unlawful" because it violated the United States Anti-Kickback Law and the Texas Patient Solicitation Act by conditioning future patient referrals to UTSA on Dr. Feldman's exclusion. ECF No. 22 ¶ 209. Plaintiffs have not explained how Defendants' conduct violates these statutes and instead merely assert there is "sufficient evidence" without further explanation. ECF No. 167 at 69. And even if it did, a sister court has held that neither statute serves as a predicate for a tortious interference with prospective relations claim under Texas state law. *See PPD Enterprises, LLC v. Stryker Corp.*, No. 4:16-CV-0507, 2018 WL 2335336, at *1–2 (S.D. Tex. Mar. 2, 2018). Plaintiffs offer no argument to the contrary.

Plaintiffs also claim the underlying antitrust violation is "independently tortious or unlawful." *Id.* ¶¶ 210, 217. Even if this could sustain a tortious interference with contract claim, Plaintiffs' tortious interference claims would fail as its antitrust claims fail.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (ECF No. 145) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' claims against Defendants are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Plaintiffs shall take nothing in this case against Defendants. A final judgment pursuant to Rule 58 will follow.

It is so **ORDERED**.

**SIGNED** this 28th day of January, 2025.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE